Jonathan Stoler
Eric Raphan
Adam Pekor
SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
30 Rockefeller Plaza
New York, New York 10112
Telephone:  (212) 653-8700
Facsimile: (212) 653-8701
*Attorneys for Plaintiffs Precision Medicine Group, LLC and PRECISIONadvisors Group, Inc.*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRECISION MEDICINE GROUP, LLC and PRECISIONADVISORS GROUP, INC.,<br><br>                              Plaintiffs,<br><br>          v.<br><br>BLUE MATTER, LLC, NAINA AHMAD, JOSE JAUREGUI, and MRIDUL MALHOTRA,<br><br>                              Defendants. | Case No.<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Precision Medicine Group, LLC ("Precision Medicine Group") and PRECISIONadvisors Group, Inc. ("PRECISIONadvisors" and referred to herein collectively with Precision Medicine Group as "Precision" or the "Company"), by and through their attorneys, Sheppard, Mullin, Richter & Hampton, LLP, for their Complaint, allege against Defendants Blue Matter, LLC ("Blue Matter"), Naina Ahmad ("Ahmad"), Jose Jauregui ("Jauregui"), and Mridul Malhotra ("Malhotra") (collectively, "Defendants") as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action relates to a surreptitious and systematic attack on Precision, a leading pharmaceutical and life sciences services and consulting firm, perpetrated by Blue Matter, one of the Company's direct competitors, with the aim of unlawfully targeting

Precision's employees and its trade secrets, and, ultimately, undermining the Company's entire global pricing and market access ("GPMA") business operations.

2.      Blue Matter has carried out this illicit scheme in coordination with Ahmad, Jauregui, and Malhotra – each of whom are former senior employees and GPMA specialists at Precision – who all resigned and commenced employment with Blue Matter in blatant violation of their agreements not to, among other things, compete with Precision for a limited time following the separation of their employment from the Company.  As set forth in detail below, Ahmad and Jauregui in particular heavily negotiated the terms of their post-employment obligations to Precision prior to commencing employment at the Company and only agreed to such obligations in exchange for millions of dollars in consideration.

3.      Upon information and belief, in the weeks and months leading up to their resignations, Ahmad, Jauregui, and Malhotra misappropriated Precision's trade secrets and confidential information, which they have since unlawfully disclosed to and used on behalf of Blue Matter, and will continue to disclose by virtue of the proprietary business information, and skills and expertise they uniquely possessed while performing their specialized roles at Precision.

4.      Upon information and belief, Blue Matter knowingly solicited and hired Ahmad, Jauregui, and Malhotra in violation of their respective agreements in an effort to misappropriate Precision's trade secrets and destroy Precision's GPMA business.

5.      Now, as a result of the Defendants' scheme, Precision estimates that it has suffered at least $45 million in damages to date and continues to suffer additional losses which are unquantifiable at this time.

6.      Accordingly, Precision asserts causes of action under the Defend Trade Secrets Act, 18 U.S.C. § 1836, and for breach of contract, breach of fiduciary duty and duty of loyalty, aiding and abetting breach of fiduciary duty and duty of loyalty, tortious interference with contract and prospective economic advantage, misappropriation of trade secrets and confidential information, violations of the Pennsylvania Uniform Trade Secrets Act, 12 Pa.C.S. § 5301, et seq., and the New Jersey Trade Secrets Act, N.J.S.A. 56:15-2, et seq., unfair competition, unjust enrichment, and to enjoin Defendants' unlawful actions and to recover the substantial damages they have caused.

## THE PARTIES

7.      Precision Medicine Group, LLC is a Delaware limited liability company with its principal place of business located at 2 Bethesda Metro Center, Suite 850, Bethesda, Maryland 20814.  Precision is a pharmaceutical and life sciences services and consulting firm and, together with its subsidiaries, maintains offices at 60 E. 42nd St., Suite 1325, New York, New York 10165; 530 Seventh Avenue, Suite 2505, New York, New York 10123; and 1270 Avenue of the Americas, Suite 1900, New York, NY 10020.

8.      PRECISIONadvisors Group, Inc., a wholly-owned subsidiary of Precision Medicine Group, LLC, is a Delaware corporation with its principle place of business located at 2 Bethesda Metro Center, Suite 850, Bethesda, Maryland 20814.  PRECISIONadvisors maintains offices at 530 Seventh Avenue, Suite 1601, New York, New York 10018, which was previously located 450 Seventh Avenue, Suite 2505, New York, New York 10123 (the "Seventh Avenue Office").

9.      Blue Matter is a California limited liability company with its principal place of business located at 400 Oyster Point Boulevard, Suite 309, San Francisco, California 94080.  Like

Precision, Blue Matter is a pharmaceutical and life sciences consulting firm and maintains an office at 575 Lexington Avenue, Suite 24A, New York, New York 10022.

10.     During the relevant time periods described in this Complaint, Ahmad was a resident of the State of New Jersey.  Ahmad was employed by Precision in its Seventh Avenue Office in New York from on or about December 20, 2017 to July 12, 2019, the effective date of her voluntarily resignation from her employment.  At the time of her resignation, Ahmad held the position of Senior Vice President, Managing Director.  In early March 2020, Precision learned that Ahmad had begun working at Blue Matter in direct violation of her post-employment obligations to Precision, including but not limited to, her agreement not to compete against Precision for a period of 24 months following the separation of her employment from the Company.

11.     During the relevant time periods described in this Complaint, Jauregui was a resident of the State of Pennsylvania.  Jauregui was employed by Precision from on or about December 20, 2017 to August 30, 2019, when he voluntarily resigned from his employment. During Jauregui's employment with Precision, he routinely worked two days per week in the Company's Seventh Avenue Office in New York and three days per week in its office located at 200 North High Street, West Chester, Pennsylvania 19380.  At the time of his resignation, Jauregui held the position of Senior Vice President.  In early March 2020, Precision learned that Jauregui had begun working at Blue Matter in direct violation of his post-employment obligations to Precision, including but not limited to, his agreement not to compete against Precision for a period of 24 months following the separation of his employment from the Company.

12.     During the relevant time periods described in this Complaint, Malhotra was a resident of the State of New Jersey.  Malhotra was employed by Precision in its office at 60 E. 42nd St., Suite 1325, New York, New York 10165 from on or about April 24, 2015, to December 31, 2019, when he voluntarily resigned from his employment.  At the time of his resignation, Malhotra held the position of Senior Vice President, Managing Director.  In early March 2020, Precision learned that Malhotra had begun working at Blue Matter in direct violation of his post-employment obligations to Precision, including but not limited to, his agreement not to compete against Precision for a period of one year following the separation of his employment from the Company.

## JURISDICTION AND VENUE

13.     This action arises under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

14.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331.

15.     This Court maintains supplemental jurisdiction over Precision's common law claims pursuant to 28 U.S.C. § 1367.

## FACTS

A.     **PRECISION'S BUSINESS**

16.     Precision Medicine Group was formed in 2011 and commenced business operations in late 2012.  Precision Medicine Group provides clinical research and consulting services to pharmaceutical and life sciences companies in the general areas of product development and commercialization via its two business platforms – "Medicine" and "Value and Health."

17.     The Company's Medicine business platform provides clinical research and development services to life sciences companies.  The Medicine business platform includes

clinical research organizations devoted to oncology and rare diseases and clinical, biomarker and regulatory solutions including biorepository facilities, clinical laboratories, and translational and regulatory consulting, together with bio-informatics for translational research and clinical development.

18.    The Company's Value and Health business platform provides advisory services in connection with the commercialization process for pharmaceutical and biopharmaceutical products.  Pharmaceutical commercialization involves ensuring the financial success of a new product launch through, among other things, the development and analysis of strategies related to market access and marketing, communication, patient population identification, pricing, cost models, and investor relations.

19.    Every aspect of  the Company's Value and Health business platform includes and relies upon the GPMA consulting services that Precision has spent substantial time, effort and resources to develop.  Stated simply, such GPMA consulting services are provided by Precision to its pharmaceutical company clients in order to help them formulate and implement a set of strategies, activities and processes that will maximize that client's ability to access and introduce its products into specific markets.  These strategies, activities and processes include, but are not limited to, helping pharmaceutical companies demonstrate the value of new treatments to payers (e.g., governments, insurance companies, physicians), determine product pricing, negotiate reimbursement levels, navigate distribution challenges, develop contracting strategies, optimize market penetration, and analyze pricing, prescribing, utilization, and reimbursement data, among other things.

20.    Precision's GPMA consulting services, and its market access services specifically, permeate every aspect of the Company's Value and Health business platform including, but not

limited to: (i) advisory services and expertise focused on global pricing and market access; (ii) marketing and value demonstration; (iii) resource development; (iv) brand strategies development, messaging, and engagement tactics; (v) health economics and outcomes research; (vi) data management, predictive analytics, and client engagement solutions; and (vii) medical communications, investor relations and other strategic communications services.

21.     The concepts and principles of market access permeate all aspects of the product commercialization process.  Indeed, within the pharmaceutical industry, drug manufacturers, investors, consultants, and other stakeholders have universally recognized the critical importance of market access expertise in driving a product's commercial success. For these central reasons, many of Precision's competitors, like Blue Matter, have rushed to develop their own pricing and market access businesses and expertise particularly since such consulting services are now vitally integrated with the commercialization process.

**B.     PRECISION'S ACQUISITION OF INSIGHT STRATEGY ADVISORS**

22.     Ahmad and Jauregui joined Precision in December 2017 through the Company's acquisition of a pharmaceutical consulting firm called Insight Strategy Advisors ("ISA").

23.     ISA was founded in 2002 by Harry Schiavi ("Schiavi") and Stephen Reid ("Reid") and specialized in market access consulting services.

24.     ISA grew substantially from approximately 2007 until 2012, when two of the firm's senior employees, who had not agreed to any post-employment restrictive covenants while at ISA, resigned to start competitive ventures.  Following their departure, ISA recruited Ahmad and Jauregui with the aim of training them in the intricacies of market access consulting and to assume senior leadership roles with ISA.

25.     Prior to joining ISA, Ahmad and Jauregui had each worked at pharmaceutical consulting firms but neither had previously held a senior leadership position.

26.     Jauregui joined ISA in September 2012, followed by Ahmad in October 2012. From the time of Ahmad and Jauregui's hire, ISA, and Schiavi in particular, invested substantial time, effort, and resources in developing their market access consulting skills and preparing them to assume senior leadership positions with ISA.

27.     Specifically, prior to joining ISA, Ahmad was primarily skilled in project management rather than originating business in the market access space, and had virtually no experience in developing new business in market access consulting.  Upon her hire, ISA devoted substantial time, effort and resources to training Ahmad to become an expert in market access consulting services, which allowed her to become an industry-leading expert and highly skilled salesperson.

28.     Similarly, prior to joining ISA, Jauregui had business development experience, but no in-depth knowledge of the intricacies of market access consulting or how to manage market access consulting projects.  Through ISA's training, Jauregui also became an elite market access consultant, salesperson and senior industry executive.

29.     Under the guidance of Schiavi, Ahmad and Jauregui excelled in their roles and became his top lieutenants.  By the time Precision acquired ISA in 2017, Ahmad had risen to become ISA's only Associate Partner and Jauregui one of its three Vice Presidents. Together with Schiavi, Ahmad and Jauregui were responsible for ISA's leadership and day-to-day operations.  By the time of ISA's acquisition by Precision, all of ISA's employees reported up to Ahmad and/or Jauregui except for Schiavi and Reid (ISA's founders), and ISA's data and analytics team.

30.     Under the leadership of Schiavi, Ahmad, and Jauregui, ISA's business grew substantially.  In 2017, Schiavi obtained a business valuation of ISA, which estimated its value to be in excess of $30,000,000.  Based on that valuation, Schiavi decided to sell ISA and obtained interest from approximately 65 potential purchasers, including Precision.

31.     Precision's interest in acquiring ISA was primarily based on its desire to expand its own burgeoning GPMA consulting business.  Given the recognized and critical importance of GPMA consulting services in the pharmaceutical commercialization process, Precision planned to invest substantially to strengthen and grow this aspect of its business.

32.     Among ISA's chief assets that Precision sought to acquire were its senior management team of Schiavi, Ahmad, and Jauregui, who had built ISA into a powerhouse market access consulting firm through their leadership and expertise.

33.     In December 2017, Precision agreed in principle to acquire ISA for an upfront payment of $24,000,000, plus up to $26,000,000 in deferred consideration contingent upon ISA's post-acquisition performance.

34.     Precision's primary motivation in paying these substantial sums for ISA was acquiring and securing the services and expertise of its leadership team, including Schiavi, Ahmad, and Jauregui.

35.     In fact, Ahmad and Jauregui were so vital to Precision's decision to purchase ISA that they were identified as two of only three "Key Employees" in the December 20, 2017 Equity Purchase Agreement ("EPA") setting forth the terms of Precision's purchase of ISA.

36.     Not only were Ahmad and Jauregui listed as "Key Employees" in the EPA, but the EPA also specified that Precision's purchase of ISA was contingent upon, among other

things, Ahmad and Jauregui agreeing to abide by certain reasonable post-employment restrictive covenants.  More specifically, Article 7, Section 7.5(a) of the EPA stated that, prior to the transaction's closing date, ISA was required to deliver to Precision "Key Employee Offer Letters" signed by Ahmad and Jauregui, which included post-employment restrictive covenants.

37.    Significantly, Ahmad and Jauregui had never been asked to agree to any such restrictive covenants while at ISA.  Accordingly, prior to Precision's acquisition of ISA, Ahmad and Jauregui were free to leave ISA at any time and commence working for any other entity including any direct competitors of ISA.

38.    Precision's purchase of ISA was complicated by the fact that Ahmad and Jauregui strongly opposed the transaction.  Among other things, Ahmad advised Schiavi that she had consulted with her friend and mentor, Ashwin Dandekar ("Dandekar"), the founder and Managing Partner of Blue Matter, and that she, as a member of ISA's senior leadership team, opposed Precision's acquisition of ISA and the imposition of any post-employment restrictive covenant obligations.  Jauregui, who had worked with Dandekar for approximately seven years at the pharmaceutical consulting firm Campbell Alliance before joining ISA, advised Schiavi that he, too, opposed the sale of ISA to Precision and the imposition of any post-employment restrictive covenant obligations.

39.    As a result, Ahmad and Jauregui – who clearly knew how vital their services and their agreement to abide by certain post-employment restrictive covenants were to Precision's purchase of ISA – engaged in protracted negotiations with ISA and Precision. These negotiations focused primarily on what portion of the ISA sale proceeds Ahmad and Jauregui would each receive and the terms of their post-employment restrictive covenants.

40.     Ahmad and Jauregui were represented by counsel during these negotiations. Finally, after several rounds of discussions and revisions to the terms of the restrictive covenants contained in Ahmad's and Jauregui's Key Employee Offer Letters, Ahmad and Jauregui agreed to join Precision and executed the Key Employee Offer Letters.  In exchange, they each received a substantial portion of ISA's sale proceeds in the form of a "Transaction Bonus" and a "Post-Closing Bonus," as well as other consideration.

41.     More specifically, Precision and ISA agreed that over $4.5 million of ISA's $24,000,000 upfront purchase price would be redirected to Ahmad and Jauregui in the form of Transaction Bonuses.  On December 18, 2017, Ahmad and Jauregui received Transaction Bonuses in the amount of $2,535,815 and $2,029,986, respectively.

42.     As further consideration, Precision also agreed to pay Ahmad and Jauregui substantial Post-Closing Bonuses.   Such Post-Closing Bonuses were taken from the performance-based deferred compensation (of up to $26,000,000) that Precision agreed to pay to ISA.  On or about June 21, 2019, Ahmad and Jauregui received Post-Closing Bonuses in the amount of $547,600 and $501,925, respectively.

43.     Precision further agreed to pay Ahmad and Jauregui substantial annual base salaries in the amount of $350,000 and $300,000, respectively.

44.     In exchange for effectively compensating Ahmad and Jauregui as partial owners of ISA, Ahmad and Jauregui agreed in their Key Employee Offer Letters that they would not:

> **Non-Compete.** While employed by the Company and for a period of (x) twenty-four (24) months after the date upon which your employment by the Company or any other Precision affiliate terminates if terminated prior to December 31, 2020 … directly or indirectly, engage in, represent in any way, be connected with, furnish consulting services to, be employed by, or have any interest in, whether as owner, principal, manager, agent, consultant, officer,

stockholder, partner, investor, lender or employee or in any other capacity, whether or not for compensation, including self-employment, any Competing Business.

. . .

**Non-Solicitation of Employees, Customers and Other Business Relations.** While employed with the Company and for a period of (x) twenty-four (24) months after the date upon which your employment by the Company or any other Precision affiliate terminates if terminated prior to December 31, 2020 …

(i)      encourage any officer, director, executive or employee of the Company or any other Precision affiliate or subsidiary to leave his or her employment with the Company or any other Precision affiliate or subsidiary; hire, employ, or cause to be hired or employed (other than by the Company or any other Precision affiliate or subsidiary), or establish a business with, any person who was employed by the Company or any other Precision affiliate or subsidiary during the one (1)year period prior to the Termination Date; or assist any third party so to offer, employ, engage, solicit or entice any employee of the Company or any other Precision affiliate or subsidiary (whether or not such person would commit any breach of his or her contract with Company);

(ii)      induce or attempt to induce (including, without limitation, by soliciting, contacting or causing to be solicited business from) any customer, client, supplier, licensee or business relation of the Company with whom you or any of your direct reports interacted (i) to do business with any Competing Business, (ii) to cease doing business with the Company, (iii) to reduce the level of business he/she/it performs for the Company, or (iv) to divert marketing or other resources away from the Company; and

(iii)      in any way interfere with the relationship between Precision and any of its customers, clients, suppliers, licensors, or other business relations.

. . .

**Non-Disclosure.** You hereby acknowledge that all Confidential Information is and shall be the exclusive property of Precision. You will not, either during or after employment with the Company and until such Confidential Information has become generally known to the public without your fault, disclose, furnish or make accessible to any person, corporation or other entity, or use for your benefit or the benefit of any person, corporation or other entity other than Precision, any Confidential Information.

45.      "Competing Business" is defined in section 9 of Ahmad and Jauregui's Key

Employee Offer Letters to include:

any person, entity, or company, including any division, department or affiliate thereof, which offers products or services that are similar to or competitive with the Company's Business … and/or services that compete with any other business planned or conducted by Precision for which you provided management leadership or performed other material duties and responsibilities for Precision or were otherwise involved in material decisions relating to the development, operations, management or strategies of such other business of Precision at any time during the two (2) year period prior to the Termination Date.

46.     Ahmad and Jauregui both acknowledged and agreed in their Key Employee Offer Letters that their Non-Compete, Non-Solicitation and Non-Disclosure obligations were inextricably intertwined with Precision's agreement to hire them and to pay them their Transaction Bonuses and Post-Closing Bonuses.  More specifically, their Key Employee Offer Letters provided in pertinent part:

**Restrictive Covenants.** You acknowledge and agree that (i) you will have a major responsibility for the operation, development and growth of the Business; (ii) your work for the Company will bring you into close contact with Confidential Information; (iii) the covenants contained in this Section 8 are essential to protect the Business; (iv) the terms of this Agreement have significant value to you as of the date hereof, including, without limitation, the Transaction Bonus and Post-Closing Bonus as set forth in Section 5 above, as well as the award of stock option rights to purchase shares of Precision's Class A common stock as set forth in Section 6 above; and (v) the Company has a legitimate business interest in protecting its Confidential Information as well as its substantial and ongoing customer and industry relationships. Accordingly, should you accept the terms of this Agreement and continue employment with the Company, you shall be bound by the following restrictive covenants . . .

## C.    AHMAD, JAUREGUI, AND MALHOTRA'S EMPLOYMENT WITH PRECISION

47.     On or about December 20, 2017, Precision closed on its acquisition of ISA and Ahmad and Jauregui commenced employment at the Company.

48.     Throughout the duration of their employment at Precision, Ahmad and Jauregui continued to perform the same market access-related job duties and responsibilities that they had performed while at ISA, including the development and management of

Precision's GPMA consulting services business.  Those responsibilities included developing and conducting trainings and workshops on market access and related issues for Precision clients and prospective clients.

49.    For approximately the first nine months following its acquisition of ISA, Precision continued to operate ISA as a distinct business entity, maintaining ISA's outward branding and internal organizational structure.  Precision maintained this structure in order to allow ISA to effectively measure its post-acquisition performance and allow Ahmad, Jauregui, and others to achieve their Post-Closing Bonus targets.

50.    Beginning in or around September 2018, Precision began the planned process of integrating ISA with Precision's existing GPMA consulting business into an entity then known as Precision Xtract and now known as PRECISIONadvisors.

51.    Precision Xtract, and specifically its GPMA consulting component, was wholly integrated into the Company's Value and Health business platform and naturally resulted in substantial crossover with its other commercialization consulting units.  This integration also resulted in Ahmad and Jauregui performing material duties and responsibilities involved in material decisions relating to the development, operations, management and strategies of such other commercialization consulting units.

52.    In connection with this platform integration, Precision assigned Defendant Malhotra, a GPMA specialist who had been employed in another business unit of the Company since 2015, to work with Ahmad, Jauregui, and the other legacy ISA employees.

53.    On April 28, 2015, Malhotra entered into a Confidentiality and Non-Solicitation Agreement and Covenant Not to Compete with Precision (the "Malhotra Agreement"), which provided in pertinent part:

**No Disclosure of Confidential Information.**   During employment with the Company and for a two year period after termination thereof, employee shall protect and guard, and shall not to use for his/her own benefit or the benefit of anyone other than Company, or disclose, publish, communicate, reveal or divulge, directly or indirectly, any Confidential Information of Company to any person or entity at any time or in any manner without the prior written consent of the individual then holding the office of President of Precision, except as required in the course of employment with Precision. Employee shall not, while employed by Precision and for a period of one year after the termination thereof, for any reason whatsoever, without the written consent of the individual then holding the office of President of Precision, directly or indirectly, engage in, represent in any way, be connected with, furnish consulting services to, be employed by, or have any interest, whether as owner, employee, principal, partner, servant, agent, employee, representative, independent contractor, member, distributor, consultant, officer, director, stockholder, or otherwise, whether or not for compensation, in any business which through the faithful performance of his/her duties thereof could reasonably be anticipated  to  lead to  the use or disclosure of Company's Confidential Information.

. . .

**No Solicitation of Customers or Potential Customers.** Employee shall not, while employed by Precision and for a period of one year after the termination thereof, for any reason whatsoever, without the written consent of the individual then holding the office of President of Precision, other than for the account of Company, directly or indirectly, solicit, attempt to solicit, or cause to be solicited any party who was a customer of Company at the time of Employee's employment with or termination of employment, for any reason whatsoever, by Precision, or who was actively solicited by Company, its agents, representatives, or employees within 12 months prior to Employee's termination of employment, for any reason whatsoever, by Precision.

**No Solicitation of Contractors/Suppliers or Potential Contractors/Suppliers.** Employee shall not, while employed by Precision and for a period of one year after the termination thereof, for any reason whatsoever, without the written consent of the individual then holding the office of President of Precision, other than for the account of Company, directly or indirectly, solicit, attempt to solicit, or cause to be solicited any party who was a contractor/supplier of Company at the time of Employee's employment with or termination of employment, for any reason whatsoever, by Precision, or who was actively solicited by Company, its agents, representatives, or employees within 12 months prior to Employee's termination of employment, for any reason whatsoever, by Precision.

**No Hiring of Employees.**   Employee shall not, while employed by Precision and for a period of one year after the termination thereof, for any reason whatsoever, without the written consent of the individual then holding the of Precision, other

than for the account of Company, directly or indirectly: (a) hire or employ any employee or other person associated with Company on behalf of any individual, including himself, corporation or other entity; or (b) induce or attempt to induce any employee or other person associated with Company to leave the employ of or cease doing business with Company.

**No Inducement to Cease Doing Business with Company.** Employee shall not, while employed by Precision and for a period of one year after the termination thereof, for any reason whatsoever, without the written consent of the individual then holding the office of President of Precision, directly or indirectly, induce or attempt to induce any customer, supplier, manufacturer, association, organization, vendor or any other person or entity to cease doing business with Company.

**Non-Compete.** Employee shall not, while employed by Precision and for a period of one (1) year after the termination thereof, for any reason whatsoever, without the written consent of the individual then holding the office of President of Precision, directly or indirectly, engage in, represent in any way, be connected with, furnish consulting services to, be employed by, or have any interest, whether as owner, employee, principal, partner, servant, agent, representative, independent contractor, member, distributor, consultant, officer, director, stockholder, or otherwise, whether or not for compensation, including self-employment, in any business or entity that engages in business activities included within, arising out of or related to the Business Activities; provided, however, that the foregoing shall not prohibit Employee from owning up to five percent (5%) of any class of equity securities of a company whose securities are publicly traded on a national securities exchange or in a national market system . . .

54.    "Business Activities" is defined in the Malhotra Agreement to include:

strategy, strategy execution, regulatory, health economics, health outcomes, epidemiology or market access services to pharmaceutical, biopharmaceutical, biotechnology, medical device, diagnostic or life science companies and consulting on pricing and contracting strategies and/or (b) services that compete with any other business planned or conducted by Company for which Employee may have provided management leadership or performed other material duties and responsibilities for Company or was otherwise involved in material decisions relating to the development, operations, management or strategies of such other business of Company at any time during the two (2) year period prior to the Termination Date.

## D.    BLUE MATTER IS A DIRECT COMPETITOR OF PRECISION

55.    Blue Matter was founded in 2012 and, like Precision, specializes in

pharmaceutical and life sciences product development and commercialization consulting.

Blue Matter undoubtedly provides pricing and market access consulting services to its

clients.  Indeed, on the "Services" page of its website, Blue Matter describes its services as "Shap[ing] Innovative Products," *i.e.*, product development, and "Driv[ing] Successful Launches" and "Maximiz[ing] Product Value," *i.e.*, commercialization, including pricing and market access.

56.    With respect to its commercialization services generally, Blue Matter advertises that it "assists clients with [] product positioning, market conditioning, product promotion and promotional mix strategy, customer engagement strategy, as well as launch tactical planning and launch readiness reviews."

57.    Within the ambit of commercialization, Blue Matter specifically emphasizes its pricing and market access services and expertise.  Under "Maximizing Product Value," Blue Matter explains:

> Once a product is launched, the brand team is responsible for maximizing its value to the company. That means quickly getting the product to peak commercial performance, and then keeping it there for as long as possible.
>
> Blue Matter provides a comprehensive range of services to help maximize the value of in-line products.  We focus in three key areas.
>
> \*      \*      \*
>
> Market Access
>
> Access and reimbursement continue to become more challenging and complex, and remain critical to any product's success. Blue Matter helps clients optimize their access and reimbursement strategies in the light of numerous trends affecting the market:
>
> - Increasing levels of payer control, with a greater focus on value-based pricing
>
> - Increasing use of health economics and outcomes research (HEOR) and real-world evidence (RWE)
>
> - The rise of combination therapies and companion diagnostics, particularly in oncology

- The ongoing evolution of treatment pathways, their importance, and their impact on treatment decisions

- The increasing diversity of customer types and the changing dynamics of care delivery, including the rise of integrated delivery networks

- The rise of biosimilars

  Blue Matter helps clients understand their current market and competitive situations, gather and interpret input from payers and other stakeholders, and develop strategies that will drive success.

58.     Blue Matter also highlights on its website a real-world example of its pricing and market access services, in which it:

> worked with a leading biotech company to improve the performance of a marketed cardiovascular drug through local market segmentation and customized tactical execution to drive growth in discrete local markets.
>
> Once a product brand is launched and commercially available, brand teams' primary goal is to reach peak performance, and to get there fast. There are a number of factors that impact the growth trajectory and performance of a brand, including: order of market entry, level of unmet need addressed, meaningful differentiation from competitors, and the overall reaction and perception about the product among target customers and stakeholders. While some of these factors may be impossible or difficult to change post-launch, there are a number of ways in which commercial teams can contribute to improving brand performance. Blue Matter assists brand teams in this in-line, growth period with a focus on three specific categories that have the most significant impact on brand performance:

- Positioning/Re-positioning and Message Customization

- Market Access Optimization

- Customer Engagement (at the local market level)

> In this example, Blue Matter worked with the client team to conduct an in-depth assessment of a pilot local market segment, using data to assess the impact of variable access situation and provider preference on the product share. Based on this assessment, the client was able to analyze the situation at the national level and divide the market into discrete local market segments for which custom marketing, access/reimbursement and sales strategies and tactical programs were developed.

59.     Likewise, Blue Matter emphasizes its pricing and market access expertise in various posts on the "Insights" page of its website.  For example, in a September 20, 2018 post, Blue Matter identifies "Changing Dynamics in Pricing and Market Access" as one of the "Key Commercial Challenges in Oncology."

60.     Similarly, in a February 24, 2020 post entitled, "Show Me the Value: Understanding the Payer Landscape and Engaging with Payers in Europe," Blue Matter demonstrates its pricing and market access expertise by explaining that "market access in Europe is very heterogeneous.  Payers, processes, timelines, pricing, and more vary considerably from country to country.  The dynamic is very different from the US."

61.     Blue Matter's corporate subsidiary, Salience Learning, also focuses on pricing and market access issues and specifically recognizes how those issues permeate the entire commercialization space.  On its website, Salience Learning markets itself to market access professionals, stating: "I'm in commercial, market access, or medical – how we can help."

62.     Salience Learning emphasizes its focus on the core purpose of pricing and market access consulting – demonstrating the value of new treatments to payers – explaining, "Commercializing biopharmaceuticals has never been more complex. Companies must demonstrate the value of their therapies to an increasingly demanding and diverse set of customer stakeholders.  That requires seamless cross-functional teams that can expertly use health economics and outcomes research (HEOR), real world evidence, and other complex tools. It can be overwhelming. We have yet to meet a company that is dealing with all of this effectively. So, we decided to do something about it."

63.     Salience Learning also provides "live or virtual instructor-led learning experiences for national sales meetings and [plan of action meetings], market access [plan

of action meetings], brand-specific clinical and economic workshops, and more."  Likewise, while at Precision, Ahmad and Jauregui developed and led similar trainings and workshops for Precision clients and prospective clients.

64.     Further demonstrating Salience Learning's pricing and market access focus, two out of three members of its senior leadership team are experienced market access professionals.  Salience Learning's Head of Client Services, Krista Gerhard, was previously Associate Director of Market Access Strategy and Innovation at Novo Nordisk.  Its Head of Learning Strategy and Solutions, Karen Foster, was previously Manager, Market Access Sales Training at Novo Nordisk.

### E.   BLUE MATTER'S TORTIOUS INTERFERENCE WITH AHMAD, JAUREGUI, AND MALHOTRA'S AGREEMENTS WITH PRECISION

65.     Upon information and belief, following ISA's integration with Precision's Value and Health business platform, Ahmad and Jauregui entered into discussions with Dandekar and other Blue Matter executives and employees about Ahmad and Jauregui leaving Precision to join Blue Matter. Blue Matter employees and executives, including Dandekar, were aware of Ahmad, Jauregui and Malhotra's post-employment obligations to Precision and nevertheless began to conspire with them to breach such obligations.

66.     As set forth above, on or about June 21, 2019, Precision paid Ahmad and Jauregui their Post-Closing Bonuses in the amount of $547,600 and $501,925, respectively.

67.     Within hours of receiving her payment, Ahmad resigned from her employment with Precision, effective July 12, 2019.

68.     Upon information and belief, and while still employed at Precision, Ahmad breached her obligations to Precision by encouraging Kelly Scull ("Scull") to resign from her employment at Precision and join Blue Matter.  In fact, less than twenty hours after

Ahmad notified Precision of Scull's decision to resign from her employment at the Company, Ahmad herself resigned, demonstrating that both of their employment resignations were intentionally coordinated and part of Blue Matter's larger conspiracy to pilfer from the most senior ranks of Precision's GPMA business.

69.     Upon information and belief, Blue Matter enlisted the assistance of Scull and other current Blue Matter employees and executives to encourage Ahmad, Jauregui, and Malhotra to leave Precision and join Blue Matter in breach of their post-employment obligations.

70.     On August 30, 2018, which was less than two months after Jauregui received his Post-Closing Bonus, Jauregui also abruptly resigned from his employment at Precision.

71.     In the weeks leading up to his resignation, Jauregui deleted over 21,000 files, totaling over 90GB, from his Company-issued laptop.  Such files included, but were not limited to, documents containing proprietary information relating to: (i) fair market value methodologies; (ii) predictive model methodologies; (iii) value proposition proposals; (iv) pricing research, methods, and case studies; (v) launch pricing capabilities, and (v) other market access strategies and modeling prepared for specific Precision clients.  Upon and information and belief, prior to deleting those files, Jauregui copied without authorization large numbers of them containing confidential and proprietary information and trade secrets onto an external drive.

72.     In addition, Jauregui sent Precision files containing confidential and proprietary information and trade secrets to his personal email address.  Such documents and information included, but were not limited to, confidential GPMA projects relating to safe

harbor and other market access strategies specifically crafted and designed for Precision clients.

73.     Upon information and belief, Jauregui misappropriated Precision's trade secrets and confidential and proprietary information for the purpose of unlawfully retaining that information following his resignation, providing it to Blue Matter, and using it on Blue Matter's behalf.

74.     Following Ahmad and Jauregui's resignations, on August 28, 2019, Precision promptly notified them in writing of their post-employment non-compete, non-solicit and non-disclosure obligations to Precision, to which they agreed to comply in exchange for the multi-million dollar Transaction Bonus and Post-Closing Bonus payments they received.

75.     Effective December 31, 2019, Malhotra resigned his employment with Precision.  Notwithstanding Precision policy providing that employees are only eligible to receive a bonus if they are actively employed with the Company on the bonus payment date, Precision agreed to and did pay Malhotra an annual bonus of $169,950 following his resignation, on or about February 14, 2020.

76.     Following Malhotra's resignation, Precision conducted a forensic analysis of his Company-issued computer which revealed that he had not used his Company-issued computer for approximately the final six months of his employment.  Upon information and belief, during this time, Malhotra used his personal computer to perform his duties at Precision, which allowed him to access and retain large numbers of Precision files containing confidential and proprietary information and trade secrets.  Upon information and belief, Malhotra misappropriated Precision's trade secrets and confidential and proprietary information and forwarded such information to Blue Matter for the purpose of, among other

things, unlawfully retaining that information following his resignation, providing it to Blue Matter, and using it on Blue Matter's behalf.

77.     In early March 2020, Precision learned that Ahmad, Jauregui, and Malhotra had all commenced employment with Blue Matter.

78.     Upon information and belief, Blue Matter solicited and hired Ahmad, Jauregui, and Malhotra in violation of their agreements with Precision in order to misappropriate Precision's trade secrets, bolster Blue Matter's pricing and market access consulting business, and destroy Precision's GPMA consulting business.

79.     Upon information and belief, Ahmad, Jauregui, and Malhotra are all performing duties at Blue Matter which are the same or similar to the duties they performed at Precision, in direct violation of their non-compete, non-solicit and non-disclosure obligations to Precision.

80.     Among other things, Precision learned that Jauregui had attended client meetings on behalf of Blue Matter, including at least one meeting with the pharmaceutical company AstraZeneca, an existing Precision client, which Jauregui attended together with Scull.

81.     Recognizing that it is a competitor of Precision and that its employment of Ahmad, Jauregui, and Malhotra undeniably violates their non-compete agreements, Blue Matter has informed Precision, through counsel, that it has placed Ahmad, Jauregui, and Malhotra on "garden leave" for the remainder of their non-compete periods.  However, upon information and belief, Blue Matter employed Ahmad, Jauregui, and Malhotra for up to several months before placing them on garden leave, during which time Ahmad, Jauregui, and Malhotra breached their agreements with Precision and disclosed and used on Blue

Matter's behalf Precision trade secrets and other confidential and proprietary information, causing untold damages to Precision. Moreover, notwithstanding its placement of Ahmad, Jauregui, and Malhotra on garden leave, Blue Matter has not terminated their employment and continues to employ them in violation of their non-compete agreements.

**F.   PRECISION HAS SUFFERED SUBSTANTIAL DAMAGES AS A RESULT OF THE DEFENDANTS' SCHEME TO UNLAWFULLY COMPETE AGAINST THE COMPANY AND MISAPPROPRIATE ITS TRADE SECRETS**

82.   One day after Precision purchased ISA in 2017, Precision obtained a combined investment of $270 million from two outside investors. Precision was able to obtain that investment because of the recognized value of pricing and market access expertise in all aspects of drug commercialization and Precision's ability to purchase ISA and secure the services and post-employment obligations of ISA's key employees including Ahmad and Jauregui.

83.   Precision has suffered substantial and crippling damages as a result of the Defendants' unlawful conduct. While the precise amount of Precision's damages is impossible to quantify at this time, the Company estimates that its damages as a result of Defendants' unlawful conduct are at least $45,000,000 to date.

84.   Defendants' unlawful conduct continues to damage Precision to date.

85.   In sum, Blue Matter, having been made aware of Ahmad's, Jauregui's and Malhotra's post-employment obligations to Precision, nevertheless conspired and implemented a brazen plan with them while they were still employed by Precision, and thereafter, to breach such obligations and violate various federal and state laws all in an effort to unlawfully destroy Precision's GPMA business. Ahmad, Jauregui and Malhotra collectively received millions of dollars from Precision in exchange for their agreement to abide by their reasonable post-employment obligations. Nevertheless, all three of them

waited until they received every dollar to which they were entitled and then immediately resigned from Precision to work for Blue Matter.  As employees of Blue Matter, Ahmad, Jauregui and Malhotra – who have a combined 60 years of pricing and market access expertise and experience – are directly competing against Precision by performing the same or similar job functions for Blue Matter including, but not limited to, providing pricing and market access consulting services to Blue Matter's clients and training such clients in the areas of pricing and market access.  In unlawfully performing such job duties, all three of these employees are relying upon and using Precision trade secrets and confidential and proprietary information that they misappropriated from Precision in an effort to gain an unfair advantage in the drug commercialization marketplace.

## COUNT I

### VIOLATION OF THE DEFEND TRADE SECRETS ACT
### 18 U.S.C. §1836
### (Against Blue Matter, Ahmad, Jauregui, and Malhotra)

86.    Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 85 above as if fully set forth herein.

87.    The Defend Trade Secrets Act of 2016 ("DTSA") forbids threatened and actual misappropriation of trade secrets "if the trade secret is related to a product or service used in, or intended for use in, interstate or foreign commerce."  18 U.S.C. § 1836(b)(1) (as amended).

88.    Under the DTSA, "trade secret" means "all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing

if, (A) the owner thereof has taken reasonable measures to keep such information secret, and (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information."  18 U.S.C. § 1839(3) (as amended).

89.    Under the DTSA, "misappropriation" means "(A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or (B) disclosure or use of a trade secret of another without express or implied consent by a person who: (i) used improper means to acquire knowledge of the trade secret; or (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was: (I) derived from or through a person who had used improper means to acquire the trade secret; (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; or (III) derived from or through a person who owed a duty to the person seeking relief to maintain the secrecy of the trade secret or limit the use of the trade secret; or (iii) before a material change of the position of the person, knew or had reason to know that (I) the trade secret was a trade secret and (II) knowledge of the trade secret had been acquired by accident or mistake."  18 U.S.C. § 1839(5) (as amended).

90.    Under the DTSA, "improper means" "(A) includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and (B) does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  18 U.S.C. § 1839(6) (as amended).

91.    Certain confidential and proprietary information of Precision constitutes trade secrets related to a product or service used in, or intended for use in, interstate commerce,

including, but not limited to, its: (i) business plans and models; (ii) client contact information; (iii) marketing strategies and future plans with respect to clients; (iv) client contracts, which set forth the key terms of such relationships; (v) market research data; (vi) proprietary analytics, strategies, and methodologies relating to market access, pricing and contracting, distribution and HUB services, reimbursement, and due diligence; (vii) proprietary data management systems; and (viii) proprietary payer relationship data.

92.     Precision derives economic value from the fact that its trade secrets and confidential and proprietary information, including the categories of information described above, are not generally known to individuals or entities outside of Precision.

93.     Precision takes reasonable measures to protect the secrecy of such trade secrets and confidential and proprietary information. These measures include maintaining a dedicated IT security staff, ensuring compliance with a documented Precision Security Policy that is focused on protecting data from being accessed by unauthorized users, both inside and outside Precision, ensuring compliance with a documented Security Framework, utilizing unique user IDs and strong passwords, employing the principle of least privilege which limits access rights for users to the bare minimum permissions they need to perform their work, requiring all of its employees to sign confidentiality provisions, and requiring third parties to sign non-disclosure agreements before accessing any Precision trade secrets or other confidential or proprietary information.

94.     Ahmad, Jauregui, and Malhotra knew they had a duty to maintain the secrecy of Precision's trade secrets and confidential and proprietary information due, in part, to their acknowledgment of such duties in the Key Employee Offer Letters and Non-Compete Agreement they signed, respectively.

95.    Blue Matter is under a duty to not accept any misappropriated trade secrets and confidential and proprietary information, including Precision's trade secrets and confidential and proprietary information, and Blue Matter is also under a duty not to disclose or use misappropriated trade secrets and confidential and proprietary information for the purpose of gaining a competitive advantage in the marketplace.

96.    Upon information and belief, Blue Matter, Ahmad, Jauregui, and Malhotra have already and/or will improperly acquire, disclose, and use Precision's trade secrets and confidential and proprietary information without consent of any kind for their own financial gain.

97.    Upon information and belief, in the weeks leading up to the resignation of his employment with Precision, Jauregui misappropriated Precision's trade secrets and confidential and proprietary information by copying over 21,000 files comprising over 90 GB from his Company-issued laptop onto an external drive without authorization.

98.    Jauregui also sent Precision files containing trade secrets and confidential and proprietary information to his personal email address.

99.    Upon information and belief, for approximately the final six months of his employment, Malhotra used his personal computer to perform his duties at Precision, which included accessing and retaining large numbers of Precision files containing trade secrets and confidential and proprietary information.  Malhotra was not authorized to use his personal computer to perform his duties or to access Precision files and such conduct was in violation of Precision policies and business practices.  Further, Malhotra failed to notify anyone at Precision that he was using his personal computer to perform his duties and Precision only learned of Malhotra's misconduct and blatant disregard for Precision policies and business practices after he resigned from his employment.

100.     Ahmad, Jauregui, and Malhotra have and will continue to disclose and utilize Precision's trade secrets and confidential and proprietary information in the course of their employment with Blue Matter by using this information to unfairly compete with Precision by developing, among other things, Blue Matter's business strategy with respect to pricing and market access consulting services and other areas of commercialization consulting.

101.     Blue Matter, Ahmad, Jauregui, and Malhotra's actions constitute actual and/or threatened misappropriation in violation of the DTSA.

102.     Precision has suffered and will continue to suffer irreparable damages as a result of Blue Matter, Ahmad, Jauregui, and Malhotra's actual and/or threatened breach of the DTSA, including loss of clients and employees, harm to its goodwill and reputation, and an unfair reduction in its competitive advantage.

103.     Precision is entitled to actual damages from Blue Matter, Ahmad, Jauregui, and Malhotra, jointly and severally, and for attorneys' fees.

104.     Precision's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

105.     Blue Matter, Ahmad, Jauregui, and Malhotra's actions will continue to cause irreparable harm and damages to Precision and its trade secrets and confidential and proprietary information if not restrained.

## COUNT II

### BREACH OF CONTRACT
### (Against Ahmad, Juaregui, and Malhotra)

106.     Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 105 above as if fully set forth herein.

107.   Ahmad and Jauregui each executed a Key Employee Offer Letter, and Malhotra executed a Non-Compete Agreement, which contain valid, enforceable, and binding non-compete and non-disclosure provisions, which serve to protect Precision's legitimate business interests and which are reasonable in time and scope.

108.   The non-compete provisions in Ahmad's and Jauregui's Key Employee Offer Letters prohibit them from working with Precision's competitors for a period of 24 months following the end of their employment with Precision.

109.   The non-compete provisions in Malhotra's Non-Compete Agreement prohibit him from working with Precision's competitors for a period of one year following the end of his employment with Precision.

110.   As described above, Blue Matter is a competitor of Precision.

111.   The non-disclosure provisions of Ahmad and Jauregui's Key Employee Offer Letter prohibit them from using, furnishing, disclosing, or making available to anyone any of the Company's trade secrets or confidential and proprietary information.

112.   The non-disclosure provisions in Malhotra's Non-Compete Agreement prohibit him, for a period of two years following the end of his employment with Precision, from using, furnishing, disclosing, or making available to anyone any of the Company's trade secrets or confidential and proprietary information, and prohibit him, for a period of one year following the end of his employment with Precision, from becoming employed with any entity where, through the faithful performance of his duties, Malhotra could reasonably be anticipated to use or disclose the Company's trade secrets or confidential and proprietary information.

113.     Ahmad, Jauregui, and Malhotra, through their actions as set forth herein, have breached the non-compete and non-disclosure provisions of their agreements with Precision in several material respects, including, but not limited to: (i) accepting competitive employment with Blue Matter prior to the expiration of their non-compete periods; and (ii) using, disclosing, and making available Precision's trade secrets and confidential and proprietary information in connection with their employment with Blue Matter.

114.     As a direct and proximate result of Ahmad, Jauregui, and Malhotra's breach, Precision has suffered substantial monetary and intangible damages.

115.     Precision's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

## COUNT III

### BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY
### (Against Ahmad, Jauregui, and Malhotra)

116.     Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 115 above as if fully set forth herein.

117.     By virtue of Ahmad, Jauregui, and Malhotra's employment relationship with Precision, as senior leaders of Precision's global pricing and market access business, Precision reposed trust and confidence in them to provide services, and to refrain from acting in any manner contrary to Precision's interests.

118.     Ahmad, Jauregui, and Malhotra undertook such trust and confidence.

119.     By reason of the foregoing, Ahmad, Jauregui, and Malhotra owed Precision a fiduciary duty and duty of loyalty to act in good faith and in Precision's best interest.

120.    Such fiduciary duty and duty of loyalty owed by Ahmad, Jauregui, and Malhotra to Precision existed throughout their employment with Precision and survived the termination of that employment.

121.    Ahmad, Jauregui, and Malhotra breached their fiduciary duty and duty of loyalty to Precision by engaging in the wrongful activity as described herein, including but not limited to, the misappropriation of Precision's trade secrets and confidential and proprietary information for their benefit and the benefit of Blue Matter, a direct competitor of Precision.

122.    Ahmad further breached her fiduciary duty and duty of loyalty to Precision by assisting a Precision employee, Scull, in obtaining competitive employment with Blue Matter.

123.    Ahmad, Jauregui, and Malhotra's actions were and are willful and malicious and without legal justification or excuse.

124.    Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty has and will continue to directly and proximately cause substantial damage to Precision and its business, including damage to its reputation.

125.    Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty has and will continue to directly and proximately cause Precision to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Precision.  Precision will continue to suffer by the continued acts of Ahmad, Jauregui, and Malhotra.

## COUNT IV

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### AND DUTY OF LOYALTY
### (Against Blue Matter)

126.   Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 125 above as if fully set forth herein.

127.   Blue Matter aided and abetted Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty by contributing to and encouraging their tortious activity, including but not limited to Ahmad, Jauregui, and Malhotra's misappropriation of Precision's trade secrets and confidential and proprietary information, and inducing them to commence working for Blue Matter in violation of their agreements not to compete with the Company.

128.   Blue Matter aided and abetted Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty knowing that Ahmad, Jauregui, and Malhotra were senior leaders of Precision's global pricing and market access business and owed Precision those duties.

129.   Blue Matter's aiding and abetting Ahmad, Jauregui, and Malhotra's breach of fiduciary duty and duty of loyalty was intentional and without justification.  Blue Matter was aware of its role in Ahmad, Jauregui, and Malhotra's breach of their duties to Precision at the time it assisted their breach.

130.   Blue Matter's actions were a significant factor in causing Ahmad, Jauregui, and Malhotra's breach of their duties to Precision.

131.   Blue Matter's participation in Ahmad, Jauregui, and Malhotra's breach of fiduciary duty and duty of loyalty has and will continue to directly and proximately cause substantial damage to Precision and its business, including damage to its reputation.

132.     Blue Matter's participation in Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty has and will continue to directly and proximately cause Precision to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Precision and that Precision will continue to suffer by the continued acts of Blue Matter.

## COUNT V

### TORTIOUS INTERFERENCE WITH CONTRACT
### (Against Blue Matter)

133.     Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 132 above as if fully set forth herein.

134.     The covenants not to compete and non-disclosure agreements contained in the Key Employee Offer Letters executed by Ahmad and Jauregui and the Non-Compete Agreement executed by Malhotra constitute valid and enforceable contracts.

135.     Precision has a contractual and business expectancy that Ahmad, Jauregui, and Malhotra would abide by the restrictions in their Key Employee Offer Letters and Non-Compete Agreement, respectively.

136.     Upon information and belief, Blue Matter was aware of the restrictive covenants contained in the Key Employee Offer Letters executed by Ahmad and Jauregui and the Non-Compete Agreement executed by Malhotra, and the attendant contractual and business expectancies between Precision and Ahmad, Jauregui, and Malhotra.

137.     Upon information and belief, despite Blue Matter's awareness of Precision's contractual and business expectancies, Blue Matter intentionally and without justification sought to interfere with those expectancies and procure Ahmad, Jauregui, and Malhotra's breach of their contracts with Precision.

138.    Upon information and belief, Blue Matter encouraged and solicited Ahmad, Jauregui, and Malhotra to leave Precision and join Blue Matter in breach of their post-employment obligations.

139.    Upon information and belief, Blue Matter encouraged and solicited Ahmad, Jauregui, and Malhotra to take, disclose, and use on Blue Matter's behalf Precision's trade secrets and other confidential and proprietary information.

140.    Upon information and belief, Blue Matter interfered with Precision's contractual relationships with Ahmad, Jauregui, and Malhotra for the purpose of unlawfully targeting those employees, misappropriating Precision's trade secrets, and, ultimately, undermining the Company's entire GPMA consulting services business.

141.    Blue Matter's actions were a significant factor in causing Ahmad, Jauregui, and Malhotra's breach of their agreements with Precision.

142.    As a result of Blue Matter's intentional tortious acts, Precision's contractual and business expectancies have been damaged.

143.    Precision's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

144.    Blue Matter's actions will continue to cause harm to Precision Health if not restrained.

## COUNT VI

**TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(Against Blue Matter, Ahmad, Jauregui and Malhotra)**

145.    Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 144 above as if fully set forth herein.

146.    Until the events giving rise to this action, Precision had maintained valid business relationships, or the expectancy of business relationships, with its customers, including AstraZeneca and others.  Precision had the reasonable expectation that these relationships and prospective relationships would continue and would not be unjustifiably disrupted.

147.    Defendants were and remain aware of these customer relationships and/or expectancies.

148.    Notwithstanding their knowledge of the existence of these relationships and expectancies, Defendants intentionally and unjustifiably interfered with Precision's business relationships with its customers by soliciting them to terminate their relationships with Precision and move their business to Blue Matter.

149.    Defendants have interfered with Precision's business relationships using dishonest, unfair, and improper means, including by using the trade secrets and other confidential and proprietary information they misappropriated from Precision to solicit Precision's customers to do business with Blue Matter.

150.    Jauregui and, upon information and belief, Ahmad and Malhotra, have participated in Blue Matter's efforts to obtain business from AstraZeneca and other Precision customers.

151.    Upon information and belief, Jauregui, Ahmad, and Malhotra used and disclosed Precision's trade secrets to Blue Matter and used them on Blue Matter's behalf in furtherance of those efforts.

152.    As a result of Defendants' intentional tortious acts, Precision's customer relationships and business expectancies, including with AstraZeneca and other customers, have been damaged.

153.    Precision's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory and punitive relief.

## COUNT VII

**MISAPPROPRIATION OF TRADE SECRETS
AND CONFIDENTIAL INFORMATION
(Against Blue Matter, Ahmad, Jauregui, and Malhotra)**

154.    Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 153 above as if fully set forth herein.

155.    In the course of doing business, Precision has acquired and developed highly valuable, trade secrets and confidential and proprietary information.

156.    Precision takes reasonable measures to protect the secrecy of such trade secrets and confidential and proprietary information.  These measures include maintaining a dedicated IT security staff, ensuring compliance with a documented Precision Security Policy that is focused on protecting data from being accessed by unauthorized users, both inside and outside Precision, ensuring compliance with a documented Security Framework, utilizing unique user IDs and strong passwords, employing the principle of least privilege which limits access rights for users to the bare minimum permissions they need to perform their work, requiring all of its employees to sign confidentiality provisions, and requiring third parties to sign non-disclosure agreements before accessing any Precision trade secrets or other confidential or proprietary information.

157.    During their employment with Precision, Ahmad, Jauregui, and Malhotra were provided and otherwise had access to Precision's trade secrets and confidential and proprietary information, and owed, and continue to owe, a duty to Precision not to divulge such information.

158.    Ahmad, Jauregui, and Malhotra knew they had a duty to maintain the secrecy of Precision's trade secrets and confidential and proprietary information due, in part, to their acknowledgment of such duties in the Key Employee Offer Letters and Non-Compete Agreement they signed, respectively.

159.    Blue Matter is under a duty to not accept any misappropriated trade secrets and confidential and proprietary information, including Precision's trade secrets and confidential and proprietary information, and Blue Matter is also under a duty not to disclose or use misappropriated trade secrets and confidential and proprietary information for the purpose of gaining a competitive advantage in the marketplace.

160.    Upon information and belief, Blue Matter, Ahmad, Jauregui, and Malhotra have already and/or will improperly acquire, disclose, and use Precision's trade secrets and confidential and proprietary information without consent of any kind for their own financial gain.

161.    Upon information and belief, in the weeks leading up to the resignation of his employment with Precision, Jauregui misappropriated Precision's trade secrets and confidential and proprietary information by copying over 90 GB of files from his Company-issued laptop onto an external drive without authorization.

162.    Jauregui also sent Precision files containing trade secrets and confidential and proprietary information to his personal email address.

163.    Upon information and belief, for approximately the final six months of his employment, Malhotra used his personal computer to perform his duties at Precision, which included accessing and retaining large numbers of Precision files containing trade secrets and confidential and proprietary information.

164.    Furthermore, Ahmad, Jauregui, and Malhotra have accepted employment with Blue Matter, which is a direct competitor of Precision and sells and plans to sell the same services to the same customers.  In light of this, Precision's trade secrets and confidential and proprietary information would be highly valuable to Blue Matter, and, upon information and belief, Blue Matter has employed Ahmad, Jauregui, and Malhotra so that they will disclose Precision's trade secrets and confidential and proprietary information to Blue Matter.

165.    Through these actions, Blue Matter has gained knowledge of Precision's trade secrets and confidential and proprietary information by improper means and, upon information and belief, has used Precision's trade secrets and confidential and proprietary information for its own benefit.

166.    In addition, upon information and belief, Ahmad, Jauregui, and Malhotra's job responsibilities and functions at Blue Matter are substantially similar to those they performed for Precision such that they will not be able to fulfill their responsibilities at Blue Matter without disclosing or using Precision's trade secrets and confidential and proprietary information.  Such inevitable disclosure to Blue Matter further violates Ahmad, Jauregui, and Malhotra's duty to refrain from divulging Precision's trade secrets and confidential and proprietary information.

167.    Defendants' misappropriation of Precision's trade secrets and confidential and proprietary information will directly and proximately cause Precision to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Precision and that Precision will continue to suffer by the continued acts of Blue Matter and Ahmad, Jauregui, and Malhotra.

## COUNT VIII

**VIOLATION OF PENNSYLVANIA UNIFORM TRADE SECRETS ACT**
**12 Pa.C.S. § 5301, et seq.**
**(Against Jauregui and Blue Matter)**

168.     Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 167 above as if fully set forth herein.

169.     In the course of doing business, Precision has acquired and developed highly valuable trade secrets and confidential and proprietary information.

170.     Precision takes reasonable measures to protect the secrecy of such trade secrets and confidential and proprietary information.  These measures include maintaining a dedicated IT security staff, ensuring compliance with a documented Precision Security Policy that is focused on protecting data from being accessed by unauthorized users, both inside and outside Precision, ensuring compliance with a documented Security Framework, utilizing unique user IDs and strong passwords, employing the principle of least privilege which limits access rights for users to the bare minimum permissions they need to perform their work, requiring all of its employees to sign confidentiality provisions, and requiring third parties to sign non-disclosure agreements before accessing any Precision trade secrets or other confidential or proprietary information.

171.     During his employment with Precision, Jauregui was provided and otherwise had access to Precision's trade secrets and confidential and proprietary information, and owed, and continue to owe, a duty to Precision not to divulge such information.

172.     Jauregui knew he had a duty to maintain the secrecy of Precision's trade secrets and confidential and proprietary information due, in part, to his acknowledgment of such duty in the Key Employee Offer Letters he signed.

173.    Blue Matter is under a duty to not accept any misappropriated trade secrets and confidential and proprietary information, including Precision's trade secrets and confidential and proprietary information, and Blue Matter is also under a duty not to disclose or use misappropriated trade secrets and confidential and proprietary information for the purpose of gaining a competitive advantage in the marketplace.

174.    Upon information and belief, Blue Matter and Jauregui have already and/or will improperly acquire, disclose, and use Precision's trade secrets and confidential and proprietary information without consent of any kind for their own financial gain.

175.    Upon information and belief, in the weeks leading up to the resignation of his employment with Precision, Jauregui misappropriated Precision's trade secrets and confidential and proprietary information by copying over 90 GB of files from his Company-issued laptop onto an external drive without authorization.

176.    Jauregui also sent Precision files containing trade secrets and confidential and proprietary information to his personal email address.

177.    Furthermore, Jauregui has accepted employment with Blue Matter, which is a direct competitor of Precision and sells and plans to sell the same services to the same customers.  In light of this, Precision's trade secrets and confidential and proprietary information would be highly valuable to Blue Matter, and, upon information and belief, Blue Matter has employed Jauregui so that he will disclose Precision's trade secrets and confidential and proprietary information to Blue Matter.

178.    Through these actions, Blue Matter has gained knowledge of Precision's trade secrets and confidential and proprietary information by improper means and, upon information

and belief, has used Precision's trade secrets and confidential and proprietary information for its own benefit.

179.    In addition, upon information and belief, Jauregui's job responsibilities and functions at Blue Matter are substantially similar to those they performed for Precision such that he will not be able to fulfill his responsibilities at Blue Matter without disclosing or using Precision's trade secrets and confidential and proprietary information.  Such inevitable disclosure to Blue Matter further violates Jauregui's duty to refrain from divulging Precision's trade secrets and confidential and proprietary information.

180.    Jauregui and Blue Matter's misappropriation of Precision's trade secrets and confidential and proprietary information will directly and proximately cause Precision to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Precision and that Precision will continue to suffer by the continued acts of Blue Matter and Jauregui.

## COUNT IX

**VIOLATION OF NEW JERSEY UNIFORM TRADE SECRETS ACT
N.J.S.A. 56:15-2, et seq.
(Against Ahmad, Malhotra, and Blue Matter)**

181.    Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 180 above as if fully set forth herein.

182.    In the course of doing business, Precision has acquired and developed highly valuable, trade secrets and confidential and proprietary information.

183.    Precision takes reasonable measures to protect the secrecy of such trade secrets and confidential and proprietary information.  These measures include maintaining a dedicated IT security staff, ensuring compliance with a documented Precision Security Policy that is focused

on protecting data from being accessed by unauthorized users, both inside and outside Precision, ensuring compliance with a documented Security Framework, utilizing unique user IDs and strong passwords, employing the principle of least privilege which limits access rights for users to the bare minimum permissions they need to perform their work, requiring all of its employees to sign confidentiality provisions, and requiring third parties to sign non-disclosure agreements before accessing any Precision trade secrets or other confidential or proprietary information.

184.    During their employment with Precision, Ahmad and Malhotra were provided and otherwise had access to Precision's trade secrets and confidential and proprietary information, and owed, and continue to owe, a duty to Precision not to divulge such information.

185.    Ahmad and Malhotra knew they had a duty to maintain the secrecy of Precision's trade secrets and confidential and proprietary information due, in part, to their acknowledgment of such duties in the Key Employee Offer Letters and Non-Compete Agreement they signed, respectively.

186.    Blue Matter is under a duty to not accept any misappropriated trade secrets and confidential and proprietary information, including Precision's trade secrets and confidential and proprietary information, and Blue Matter is also under a duty not to disclose or use misappropriated trade secrets and confidential and proprietary information for the purpose of gaining a competitive advantage in the marketplace.

187.    Upon information and belief, Blue Matter, Ahmad and Malhotra have already and/or will improperly acquire, disclose, and use Precision's trade secrets and confidential and proprietary information without consent of any kind for their own financial gain.

188.    Upon information and belief, for approximately the final six months of his employment, Malhotra used his personal computer to perform his duties at Precision, which included accessing and retaining large numbers of Precision files containing trade secrets and confidential and proprietary information.

189.    Furthermore, Ahmad and Malhotra have accepted employment with Blue Matter, which is a direct competitor of Precision and sells and plans to sell the same services to the same customers.  In light of this, Precision's trade secrets and confidential and proprietary information would be highly valuable to Blue Matter, and, upon information and belief, Blue Matter has employed Ahmad and Malhotra so that they will disclose Precision's trade secrets and confidential and proprietary information to Blue Matter.

190.    Through these actions, Blue Matter has gained knowledge of Precision's trade secrets and confidential and proprietary information by improper means and, upon information and belief, has used Precision's trade secrets and confidential and proprietary information for its own benefit.

191.    In addition, upon information and belief, Ahmad and Malhotra's job responsibilities and functions at Blue Matter are substantially similar to those they performed for Precision such that they will not be able to fulfill their responsibilities at Blue Matter without disclosing or using Precision's trade secrets and confidential and proprietary information.  Such inevitable disclosure to Blue Matter further violates Ahmad and Malhotra's duty to refrain from divulging Precision's trade secrets and confidential and proprietary information.

192.    Defendants' misappropriation of Precision's trade secrets and confidential and proprietary information will directly and proximately cause Precision to suffer great and

irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Precision and that Precision will continue to suffer by the continued acts of Blue Matter and Ahmad and Malhotra.

## COUNT X

### UNFAIR COMPETITION
### (Against Blue Matter, Ahmad, Jauregui, and Malhotra)

193.   Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 192 above as if fully set forth herein.

194.   During their employment with Precision, Ahmad, Jauregui, and Blue Matter had access to Precision's trade secrets and confidential and proprietary information.

195.   Upon information and belief, in the weeks leading up to the resignation of his employment with Precision, Jauregui misappropriated Precision's trade secrets and confidential and proprietary information by copying over 90 GB of files from his Company-issued laptop onto an external drive without authorization.

196.   Jauregui also sent Precision files containing trade secrets and confidential and proprietary information to his personal email address.

197.   Upon information and belief, for approximately the final six months of his employment, Malhotra used his personal computer to perform his duties at Precision, which included accessing and retaining large numbers of Precision files containing trade secrets and confidential and proprietary information.

198.   Upon information and belief, Ahmad, Jauregui, and Malhotra took Precision's trade secrets and confidential and proprietary information to gain a competitive advantage over Precision and unjustly benefit from Precision's efforts and its expenditure of resources.

199.    Upon information and belief, Blue Matter, Ahmad, Jauregui, and Malhotra have utilized the trade secrets and confidential and proprietary information of Precision to develop Blue Matter's pricing and market access consulting and commercialization lines of business and unfairly compete against Precision with AstraZeneca and other existing and potential Precision customers.

200.    Blue Matter, Ahmad, Jauregui, and Malhotra's acts of unfair competition will directly and proximately cause substantial damage to Precision and its business, including the loss of market share and business with existing and prospective customers, including AstraZeneca and others, as well as loss of its trade secrets and confidential and proprietary information and damage to its reputation.

201.    Blue Matter, Ahmad, Jauregui, and Malhotra's acts of unfair competition will directly and proximately cause Precision to suffer great and irreparable damage and injury, and it will be impossible to ascertain with any degree of certainty the exact amount in money damages that will be caused to Precision and that Precision will continue to suffer by the continued acts of Blue Matter, Ahmad, Jauregui, and Malhotra.

### COUNT XI

**UNJUST ENRICHMENT**
**(Against Ahmad and Jauregui)**

202.    Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 201 above as if fully set forth herein.

203.    Precision provided Ahmad and Jauregui substantial consideration in exchange for their agreement to the non-compete and non-disclosure obligations set forth in their Key Employee Offers Letters, including Transaction Bonuses of $2,535,815 paid to Ahmad and

$2,029,986 paid to Jauregui and Post-Closing Bonuses of $547,600 paid to Ahmad and $501,925 paid to Jauregui.

204.    However, despite the millions of dollars in consideration Precision paid Ahmad and Jauregui in exchange for those agreements, Ahmad and Jauregui violated both their non-compete obligations by accepting employment with Blue Matter and their non-disclosure obligations by misappropriating Precision's trade secrets and confidential and proprietary information, providing that information to Blue Matter, and using it on Blue Matter's behalf.

205.    Ahmad and Jauregui have been unjustly enriched by retaining the substantial consideration Precision paid them in exchange for their agreement to the non-compete and non-disclosure obligations they subsequently violated.

206.    Precision has been impoverished by Ahmad and Jauregui's retention of the substantial consideration Precision paid them in exchange for their agreement to the non-compete and non-disclosure obligations they subsequently violated.

207.    Ahmad and Jauregui's actions were without justification.  Equity and good conscience militate against permitting Ahmad and Jauregui to retain the substantial consideration paid to them in exchange for their agreement to the non-compete and non-disclosure obligations set forth in their Key Employee Offer Letters.

208.    Precision's damages cannot be adequately compensated through remedies at law alone, thereby requiring equitable relief in addition to compensatory relief.

209.    Accordingly, Ahmad and Jauregui should be required to repay the full amount of the Transaction Bonuses and Post-Closing bonuses paid them in exchange for their agreement to the non-compete and non-disclosure obligations they subsequently violated.

## COUNT XII

**AN ACCOUNTING**
**(Against Blue Matter, Ahmad, Jauregui, and Malhotra)**

210.    Precision incorporates by reference and realleges the allegations contained in paragraphs 1 through 209 above as if fully set forth herein.

211.    As a direct and proximate result of Defendants' acts as alleged herein, Precision has been injured in its business, goodwill, and property, and has sustained substantial damage, while Defendants have profited at Precision's expense in an amount not presently known.  The amount of the gains, profits, benefits, advantages, and revenues wrongfully realized by Defendants from their acts as alleged herein is unknown to Precision and cannot be ascertained without an accounting.  The information needed to establish that amount due is peculiarly within the knowledge of Defendants.  Precision, therefore, demands an accounting for the aforementioned gains, profits, benefits, advantages, and revenues wrongfully realized by Defendants for their activities as alleged herein.

**WHEREFORE**, Precision demands judgment against Defendants as follows:

(1)    For a permanent injunction enjoining Blue Matter from employing or otherwise engaging Ahmad, Jauregui, and Malhotra for the full duration of the non-compete periods set forth in their Key Employee Offer Letters and Non-Compete Agreement, respectively;

(2)    For a permanent injunction enjoining Ahmad, Jauregui, and Malhotra from violating their Key Employee Offer Letters and Non-Compete Agreement, respectively, including but not limited to the non-compete and non-disclosure obligations contained therein;

(3)    For a permanent injunction enjoining Defendants and their agents, servants, employees, officers, attorneys, successors, licensees, partners, and assigns, and all other persons acting in concert with them:

(a)     from all further misappropriation of Precision's trade secrets and confidential and proprietary information;

(b)     from all further violation of or tortious interference with Precision's agreements with Ahmad, Jauregui, and Malhotra;

(4)     For an order awarding Precision exemplary damages in an amount twice the amount of actual damages awarded, for willful and malicious misappropriation under the Defend Trade Secrets Act;

(5)     For an order awarding Precision its attorneys' fees under the Defend Trade Secrets Act;

(6)     For an order requiring an attorney-supervised inspection of all computers, including hard drives and mobile storage devices in Defendants' possession, custody or control, including but not limited to, Ahmad, Jauregui, and Malhotra's personal computers, Blue Matter's computer network and systems, and any computers used by Ahmad, Jauregui, or Malhotra in the course of their employment with Blue Matter;

(7)     For an award of compensatory damages against Defendants in favor of Precision;

(8)     For an award of punitive damages against Defendants and in favor of Precision;

(9)     For an order that Precision recover its costs from Defendants;

(10)    For pre-judgment and post-judgment interest according to law; and

(11)    For such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Precision demands a

trial by jury of all issues so triable.


Dated:  New York, New York
         April 10, 2020

                              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP


                              By:     */s/ Jonathan Stoler*
                                      Jonathan Stoler
                                      Eric Raphan
                                      Adam Pekor

                                      30 Rockefeller Plaza
                                      New York, New York 10112
                                      Telephone:  (212) 653-8700

                                      *Attorneys for Plaintiffs*
                                      Precision Medicine Group, LLC and
                                      PRECISIONadvisors Group, Inc.