UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

PRECISION MEDICINE GROUP, LLC,
PRECISIONADVISORS GROUP, INC.,
and PRECISION MEDICINE GROUP
HOLDINGS, INC.,

                                    Plaintiffs,

                - against -

BLUE MATTER, LLC,

                                    Defendant.

**MEMORANDUM
OPINION & ORDER**

20 Civ. 2974 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

       In this action, Plaintiffs Precision Medicine Group, LLC, PRECISIONadvisors

Group, Inc., and Precision Medicine Group Holdings, Inc. (collectively, "Precision") bring

claims against Blue Matter, LLC for violation of the Defend Trade Secrets Act, misappropriation

of trade secrets, unfair competition, tortious interference with contract, tortious interference with

prospective economic advantage, and aiding and abetting a breach of fiduciary duty and duty of

loyalty. According to Plaintiffs, Precision and Blue Matter are competing pharmaceutical

consulting firms (Am. Cmplt. (Dkt. No. 42) ¶¶ 7-9, 17, 61), and Blue Matter hired away former

Precision employees Naina Ahmad, Jose Jauregui, and Mridul Malhotra. (Id. ¶ 2) Plaintiffs

further allege that Blue Matter induced Ahmad, Jauregui, and Malhotra to violate the non-

compete and non-solicitation agreements they had entered into with Precision, all in an effort to

misappropriate Precision's trade secrets and "destroy Precision's . . . business." (Id. ¶¶ 2, 4, 168)

       The parties have cross-moved for summary judgment. Plaintiffs seek summary

judgment as to liability on their claims against Defendant Blue Matter for aiding and abetting

Ahmad, Jauregui, and Malhotra's breach of fiduciary duty and breach of the duty of loyalty (Am.

Cmplt. (Dkt. No. 42) Count IV), and for tortious interference with contract (id., Count V).  (Pltf.

Mot. (Dkt. No. 143))  Defendant Blue Matter seeks summary judgment on all of Precision's

claims.  (Def. Mot. (Dkt. No. 154))  For the reasons stated below, (1) Plaintiffs' motion for

summary judgment will be denied; and (2) Defendant's motion for summary judgment will be

granted as to Plaintiffs' claims for aiding and abetting a breach of fiduciary duty, tortious

interference with contract, and tortious interference with prospective economic advantage.

Defendant's motion will otherwise be denied.

## BACKGROUND[1]

Precision provides "market access" services to large pharmaceutical companies.

(Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 1; Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 174)  "[M]arket

---

[1]  To the extent that this Court relies on facts drawn from a party's Local Rule 56.1 statement, it has done so because the opposing party has either not disputed those facts or has not done so with citations to admissible evidence.  See Giannullo v. City of New York, 322 F.3d 139, 140 (2d Cir. 2003) ("If the opposing party . . . fails to controvert a fact so set forth in the moving party's Rule 56.1 statement, that fact will be deemed admitted.") (citations omitted).

Defendant Blue Matter – in responding to Plaintiffs' Rule 56.1 Statement – frequently does not cite evidence in support of its denials (see, e.g., Def. R. 56.1 Resp. (Dkt. No. 151) ¶¶ 19, 22, 24, 87), or denies Plaintiffs' factual assertion, acknowledges that the assertion is accurate, but offers "context." (See, e.g., id. ¶¶ 109, 111, 119, 128, 130, 135, 153, 156, 164-65, 170)  In all such instances, Plaintiffs' factual assertion will be deemed admitted.  With respect to documents quoted by Plaintiffs in their Rule 56.1 Statement, Defendant responds by stating that the document "speaks for itself." (See, e.g., id. ¶¶ 20-21, 25, 30, 38, 47, 51-53, 59, 72, 76-78, 88-89, 95, 104)  In all such instances, Plaintiffs' assertion of what the quoted document says will be deemed admitted.

As noted above, the parties have filed cross-motions for summary judgment.  In such circumstances – where a non-movant disputes a movant's characterization of cited evidence, and has presented an evidentiary basis for doing so – the Court relies on the non-movant's characterization of the evidence for purposes of resolving the motion.  See Cifra v. Gen. Elec. Co., 252 F.3d 205, 216 (2d Cir. 2001) (court must draw all rational factual inferences in non-movant's favor in deciding summary judgment motion).  Unless otherwise indicated, the facts cited by the Court are undisputed or deemed undisputed for the reasons discussed above.

access . . . involves helping [pharmaceutical] clients maximize their ability to access and introduce their products into specific markets." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 2)

> Through its Global Pricing and Market Access ("GPMA") practice, Precision helps its clients to, among other things, develop strategies, activities, and processes to demonstrate the value of new treatments to payers, determine product pricing, negotiate reimbursement levels, navigate distribution challenges, develop contracting strategies, and analyze pricing, utilization, and reimbursement data.

(Id. ¶ 3)

Defendant Blue Matter is a "consulting company" that provides services to pharmaceutical and life sciences companies. (Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 173; Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 7) While Plaintiffs assert that Blue Matter initiated a "market access" consulting service in 2019 – hiring away Ahmad, Jauregui, and Malhotra from Precision for this purpose (Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 7, 9, 81, 90, 102, 107-11, 124-25, 171) – Defendant Blue Matter asserts that it "did not begin providing market access consulting services to clients until late 2020, well after [Ahmad, Jauregui, and Malhotra's] employment with Blue Matter had ended." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 7 ("At the time relevant to this action, Blue Matter provided brand strategy and related services to clients, but not market access consulting.") (internal citation omitted))

I.    **FACTS**

    A.    **Precision Acquires Insight Strategy Advisors**

"In 2017, Precision entered into discussions to acquire a market access consulting firm called Insight Strategy Advisors ('ISA')." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 12) "Precision's primary interest in acquiring ISA was to secure the services of its senior leadership team of Naina Ahmad . . . , Jose 'Jay' Jauregui . . . , and ISA's co-founder, Harry Schiavi . . . , in order to bolster its existing [Global Pricing and Market Access] practice." (Id. ¶ 13) Ahmad and Jauregui "were identified as two of only three 'Key Employees' in the December 20, 2017

Equity Purchase Agreement ('EPA') setting forth the terms of the transaction." (Id. ¶ 14) "On December 20, 2017, Precision closed on its acquisition of ISA for an upfront payment of $24 million plus up to $26 million in deferred consideration." (Id. ¶ 17)

In December 2017, and in connection with the acquisition transaction, Ahmad and Jauregui executed offer letters, "pursuant to which they received a substantial portion of ISA's sale proceeds in the form of 'Transaction Bonuses' of $2,535,815 and $2,029,986, respectively, as well as 'Post-Closing Bonuses' and other consideration." (Id. ¶ 18) The offer letters executed by Ahmad and Jauregui included the following non-compete, non-solicitation, and confidentiality provisions:

> Non-Compete . . . You agree that you will not, while employed by [Precision] and for a period of . . . twenty-four (24) months after the date upon which your employment by the Company . . . terminates[,] . . . be employed by . . . any Competing Business.
>
> . . . .
>
> Non-Solicitation of Employees, Customers and Other Business Relations. You agree not to, while employed with [Precision] and for a period of . . . twenty-four (24) months after the date upon which your employment . . . terminates[,] . . . do any of the following:
>
> > (i) encourage any . . . employee of the Company . . . to leave his or her employment with the Company or . . . assist any third party . . . to offer, employ, engage, solicit or entice any employee of the Company. . . ;
> >
> > (ii) induce or attempt to induce (including, without limitation, by soliciting, contacting, or causing to be solicited business from) any customer [or] client . . . of the Company with whom you or any of your direct reports interacted . . . to do business with any Competing Business
>
> . . . .
>
> Non-Disclosure. You hereby acknowledge that all Confidential Information is and shall be the exclusive property of Precision. You will not, either during or after employment with the Company and until such Confidential Information has become generally known to the public without your fault, disclose, furnish or make accessible to any person, corporation or other entity, or use for your benefit

or the benefit of any person, corporation or other entity other than Precision, any Confidential Information.

You hereby acknowledge that any written or otherwise tangible material containing Confidential Information, whether created by you or others, which comes into your custody or possession during employment by the Company, shall be and is the exclusive property of Precision to be used by you only in the performance of duties for the Company. You shall promptly deliver to the Company all such material upon either the Termination Date or at any other time Precision may request.

(Pltf. R. 56.1 Stmt., Ex. 18 (Ahmad Contract) (Dkt. No. 146-18) at 4, 6; id., Ex. 19 (Jauregui Contract) (Dkt. No. 146-19) at 4, 6)[2]

Ahmad and Jauregui's non-compete and non-solicitation obligations to Precision continue for "twenty-four (24) months after the date upon which [their] employment . . . terminates[,]" where their employment terminates before December 31, 2020. (Pltf. R. 56.1 Stmt., Ex. 18 (Ahmad Contract) (Dkt. No. 146-18) at 4, 6; id., Ex. 19 (Jauregui Contract) (Dkt. No. 146-19) at 4, 6)

"[W]hile they were negotiating the terms of the acquisition, Ahmad and Jauregui were contemplating leaving ISA." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 23) "Ahmad in particular was focused on the prospect of joining Blue Matter to work with [Ashwin] Dandekar," "Blue Matter's co-founder and Managing Partner," and "Ahmad's longtime mentor." (Id. ¶¶ 24, 26-27) Dandekar – who had had been trying to form a market access practice at Blue Matter since 2013 – contacted Ahmad in October 2017 and requested a meeting. Ahmad reported Dandekar's contact to Jauregui, and suggested that "[m]aybe it's worth the three of us meeting one day." (Id. ¶¶ 25, 28 (internal quotations omitted); Pltf. R. 56.1 Stmt., Ex. 26 (Oct. 28, 2017 email) (Dkt. No. 146-26) at 2) On October 4, 2017, Ahmad reported to Jauregui that Dandekar

---

[2] Except for deposition transcripts, the page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system. Deposition page numbers refer to the pagination assigned by the court reporter.

had "committed to 2M as an investment" if the two joined Blue Matter. (Def. R. 56.1 Resp.
(Dkt. No. 151) ¶ 30 (internal quotations omitted))

       Although "Ahmad and Jauregui ultimately decided to join Precision, Ahmad
maintained regular contact with Dandekar." (Id. ¶ 31)  In March 2018, Dandekar "reminded
[Ahmad] that non competes don't hold in CA," where Blue Matter was founded. (Id. ¶¶ 32-33)
"Throughout 2018, [however,] Precision continued the process of integrating ISA, including
Ahmad and Jauregui specifically, with its existing [Global Pricing and Market Access] practice."
(Id. ¶ 35)

       "Precision's existing [Global Pricing and Market Access] practice was then
headed by Mridul Malhotra." (Id. ¶ 36)  "Like Ahmad and Jauregui, Malhotra was also bound
by certain non-solicit and non-compete obligations to Precision." (Id. ¶ 37)  "Specifically, on or
about April 28, 2015, Malhotra entered into a Confidentiality and Non-Solicitation Agreement
and Covenant Not to Compete . . . , pursuant to which he agreed that, among other things, for a
period of one year after the separation of his employment with Precision, he would not become
employed with a competing business." (Id.)  "Through the integration process, Ahmad and
Malhotra ultimately developed a close working relationship." (Id. ¶ 40)

       "By the beginning of 2019, at Ahmad's request, Precision made her the head of its
entire [Global Pricing and Market Access] consulting practice." (Id. ¶ 41)  "Malhotra and
Jauregui directly reported to [Ahmad] in 2019." (Id. ¶ 42)

    **B.**    **Ahmad's Discussions with Dandekar**
        **and Subsequent Departure from Precision**

       In the spring of 2019, Ahmad and Dandekar "held a number of meetings to
discuss a potential collaboration" in which Ahmad would join Blue Matter. (Id. ¶ 46)  In an
April 2, 2019 email, Ahmad sent Dandekar the offer letter contract she had entered into with

Precision, "so that [Dandekar] could review [her] obligations" to Precision." (Id. ¶ 44; Pltf. R. 56.1 Stmt., Ex. 32 (Apr. 2, 2019 email) (Dkt. No. 146-32)) "Dandekar admits that he reviewed Ahmad's post-employment obligations to Precision [as] set forth in Ahmad's Key Employee Offer Letter." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 45) Over the next several months, Ahmad and Dandekar had a number of meetings at which they discussed opportunities for Ahmad at Blue Matter. (Id. ¶ 46) Ahmad testified, however, that to the extent any such opportunity involved market access consulting, any such consulting would take place only "'after [Ahmad's] period of noncompete was over.'" (Id. (quoting Pltf. R. 56.1 Stmt., Ex. 4 (Ahmad Dep.) (Dkt. No. 146-5) at 209:12-209:13))

"Ahmad kept Jauregui and Malhotra apprised of [her] discussions with Dandekar. For example, on April 29, 2019, Ahmad sent an email to Jauregui and Malhotra with the subject line 'Ashwin follow up.'" In the email, Ahmad states that she would "'like to say that I am interested'" in the opportunities Dandekar was offering her at Blue Matter. (Id. ¶ 47 (quoting Pltf. R. 56.1 Stmt., Ex. 36 (Apr. 29, 2019 email) (Dkt. No. 146-36) at 2)

"On June 7, 2019, Ahmad emailed Dandekar, stating, 'I think we had tossed around the idea of speaking this week and then meeting next week. Do you want to meet June 13th? I'll have some ideas jotted down by then and we can make some progress.'" (Id. ¶ 48 (quoting Pltf. R. 56.1 Stmt., Ex. 37 (Jun. 7, 2019 email) (Dkt. No. 146-37) at 2)) On June 13, 2019, Ahmad emailed Dandekar with the subject line, "some draft notes for our chat this morning," and attached a document entitled "Global pricing & market access – 5 year evolution (2019 – 2023)." (Pltf. R. 56.1 Stmt., Ex. 38 (Five Year Plan) (Dkt. No. 146-38) at 2-3) "The Five Year Plan [that] Ahmad created identified various focus areas and phases of growth necessary to enhance Blue Matter's market access practice, with phase 1 beginning just two

months later in August 2019." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 51) In Phase 1 of her Five

Year Plan for Blue Matter's new market access practice, Ahmad recommended that Blue Matter

"make a '[p]ersonnel investment' in a 'team of leaders,'" which she referred to as "'MD #1,'

'MD #2,' and 'MD #3.'" (Id. ¶¶ 52-53 (quoting Pltf. R. 56.1 Stmt., Ex. 38 (Five Year Plan)

(Dkt. No. 146-38))

Dandekar was aware that Jauregui "was part of the [five-year] plan

that . . . [Ahmad] was [then] proposing to [him]." (Id. ¶ 54 (quoting Pltf. R. 56.1 Stmt., Ex. 7

(Dandekar Dep.) (Dkt. No. 146-8) at 188:12-189:21)) Ahmad had also shown her "Five Year

Plan" to Malhotra, "and advised him that he would be either MD #2 or MD # 3." (Id. ¶ 55

(citing Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 128:18-129:18, 140:13-

143:22))

In a June 10, 2019 email, Dandekar instructed a staffing recruiter "'not [to] send

us any candidates from ISA or in market access at this time. We have already identified a

number of ISA candidates . . . based on some intel we have and are in the process of reaching out

to them.'" (Id. ¶ 60 (quoting Pltf. R. 56.1 Stmt., Ex. 43 (Jun. 10, 2019 email) (Dkt. No. 146-43)

at 2)) At deposition, Dandekar testified that the "'intel' in question – provided by Ahmad – was

that Jauregui and Malhotra might be interested in joining Blue Matter as well." (Id. ¶ 61)

"On June 21, 2019, Precision paid Ahmad and Jauregui Post-Closing Bonuses of

$547,600 and $501,925, respectively." (Id. ¶ 69) That same day, Ahmad resigned from

Precision. (Id. ¶ 70)

"On June 24, 2019, Ahmad sent Dandekar an 'updated excel file' of detailed

financial forecasts, staffing plans, and compensation models for Blue Matter Market Access

(which she abbreviated [as] 'BMMA') projected out for the next seven to ten years using ISA's

revenues and growth for comparison." (Id. ¶ 78)  Given that "Ahmad resigned effective July 12, 2019" (id. ¶ 73), "her Non-Solicit and Non-Compete Obligations were effective through July 12, 2021." (Id. ¶ 74)

Shortly after Ahmad's resignation, Precision asked Malhotra to temporarily assume a business operations role at Precision. (Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 219 ("Shortly after Ahmad's resignation, Precision asked Malhotra to accept an interim role, with a 90-day check-in period, to temporarily help the business."); Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 219 ("Disputed in part.  In the deposition testimony to which Blue Matter cites, Clein testified that Malhotra was asked to temporarily assume a business operations role to help stabilize the [Global Pricing and Market Access] practice following Ahmad's abrupt departure.  Clein testified that Precision agreed to review Malhotra's role with him at the end of 2019, recognizing that Malhotra might not be interested [in] continuing to serve in an operations capacity.") (emphasis omitted))

Malhotra was not pleased by the change in his work responsibilities (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 220), but "was told to just 'get in line.'"  (Id. ¶ 221)  "Malhotra believed he should be leading the business, but Precision put [Harry] Schiavi[, ISA's co-founder,] in charge [of the Global Pricing and Market Access practice] instead."  (Id. ¶ 222)

**C.    Jauregui Resigns from Precision and Joins Blue Matter**

After Ahmad's June 21, 2019 resignation from Precision, she "kept Dandekar apprised of Jauregui and Malhotra's reactions to the idea of joining Blue Matter." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 83)  For example, "Ahmad informed Dandekar that Jauregui might be reluctant to leave Precision before the end of 2020 because he wanted to receive his full post-closing earn-out. . . ."  (Id. ¶ 84)

"In July 2019, Dandekar began communicating with Jauregui directly. . . ." (Id. ¶ 86)  In an August 6, 2019 email, Jauregui told Dandekar that, "[b]ased on our discussion, I agreed to share my compensation expectations this week," which "ended up aligning with what [Ahmad] had shared."[3]  (Pltf. R. 56.1 Stmt., Ex. 50 (Aug. 6, 2019 email) (Dkt. No. 146-49) at 2)  Jauregui told Dandekar, "I understand that I cannot come in at the same capacity [at Blue Matter], [and] thus not [at] the same comp [as at Precision]."  Jauregui stated, however, that his "goal [wa]s to earn a competitive comp and grow it based on performance." (Id.)  Jauregui also told Dandekar that he needed "to receive an offer in writing before I resign from Precision.  Unlike [Ahmad], [Jauregui] need[ed] to secure employment prior to resigning." (Id.)

"On August 21, 2019, Blue Matter presented Jauregui with an offer letter for the role of Principal [at Blue Matter], with a starting salary of $250,000 and a guaranteed first-year bonus of $100,000." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 90)  "Jauregui accepted Blue Matter's offer and resigned his employment with Precision effective August 30, 2019." (Id. ¶ 93)  "Jauregui began working at Blue Matter less than two weeks later on September 11, 2019." (Id. ¶ 94)  "In its offer letter to Jauregui, Blue Matter specifically acknowledged reviewing Jauregui's Key Employee Offer Letter [from Precision] and the post-employment obligations contained therein." (Id. ¶ 95)

"Prior to the termination of his employment with Precision, Jauregui attempted to clean his personal pictures and files from his Precision laptop by copying the materials from his desktop to a thumb drive." (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 236)  Plaintiffs contend that Jauregui copied onto a thumb drive "approximately 6,800 [Precision] documents" during this

---

[3]  It is not clear from the email (1) with whom Jauregui "agreed to share [his] compensation expectations"; or (2) what Ahmad shared with Jauregui.  (Pltf. R. 56.1 Stmt., Ex. 50 (Aug. 6, 2019 email) (Dkt. No. 146-49) at 2)

process. (Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 114 (citing Pltf. R. 56.1 Stmt., Ex. 5 (Jauregui

Dep.) (Dkt. No. 146-6) at 242:16-243:5)) Defendant states that "Jauregui inadvertently copied

Precision files to his thumb drive . . . while attempting to clean his personal effects from his

Precision laptop, since the files were intermingled." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 113)

Defendant further asserts that "[b]efore and during the course of Jauregui's employment with

Blue Matter, nobody at Blue Matter knew anything about Jauregui's handling of any Precision

files, including that he had copied certain files to his thumb drive." (Def. R. 56.1 Stmt. (Dkt. No.

156) ¶ 240)

    **D.**    <u>**Malhotra Resigns from Precision and Joins Blue Matter**</u>

        "[I]n the fall of 2019, Ahmad shared the Five Year Plan [for Blue Matter's new

market access practice] with Malhotra and asked him for his thoughts on it." (Def. R. 56.1 Resp.

(Dkt. No. 151) ¶ 99) According to Malhotra, "Ahmad contacted him and stated, 'I know of this

guy named Ashwin [Dandekar]. He's running Blue Matter. They have a very strong culture.

I'm considering it. Something you would be interested in. Have a discussion.'" (<u>Id.</u> ¶ 98

(quoting Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 117:16-118:23))

"Malhotra agreed to join Ahmad and Dandekar for a meeting at a coffee shop in Manhattan."

(<u>Id.</u> ¶ 100) "At that meeting, Ahmad, Dandekar, and Malhotra discussed Malhotra's career, his

non-compete obligations to Precision, and his interest in 'an opportunity where [he] could build

something.'" (<u>Id.</u> ¶ 101 (citing Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at

120:2-120:21, 123:22-124:3, 203:15-203:25))

        "On October 29, 2019, Blue Matter presented Malhotra with an offer letter." (<u>Id.</u>

¶ 102) "In its offer letter to Malhotra, Blue Matter . . . acknowledged reviewing his contractual

post-employment obligations to Precision." (<u>Id.</u> ¶ 104) "Malhotra accepted Blue Matter's offer

and resigned his employment with Precision effective December 31, 2019." (Id. ¶ 105)

"Malhotra joined Blue Matter in February 2020." (Id. ¶ 106)

Plaintiffs contend that Dandekar "solicit[ed] Ahmad, Jauregui, and Malhotra to resign from Precision to develop a competing market access practice at Blue Matter." (Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 171)

Defendant Blue Matter asserts, however, that Ahmad and Jauregui "experienced significant hardships that caused them to be unhappy at Precision and ultimately culminated in their (and a number of other employees') resignations in 2019." (Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 198) As for Malhotra, Blue Matter contends that he found the work environment at Precision "'toxic,'" (id. ¶ 227 (quoting Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 227:5-227:7)), and that he "ultimately resigned . . . because there was no future for him at the company and he was asked to take a demotion and decrease in pay." (Id. ¶ 226)

Precision responds that "[t]he overwhelming evidence demonstrates that Ahmad and Jauregui were satisfied with their employment at Precision and ultimately resigned their employment because of the opportunity Blue Matter offered to them to compete with Precision in the market access space." "Malhotra [thus] resigned his employment with Precision to accept employment with Blue Matter." (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶¶ 198, 226)

### D.    Ahmad, Jauregui, and Malhotra's Employment at Blue Matter

The parties dispute the nature of the work that Ahmad, Jauregui, and Malhotra performed at Blue Matter. Plaintiffs contend that, after joining Blue Matter, Ahmad, Jauregui, and Malhotra "immediately began working on enhancing Blue Matter's market access capabilities." (Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 126 (citing, inter alia, Pltf. R. 56.1 Stmt., Ex. 60 (Feb. 11, 2020 email) (Dkt. No. 146-58) at 2)) Plaintiffs further assert that "[w]hile Ahmad, Jauregui, and Malhotra were working on transforming Blue Matter's market access capabilities,

Dandekar and other Blue Matter employees were informing third parties that the three of them were now members of Blue Matter's 'market access team.'" (Id. ¶ 127)  In this regard, Plaintiffs point to a February 11, 2020 email from Ahmad to other Blue Matter employees listing "PITCH[ing] ideas for market access projects" as a meeting agenda item.  This email also contains text stating, "BM+ - now with MA firepower."  (Pltf. R. 56.1 Stmt., Ex. 60 (Feb. 11, 2020 email) (Dkt. No. 146-58) at 2)

According to Plaintiffs, Jauregui and Ahmad also sought work from Precision clients.  After joining Blue Matter, "Jauregui developed PowerPoint presentations, statements of work, and work session agendas in connection with [Purdue Pharma, a Precision client]."  (Pltf. R. 56.1 Stmt. (Dkt. No. 149) ¶¶ 132, 134)  Jauregui is also listed as a member of a proposed Blue Matter team in a November 6, 2019 "go-to-market" strategy proposal for AstraZeneca (see Pltf. R. 56.1 Stmt., Ex. 70 (Nov. 6, 2019 Presentation) (Dkt. No. 149-27) at 19), another Precision market access client, and Ahmad ultimately joined in on Jauregui's presentations to Precision clients.  (Pltf. R. 56.1 Stmt. (Dkt. No. 149) ¶¶ 136-152; see also Pltf. R. 56.1 Stmt., Ex. 80 (Mar. 11, 2020 email) (Dkt. No. 146-67) at 2-3)

In a March 2020 letter to Blue Matter, Precision asserted that Ahmad, Jauregui, and Malhotra had breached the "post-employment" obligations they owed to Precision.  (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 166)  "Ahmad was placed on garden leave (leave with pay with no expectation of performing work) by Blue Matter in April 2020," and "resigned from Blue Matter in July 2020."  (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶¶ 177-78)  "Jauregui was placed on garden leave by Blue Matter in April 2020" and likewise "resigned from Blue Matter in July 2020."  (Id. ¶¶ 180-81)  "Malhotra was placed on garden leave by Blue Matter in March 2020," and "resigned from Blue Matter in July 2020."  (Id. ¶¶ 183-84)

13

Defendant Blue Matter contends, however, that the activities of Ahmad, Jauregui, and Malhotra cited by Plaintiffs were all in furtherance of a "prospective market access practice – a practice that would be led by Jauregui upon the expiration of his alleged non-compete obligations to Precision – not a market access practice that was then in operation." (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 128)  According to Blue Matter, "[a]fter Ahmad, Jauregui, and Malhotra joined Blue Matter, they were expressly prohibited from performing any market access work that may have encroached on any of their alleged post-employment obligations to Precision."  Blue Matter further asserts that, "[a]t that time, Blue Matter did not compete with Precision in the area of market access consulting."  (Def. R. 56.1 Stmt. (Dkt. No. 156) ¶¶ 185-186)  According to Blue Matter, it "did not engage in any market access work until late-2020," after Ahmad, Jauregui, and Malhotra's resignations from Blue Matter.  (Id. ¶ 234)

## II.    **PROCEDURAL HISTORY**

The Complaint was filed on April 10, 2020 (Cmplt. (Dkt. No. 1)), and the Amended Complaint was filed on July 2, 2020.  (Am. Cmplt. (Dkt. No. 42))

The Amended Complaint names as Defendants Blue Matter, Ahmad, Jauregui, and Malhotra, and alleges (1) violation of the Defend Trade Secrets Act as against all Defendants; (2) breach of contract as against the individual Defendants; (3) breach of fiduciary duty and breach of the duty of loyalty as against the individual Defendants; (4) aiding and abetting breach of fiduciary duty and breach of the duty of loyalty as against Blue Matter; (5) tortious interference with contract as against Blue Matter; (6) tortious interference with prospective economic advantage as against all Defendants; (7) misappropriation of trade secrets as against all Defendants; (8) violation of the Pennsylvania Uniform Trade Secrets Act as against Jauregui and Blue Matter; (9) violation of New Jersey Uniform Trade Secrets Act as against

Ahmad, Malhotra, and Blue Matter; (10) unfair competition as against all Defendants; and (11) unjust enrichment as against Ahmad and Jauregui. (Id. ¶¶ 106-240)

In the Amended Complaint, Plaintiffs seek injunctive relief prohibiting (1) Blue Matter from employing Ahmad, Jauregui, and Malhotra during the non-compete periods set forth in their offer letters and non-compete agreements; (2) Ahmad, Jauregui, and Malhotra from violating their non-compete, non-solicitation, and non-disclosure agreements; (3) all Defendants from "further misappropriation of Precision's trade secrets and confidential and proprietary information," and "all further violation of or tortious interference with Precision's [non-compete, non-solicitation, and non-disclosure agreements with Ahmad, Jauregui, and Malhotra]." The Amended Complaint also seeks an order granting Plaintiffs the right to inspect certain computers in Defendants' custody, and an award of compensatory damages, punitive damages, and attorneys' fees. (Id. at 56-57)

On July 24, 2020, Ahmad, Jauregui, and Malhotra filed their answer, and Malhotra filed counterclaims (Dkt. No. 55). Blue Matter filed a separate answer on July 27, 2020. (Dkt. No. 57) On August 14, 2020, Precision filed an answer to Malhotra's counterclaims. (Dkt. No. 58)

On September 2, 2020, the individual Defendants moved to dismiss Plaintiffs' breach of contract claim. (Dkt. Nos. 65, 69)

On November 10, 2020, Plaintiffs filed a stipulation of voluntary dismissal as to Malhotra (Dkt. No. 96), which this Court so ordered on November 11, 2020. (Dkt. No. 97) On January 6, 2021, Plaintiffs filed stipulations of voluntary dismissal as to Ahmad and Jauregui (Dkt. Nos. 115, 116), which this Court so ordered on January 7, 2021. (Dkt. Nos. 117, 118)

On September 23, 2021, following the close of discovery, the parties filed cross-motions for summary judgment. (Dkt. Nos. 143, 154) Plaintiffs seek summary judgment against Blue Matter on their claims for aiding and abetting breach of fiduciary duty and breach of the duty of loyalty (Count IV) and tortious interference with contract (Count V). (Pltf. Sum. J. Br. (Dkt. No. 144)) Defendant Blue Matter seeks summary judgment on all of Plaintiffs' claims against it. (Def. Sum J. Br. (Dkt. No. 155))

In their opposition brief, Plaintiffs "agree[] to withdraw [their] claims under the Pennsylvania Uniform Trade Secrets Act (Count VIII) and the New Jersey Uniform Trade Secrets Act (Count IX). . . ." (Pltf. Opp. (Dkt. No. 161) at 7 n.1) Accordingly, those claims are dismissed.

Plaintiffs' remaining claims against Blue Matter are for (1) violation of the Defend Trade Secrets Act (Count I); (2) aiding and abetting breach of fiduciary duty and breach of the duty of loyalty (Count IV); (3) tortious interference with contract (Count V); (4) tortious interference with prospective economic advantage (Count VI); (5) misappropriation of trade secrets and confidential information (Count VII); and (6) unfair competition (Count X).

## DISCUSSION

## I.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is warranted where the moving party "shows that there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A dispute about a 'genuine issue' exists for summary judgment purposes where the evidence is such that a reasonable jury could decide in the non-movant's favor." Beyer v. Cnty. of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (quoting Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)). "When no rational jury could find in favor of the nonmoving

party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Residential Servs., Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994) (citing Dister v. Cont'l Grp., Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). "'[T]hat opposing parties assert competing versions of the same event is not in itself sufficient to preclude summary judgment,' in that contradictory testimony only establishes a 'genuine' issue for trial if it 'lead[s] to a different legal outcome.'" Yi Fu Chen v. Spring Tailor, L.L.C., 14 Civ. 218 (PAE), 2015 WL 3953532, at *4 (S.D.N.Y. June 29, 2015) (alterations in original) (quoting Krynski v. Chase, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009)).

In deciding a summary judgment motion, the Court "'resolve[s] all ambiguities, and credit[s] all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment.'" Spinelli v. City of New York, 579 F.3d 160, 166 (2d Cir. 2009) (quoting Brown v. Henderson, 257 F.3d 246, 251 (2d Cir. 2001)). However, "'[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment. . . . [M]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise exist.'" Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010) (second alteration and omissions in original) (quoting Fletcher v. Atex, Inc., 68 F.3d 1451, 1456 (2d Cir. 1995)). Moreover, "'[t]he principles governing admissibility of evidence do not change on a motion for summary judgment[,]' and district courts need only consider admissible evidence in ruling on a motion for summary judgment." I.M. v. United States, 362 F. Supp. 3d 161, 174 n.9 (S.D.N.Y. 2019) (quoting Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997)).

"'Where, as here, the burden of persuasion at trial would be on the non-moving party[,] . . . the party moving for summary judgment may satisfy [its] burden of production under

Rule 56 in either of two ways:  (1) by submitting evidence that negates an essential element of the non-moving party's claim, or (2) by demonstrating that the non-moving party's evidence is insufficient to establish an essential element of the non-moving party's claim.'" Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 114 (2d Cir. 2017) (quoting Farid v. Smith, 850 F.2d 917, 924 (2d Cir. 1988)).  In ruling on a summary judgment motion, a court "may not make credibility determinations or weigh the evidence." Reeves v. Sanderson Plumbing Prod., Inc., 530 U.S. 133, 150 (2000).  "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . ." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

"The same standard[s] appl[y] where, as here, the parties file[] cross-motions for summary judgment. . . ." Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party.  Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (internal citations omitted).

## II.    ANALYSIS

### A.    Aiding and Abetting Breach of Fiduciary Duty and Breach of Duty of Loyalty

In Count IV of the Amended Complaint, Plaintiffs allege that

Blue Matter aided and abetted Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty by contributing to and encouraging their tortious activity, including but not limited to Ahmad, Jauregui, and Malhotra's misappropriation of Precision's trade secrets and confidential and proprietary information, and inducing them to commence working for Blue Matter in violation of their agreements not to compete with the Company.

. . . Blue Matter aided and abetted Ahmad, Jauregui, and Malhotra's breach of their fiduciary duty and duty of loyalty knowing that Ahmad, Jauregui, and Malhotra were

senior leaders of Precision's global pricing and market access business and owed Precision those duties.

(Am. Cmplt. (Dkt. No. 42) ¶¶ 156-57)

As pled in the Amended Complaint, Plaintiffs' breach of fiduciary duty/duty of loyalty claim has two components: Blue Matter induced the individual Defendants to (1) misappropriate Plaintiffs' trade secret, confidential, and proprietary information; and (2) breach their non-compete agreements with Precision. (Id. ¶ 156)

Plaintiffs and Defendant Blue Matter have cross-moved for summary judgment on this claim. (See Pltf. Sum. J. Br. (Dkt. No. 144) at 28; Def. Sum. J. Br. (Dkt. No. 155) at 21) In opposing Blue Matter's motion for summary judgment, Plaintiffs only address the aiding and abetting claim as it relates to Ahmad's alleged breach of fiduciary duty and breach of her duty of loyalty. (Pltf. Opp. (Dkt. No. 161) at 18-19) Similarly, in moving for summary judgment on this claim, Plaintiffs only address whether Blue Matter aided and abetted Ahmad's breach of fiduciary duty and breach of her duty of loyalty. (See Pltf. Sum. J. Br. (Dkt. No. 144) at 28-30)

The Court concludes that Plaintiffs have abandoned their aiding and abetting claim to the extent it is premised on Jauregui and Malhotra's alleged breach of fiduciary duty and duty of loyalty. Plaintiffs "did not address [Blue Matter's] argument[s] [as to Jauregui and Malhotra] in [their] opposition papers, which operates as an abandonment of the [claim to that extent]." Senno v. Elmsford Union Free Sch. Dist., 812 F. Supp. 2d 454, 468 (S.D.N.Y. 2011); see also Duarte v. St. Barnabas Hosp., 265 F. Supp. 3d 325, 352-53 (S.D.N.Y. 2017) ("'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'") (quoting Taylor v. City of New York, 269 F.Supp.2d 68, 75 (E.D.N.Y. 2003)); Plahutnik v. Daikin Am., Inc., 912 F. Supp. 2d 96, 104 (S.D.N.Y. 2012) ("[A]rguments not made in opposition to a motion

19

for summary judgment are deemed abandoned."); Kassem v. Long Island R.R., No. 09 CIV. 7506 (AKH), 2011 WL 13327242, at *5 n.3 (S.D.N.Y. Mar. 25, 2011) ("In opposing summary judgment, [plaintiff] Kassem does not advance any argument that he was falsely arrested, in violation of 42 U.S.C. § 1983 and the Fourth Amendment, by either [defendant] Officer Capolino or [defendant] Officer Walls. To the extent that Kassem's complaint alleges a § 1983 false arrest claim against either of those two officers, I deem Kassem to have abandoned the claim and dismiss count I of the complaint as to Officers Capolino and Walls. 'Federal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'") (quoting Taylor, 269 F. Supp. 2d at 75). Accordingly, Defendant Blue Matter is entitled to summary judgment on Plaintiffs' aiding and abetting claim to the extent that claim is premised on Jauregui and Malhotra's alleged breach of fiduciary duty and duty of loyalty.

In moving for summary judgment on their aiding and abetting claim, Plaintiffs contend that

> the undisputed record establishes that: (i) Ahmad breached her fiduciary duty and duty of loyalty to Precision by advising Blue Matter on the development of its market access practice and assisting Blue Matter in recruiting Jauregui and Malhotra while she was still employed with Precision; (ii) Blue Matter knowingly participated in Ahmad's breach; and (iii) Precision has suffered damages as a result.

(Pltf. Sum. J. Br. (Dkt. No. 144) at 28)

In opposing Plaintiffs' motion, and in cross-moving for summary judgment on the aiding and abetting claim, Defendant Blue Matter asserts that

> Ahmad, Jauregui, and Malhotra did not violate any duty allegedly owed to Precision. They did not misappropriate any of Precision's trade secrets or confidential information. Nor did they use such information or share it with Blue Matter. Further, they did not usurp any client business opportunities for Blue Matter that would have otherwise gone to Precision.

(Def. Sum. J. Br. (Dkt. No. 155) at 22; see also Def. Opp. (Dkt. No. 150) at 13 ("[T]here are no

allegations that Ahmad stole Precision's confidential information and used that information

against it, nor has any such evidence been revealed during discovery.  Likewise, Precision has

not proffered any evidence that Ahmad improperly used Precision's time, facilities, or

proprietary secrets.  Instead, Precision merely contends that it was improper for Ahmad to devise

a business plan to compete with Precision, and to present her business plan to Blue Matter.

Based on the well-established New York law, Precision is simply wrong.  Because there is no

evidence that Blue Matter assisted or induced Ahmad in any alleged breach, Precision's request

for summary judgment must be denied.") (internal citations omitted))

        **1.**     **<u>Applicable Law</u>**

        "To sustain a claim for aiding and abetting breach of fiduciary duty [under New

York law], a plaintiff must allege:   (1) a breach of fiduciary duty; (2) knowledge of the breach

by the aider and abettor; (3) substantial assistance by the aider and abettor in achieving the

breach; and (4) that plaintiff suffered damage as a result of the breach.  Substantial assistance

occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do

so, thereby enabling the breach to occur."  <u>Melwani v. Lipton</u>, 17 Civ. 8308 (PGG) (SLC), 2023

WL 1991423, at *5 (S.D.N.Y. Feb. 14, 2023) (citations and quotations omitted).[4]

---

[4]  Because both sides have cited to New York law throughout their summary judgment briefing
(see Pltf. Sum. J. Br. (Dkt. No. 144) at 28-29; Pltf. Reply Br. (Dkt. No. 166) at 12-14; Def. Opp.
(Dkt. No. 150) at 12-13), this Court will apply New York law to all of Plaintiffs' state law
claims.  <u>Golden Pac. Bancorp v. F.D.I.C.</u>, 273 F.3d 509, 514 n.4 (2d Cir. 2001) (Where "[t]he
parties' briefs assume that New York substantive law governs the issues . . . presented[,] . . . such
implied consent is, of course, sufficient to establish the applicable choice of law." ); <u>see also</u>
<u>DeBlasio v. Merrill Lynch & Co., Inc.</u>, No. 07 Civ. 318 (RJS), 2009 WL 2242605, at *19 n.14
(S.D.N.Y. July 27, 2009) (applying New York law to common-law fraud claims based on the
parties' reliance on New York law); <u>Corbett v. Firstline Sec., Inc.</u>, 687 F. Supp. 2d 124, 128
(E.D.N.Y. 2009) (applying New York law where "both parties cite exclusively to New York . . .
law in their arguments. . . .").

"'[E]mployees owe a duty of loyalty and good faith to their employer in the performance of their duties.'  Generally, to establish a breach of this fiduciary duty, 'the employee's misuse of the employer's resources to compete with the employer is . . . required.'" Espire Ads LLC v. TAPP Influencers Corp., 655 F. Supp. 3d 223, 266 (S.D.N.Y. 2023) (quoting Cerciello v. Admiral Ins. Brokerage Corp., 90 A.D.3d 967, 936 (2011)).  Pursuant to the duty of loyalty and good faith, "'[an employee] is prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'" Advance 2000, Inc. v. Harwick, 16 Civ. 1037S, 2019 WL 6725977, at *3 (W.D.N.Y. Dec. 11, 2019) (quoting Lamdin v. Broadway Surface Adv. Corp., 272 N.Y. 133, 138 (1936)).

"'An employee may create a competing business prior to leaving her or his employer without breaching any fiduciary duty[, however,] unless she or he makes improper use of the employer's time, facilities or proprietary secrets in doing so.'" Espire Ads, 655 F. Supp. 3d at 266 (quoting Island Sports Physical Therapy v. Burns, 84 A.D.3d 878, 923 (2011)); see also Dewitt Stern Grp., Inc. v. Eisenberg, 257 F. Supp. 3d 542, 585 (S.D.N.Y. 2017), aff'd, 734 F. App'x 48 (2d Cir. 2018) ("'A breach of fiduciary duty, and generally in tandem, of loyalty, "occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity."'") (quoting Poller v. BioScrip, Inc., 974 F.Supp. 2d 204, 227 (S.D.N.Y. 2013) (quoting Beard Rsch., Inc. v. Kates, 8 A.3d 573, 602 (Del. Ch.), aff'd sub nom. ASDI, Inc. v. Beard Rsch., Inc., 11 A.3d 749 (Del. 2010))).

"While these duties, as a general rule, apply only to an employee's performance of her job as an agent of her employer, the Second Circuit, and New York, both recognize that 'an employee's fiduciary duty may continue after termination of the employment relationship.'" Poller v. BioScrip, Inc., 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013), on reconsideration, No. 11 CIV. 1675 (JPO), 2014 WL 13109132 (S.D.N.Y. Apr. 14, 2014) (quoting Am. Fed. Grp., Ltd. v. Rotherberg, No. 91 Civ. 7860(THK), 2003 WL 22349673, at *13 (S.D.N.Y. Oct. 14, 2003) (citing cases)). "This duty may include 'the specific duty not to divert business in which a former employer has the requisite "tangible expectancy," and the duty not to exploit to the former employer's detriment specific information obtained during the employment that was either technically confidential or that was available to the fiduciary only because of the employment.'" Id. at 227-28 (quoting Am. Fed. Grp., Ltd. v. Rothenberg, 136 F.3d 897, 914 (2d Cir. 1998)).

As to an employee's duty of loyalty, under New York law "'[t]he duty of loyalty has been limited to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks.'" Ebel v. G/O Media, Inc., No. 20 CIV. 7483 (PAE), 2021 WL 2037867, at *5 (S.D.N.Y. May 21, 2021) (quoting Farricker v. Penson Dev., Inc., No. 07 Civ. 11191 (DAB), 2010 WL 845983, at *2 (S.D.N.Y. Mar. 4, 2010) (citation omitted)). "A claim 'for breach of the duty of loyalty . . . is available only where the employee has acted directly against the employer's interests – as in embezzlement, improperly competing with the current employer, or usurping business opportunities.' '[M]isuse of the employer's resources to compete with the employer is generally required.'" Id. (quoting Veritas

Cap. Mgmt., LLC v. Campbell, 82 A.D.3d 529, 530 (1st Dep't 2011), and then Cerciello v. Admiral Ins. Brokerage Corp., 90 A.D.3d 967, 968 (2d Dep't 2011)).

"An employee's disclosure of employer information, particularly confidential information or trade secrets, can be a breach of this fiduciary duty." Advance 2000, 2019 WL 6725977, at *3.

"New York courts have 'applied the same standards for determining a breach of duty of loyalty claim to a breach of fiduciary duty claim against an employee.'" Zebra Strategies, Inc. v. Gonzalez-Nazario, 764 F. Supp. 3d 144, 162 (S.D.N.Y. 2025) (quoting Bluebanana Grp. v. Sargent, 107 N.Y.S.3d 667, 667 (2019) (citation omitted)).

## 2. **Analysis**

In the Amended Complaint, Plaintiffs assert that Blue Matter aided and abetted Ahmad's breach of her fiduciary duty and duty of loyalty to Precision by "contributing to and encouraging" her (1) "misappropriation of Precision's trade secrets and confidential and proprietary information"; and (2) by "inducing [her] to commence working for Blue Matter in violation of [her] agreement[] not to compete with [Precision]." (Am. Cmplt. (Dkt. No. 42) ¶ 156)

As to Plaintiffs' misappropriation of trade secrets theory, Plaintiffs cite evidence that Ahmad's Five-Year Plan – and the updated spreadsheet Ahmad sent Dandekar on June 24, 2019, containing financial forecasts, staffing plans, and compensation models for Blue Matter's new market access practice projected out for the next seven to ten years (see Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 78) – were premised on ISA data. (Pltf. R. 56.1 Stmt., Ex. 38 (Five Year Plan) (Dkt. No. 146-38); id., Ex. 41 (Jun. 24, 2019 Spreadsheet) (Dkt. No. 146-41); Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶ 26) ("The Five Year Plan, along with additional

information Ahmad provided Dandekar with in a spreadsheet bearing Bates No.

Ahmad_00004839, provided Blue Matter with a blueprint on how to enhance its market access

business and included, among other things, Precision's confidential and proprietary staffing and

compensation models, formulas, operations and financial strategies that ISA and Precision had

developed over 15 plus years and that were not publicly available.")).  Plaintiffs further allege

that this data is proprietary to Plaintiffs and was maintained as confidential.  (See Pltf. R. 56.1

Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶ 26)

> Plaintiffs have not proffered evidence, however, that Blue Matter was aware that
Ahmad's Five-Year Plan and her June 24, 2019 spreadsheet were premised on Plaintiffs' alleged
trade secret, proprietary, and confidential information.  As discussed above – in order to prevail
on a claim of aiding and abetting a breach of fiduciary duty – a plaintiff must demonstrate
"knowledge of the breach by the aider and abettor."  Melwani, 2023 WL 1991423, at *5 (internal
quotations and citations omitted); see also Aon Risk Servs. v. Cusack, 34 Misc. 3d 1205(A), 946
N.Y.S.2d 65, at *13 (N.Y. Sup. Ct. 2011) ("'[A] plaintiff is not required to allege that the aider
had an intent to harm, [but] there must be an allegation that such defendant had actual
knowledge' of the underlying breach of fiduciary duty.") (quoting Kaufman v. Cohen, 307
A.D.2d 113, 125 (3d Dept. 2003)); Lefkowitz v. Bank of New York, 676 F. Supp. 2d 229, 262
(S.D.N.Y. 2009) ("To aid and abet a violation [of fiduciary duty], the defendant must knowingly
participate in the breach—that is, he must actually know of the violation rather than have
constructive knowledge. . . ."); Bd. of Managers of 411 E. 53rd St. Condo. v. Perlbinder, 151
A.D.3d 523 (1st Dep't 2017) (affirming grant of summary judgment on plaintiff's claim for
aiding and abetting a breach of fiduciary duty; concluding that plaintiff had offered "insufficient
evidence to support a conclusion that [defendant] had actual knowledge of [co-defendant's]

alleged breach of fiduciary duty"). Because Plaintiffs have not proffered evidence that Blue Matter was aware that Ahmad's Five-Year Plan or her June 24, 2019 spreadsheet were premised on Plaintiffs' alleged trade secret, proprietary and confidential information, Blue Matter is entitled to summary judgment on Plaintiff's aiding and abetting a breach of fiduciary duty claim to the extent that it is premised on the assertion that Ahmad misappropriated Plaintiffs' trade secret, proprietary, or confidential information.[5]

The Amended Complaint also asserts that Blue Matter aided and abetted Ahmad's breach of fiduciary duty by "inducing [her] to commence working for Blue Matter in violation of [her] agreement[] not to compete with [Precision]." (Am. Cmplt. (Dkt. No. 42) ¶ 156) As noted above, however, in moving for summary judgment on their aiding and abetting claim, Plaintiffs contend only that (1) "Ahmad breached her fiduciary duty and duty of loyalty to Precision by advising Blue Matter on the development of its market access practice and assisting Blue Matter in recruiting Jauregui and Malhotra while she was still employed with Precision"[6]; and (2) "Blue Matter knowingly participated in Ahmad's breach. . . ." (Pltf. Sum. J. Br. (Dkt. No. 144) at 28) Moreover, in opposing Blue Matter's motion for summary judgment on Plaintiffs' aiding and abetting claim, Plaintiffs say only that "the evidence establishes that, with full knowledge of Ahmad's duties to Precision – as the leader of Precision's [Global Pricing and Market Access] practice – Dandekar coordinated with Ahmad to develop plans for a competing market access practice at Blue Matter and to recruit the remaining leaders of Precision's [Global Pricing and

---

[5] The Court also notes that it is entirely unclear from Plaintiffs' briefing what projections in Ahmad's Five-Year Plan and June 24, 2019 spreadsheet are premised on Precision data that Plaintiffs claim is trade secret, proprietary or confidential.

[6] While Plaintiffs complain that Ahmad "advis[ed] Blue Matter on the development of its market access practice," it is not clear what "advice" Plaintiffs are referring to other than the Five Year Plan and the spreadsheet discussed above.

Market Access] practice, Jauregui and Malhotra, to build [a Blue Matter market access practice]."  (Pltf. Opp. (Dkt. No. 161) at 18-19 (internal citations omitted))

In sum, in opposing Defendant's motion for summary judgment, Plaintiffs do not contend that Blue Matter aided and abetted Ahmad's breach of her fiduciary duty and duty of loyalty by inducing Ahmad to work at Blue Matter in violation of her non-compete agreement. Plaintiffs instead merely repeat the arguments they made in their moving papers:  that Blue Matter induced Ahmad's breach of her fiduciary duty and duty of loyalty to Precision by "coordinat[ing]" with Ahmad as she (1) advised Blue Matter on the development of its market access practice, and (2) assisted Blue Matter in recruiting Jauregui and Malhotra.  Accordingly, Plaintiffs have abandoned their aiding and abetting claim to the extent it is premised on the notion that Blue Matter induced Ahmad to begin work at Blue Matter in violation of her agreement not to compete with Precision.  See Duarte, 265 F. Supp. 3d at 352-53.

As to Plaintiffs' assertion that Blue Matter induced Ahmad to breach her fiduciary duty by soliciting Jauregui and Malhotra to "join her at Blue Matter" (Pltf. Sum. J. Br. (Dkt. No. 144) at 28 ("Here, the undisputed record establishes that . . . Ahmad breached her fiduciary duty and duty of loyalty to Precision by . . . assisting Blue Matter in recruiting Jauregui and Malhotra while she was still employed with Precision. . . ."); Pltf. Reply Br. (Dkt. No. 166) at 12), to the extent that Plaintiffs rely on conduct that Ahmad engaged in after she left Precision, they have cited no case suggesting that a breach of fiduciary duty claim can be premised on post-employment conduct of this sort.

In this regard, Plaintiffs rely primarily on Augat, Inc. v. Aegis, Inc., 409 Mass. 165 (1991), which applies Massachusetts law.  (See Pltf. Reply Br. (Dkt. No. 166 at 12-13)  No party here has argued that Massachusetts law applies.  In any event, the disloyal manager at issue

in Augat, while "still general manager of [plaintiff][,] . . . solicited several

important . . . employees of [plaintiff] to join [a competitor]. . . ." Augat, 409 Mass. at 171. In

upholding a claim of aiding and abetting a breach of fiduciary duty, the Massachusetts court

emphasized that

> [t]he rule we express for the purposes of this case applies only to a general
> manager who, while still employed, secretly solicits key managerial employees to
> leave their employment to join the general manager in a competitive enterprise.

Id. at 174-75. In short, nothing in Augat, suggests that a breach of fiduciary duty claim can be

premised on a former employee's post-employment solicitation of her former colleagues.[7]

To the extent that Plaintiffs contend that Ahmad – while still employed at

Precision[8] – breached her fiduciary duty by soliciting Jauregui and Malhotra to join Blue Matter,

Plaintiffs have not proffered evidence sufficient to create a material issue of fact concerning this

point. The Rule 56.1 paragraphs cited by Plaintiffs in their summary judgment brief (see Pltf.

Sum. J. Br. (Dkt. No. 144) at 29 (referring to the "Statement of Material and Undisputed Facts,

Sections E, G, H, J, and K" in Plaintiffs' summary judgment brief)) for this assertion do not

---

[7]  Advance 2000, 2019 WL 6725977, and Aon Risk Servs. v. Cusack, 34 Misc. 3d 1205(a), 946
N.Y.S.2d 65 (Sup Ct. N.Y. Cty. 2011) – also cited by Plaintiffs (see Pltf. Sum. J. Br. (Dkt. No.
144) at 28-29; Pltf. Reply Br. (Dkt. No. 166) at 12) – are of no assistance to Plaintiffs, for
multiple reasons. In Advance 2000 – which arises at the pleading stage and not at summary
judgment – the district court declined to dismiss a breach of fiduciary duty claim where plaintiff
had alleged that defendants – while "still paid employees of [plaintiff], . . . breached their
fiduciary duty to [plaintiff] by delivering confidential information to [a competitor]." Advance
2000, 2019 WL 6725977, at *3-4. Aon Risk Servs. arises in the context of a motion for a
preliminary injunction, and also addresses the alleged misconduct of a current – as opposed to a
former – employee. Aon Risk Servs., 946 N.Y.S.2d, at *16 (finding that plaintiff Aon had
established a likelihood of success on its breach of fiduciary duty and breach of loyalty claim
where its former managing director – while still holding that position and enjoying access to
Aon's "most confidential strategic, financial and client information" – "entered into negotiations
with [a competitor]," expensed to Aon secret trips to meet with the competitor, and secured
business for the competitor).
[8]  As noted above, Ahmad's effective resignation date from Precision was July 12, 2019. (Def.
R. 56.1 Resp. (Dkt. No. 151) ¶ 73)

involve Ahmad's alleged solicitation of Jauregui and Malhotra. These paragraphs instead address Ahmad's conversations with Dandekar (see, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 48-54, 75-80), and Ahmad's resignation from Precision (including Malhotra's coaching of Ahmad on what to say during her resignation call). (See id. ¶¶ 69-74) And while Plaintiffs' Rule 56.1 statement asserts that "Malhotra testified that Ahmad had presented him with the same Five Year Plan that she shared with Dandekar and advised him that he would be either MD#2 or MD#3" (id. ¶ 55 (citing Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 128:18-129:18, 140:13-143:22)), Malhotra actually testified that while he initially thought Ahmad had shown him the Five-Year Plan before showing it to Blue Matter, he later concluded that she had only showed it to him after she had left Precision. (Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 128:18-130:3 ("Q. Did you talk to Naina [Ahmad] about developing a Global Pricing and Market Access five-year plan for Blue Matter? A. Yes. Q. When did you have those discussions with Naina? A. I don't recall, but I imagine it would be around the fall-ish timeframe perhaps. . . . Q. Did she ask you to review this plan before she provided it to Blue Matter? A. Yes. I think she had asked me for my opinion on it. Q. Do you know if that was before or after she sent it to Ashwin? A. No, I don't know. Q. Do you know if she was still working at Precision when she asked you to look at it? A. In my recollection – no, my recollection of timing, this would have to be after she left."))[9]

   In sum, Plaintiffs have not demonstrated that Ahmad's alleged post-employment solicitation of Jauregui and Malhotra can serve as the basis for a breach of fiduciary duty claim,

---

[9] The remaining Rule 56.1 paragraphs cited by Plaintiffs (see Pltf. Sum. J. Br. (Dkt. No. 144) at 29) describe events that took place after Ahmad's resignation from Precision became effective on July 12, 2019. (See, e.g., Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 90-91, 102-03, 107-110, 112-113, 115-23)

and Ahmad's alleged pre-resignation conduct does not amount to solicitation of Jauregui and Malhotra.[10]

For all these reasons, Defendant Blue Matter's motion for summary judgment on Plaintiffs' aiding and abetting breach of fiduciary duty claim (Count IV) will be granted, and Plaintiffs' cross-motion concerning Count IV will be denied.

### B.    Tortious Interference with Contract

Plaintiffs and Defendant Blue Matter have cross-moved for summary judgment on Count V of the Amended Complaint, which alleges that Blue Matter tortiously interfered with Ahmad, Jauregui, and Malhotra's employment contracts with Precision by inducing them to breach their non-compete obligations and – in Ahmad's case – by inducing her to breach her non-solicitation obligations.  (Pltf. Sum. J. Br. (Dkt. No. 144) at 22; Def. Sum. J. Br. (Dkt. No. 155) at 9)

According to Plaintiffs,

the undisputed record irrefutably establishes that:  (i) Ahmad, Jauregui, and Malhotra were bound by valid Non-Solicit and Non-Compete Obligations to Precision; (ii) Blue Matter was aware of those obligations; (iii) Blue Matter intentionally induced Ahmad to breach her Non-Solicit Obligations and intentionally induced Ahmad, Jauregui, and Malhotra to breach their Non-Compete Obligations; (iv) Ahmad, Jauregui, and Malhotra actually breached those obligations; and (v) Precision has suffered damages as a result. Accordingly, Precision should be granted partial summary judgment on its

---

[10]  To the extent that Plaintiffs argue that Ahmad breached her fiduciary duty by using "her employer's time [and] facilities" to help build a competing market access business at Blue Matter (see Pltf. Reply Br. (Dkt. No. 166) at 14 (citing DoubleClick v. Henderson, 1997 WL 731413, at *6 (N.Y. Sup. Ct. Nov. 7, 1997)), this argument is raised for the first time in Plaintiffs' Reply, and thus cannot be considered by the Court.  Eaton & Van Winkle, LLP v. Yunling Ren, No. 17 CIV. 1535 (PGG), 2020 WL 1244135, at *4 (S.D.N.Y. Mar. 16, 2020) ("[N]ew arguments cannot be raised for the first time in a reply brief.") (citing Scott v. Westchester Cty., No. 18 CV 7203 (VB), 2020 WL 364251, at *4 (S.D.N.Y. Jan. 22, 2020); Tutor Time Learning Centers, LLC v. GKO Grp., Inc., No. 13 Civ. 2980 (JMF), 2013 WL 5637676, at *1 (S.D.N.Y. Oct. 15, 2013); United States v. Sampson, 898 F.3d 287, 314 (2d Cir. 2018)).

tortious interference with contract claim, with the Company's damages to be determined at trial.

(Pltf. Sum. J. Br. (Dkt. No. 144) at 22-23)

Blue Matter asserts, however, that (1) "there is absolutely no evidence that Blue Matter caused Ahmad, Jauregui, and Malhotra to allegedly breach their restrictive covenants or to leave Precision" (Def. Sum. J. Br. (Dkt. No. 155) at 9); (2) "Ahmad, Jauregui, and Malhotra did not breach their restrictive covenants" (id. at 14); and (3) even if "Ahmad, Jauregui and Malhotra did violate their restrictive covenants[,] . . . the restrictive covenants are unenforceable." (Id. at 15)

The elements of tortious interference with contract are "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" Kirch v. Liberty Media Corp., 449 F.3d 388, 401-02 (2d Cir. 2006) (quoting Lama Holding Co. v. Smith Barney Inc., 88 N.Y.2d 413, 424 (1996)). The third element – intentional procurement – requires "but for" causation. For a plaintiff to prevail on this element, "the third party's breach must have been caused by the defendant, meaning that the breach would not have occurred but for the defendant's acts." Wolff v. Rare Medium, Inc., 210 F. Supp. 2d 490, 498 (S.D.N.Y. 2002), aff'd, 65 F. App'x 736 (2d Cir. 2003).

Defendant does not dispute that the second element is satisfied here. (See Def. Sum. J. Br. (Dkt. No. 155) at 9-17; Def. Opp. (Dkt. No. 150) at 5-12)

The Court addresses first Plaintiffs' claim that Blue Matter committed tortious interference with contract by inducing Ahmad to breach her non-solicitation obligations as set forth in her Precision offer letter.

1.    **Tortious Interference with Contract Based on Ahmad's**
      **Alleged Breach of Her Non-Solicitation Obligations**

Plaintiffs argue that the "record demonstrates that Blue Matter intentionally procured Ahmad's breach of her Non-Solicit Obligations by enlisting her to provide critical information and assistance in recruiting both Jauregui and Malhotra." (Pltf. Sum. J. Br. (Dkt. No. 144) at 24)  In this regard, Plaintiffs contend that evidence in the record shows the following:

- "In fall 2019, Ahmad presented Dandekar with the Five Year Plan, calling on Blue Matter to make a 'personnel investment' in a 'team of leaders' to build [the Blue Matter Market Access practice]" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 48-53));

- At this same time, "Ahmad made clear to Dandekar that Malhotra and Jauregui could be those leaders."  Dandekar has admitted that "he knew that Jauregui 'was part of the plan that [Ahmad] was proposing' and, as Malhotra testified, Ahmad specifically advised him that he would be either MD#2 or MD#3 in the Five Year Plan" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 54-55));

- "Ahmad . . . served as an intermediary between Dandekar, on the one hand, and Jauregui and Malhotra, on the other, apprising Jauregui and Malhotra of her and Dandekar's discussions about building [the Blue Matter Market Access practice] and providing Dandekar with 'intel' on Jauregui and Malhotra's reactions to [this] idea" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 60-63, 81-82));[11]

- "While Jauregui was reluctant to leave Precision for financial reasons, Dandekar was able to successfully recruit him through Ahmad's direct efforts and by using information she provided him."  Ahmad prepared Jauregui for his discussions with Dandekar about joining Blue Matter.  Indeed, as Jauregui told Dandekar, the compensation package Jauregui requested "'ended up aligning with what [Ahmad] had shared [with him],'" and was "'exactly what was laid out [concerning Jauregui]'" in the "'updated excel file'" Ahmad provided to Dandekar on June 24, 2019.  (Id. at 25 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 84-94))

---

[11] While paragraph 81 of Plaintiffs' Rule 56.1 statement cites to, inter alia, pages 312-13 of Ahmad's deposition (see Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 81), neither side has submitted these excerpts from the Ahmad deposition to the Court.  (See id., Ex. 4 (Ahmad Dep.) (Dkt. No. 146-5); Def. R. 56.1 Stmt. App., Ex. 4 (Ahmad Dep.) (Dkt. No. 156-1))

- "Dandekar . . . collaborated closely with Ahmad to recruit Malhotra – [with] whom [Dandekar had had no previous contact] – relying on Ahmad to introduce him to Malhotra and arrange a joint meeting in a Manhattan coffee shop in the fall of 2019, where the three of them discussed Malhotra's interest in 'building something.'" (Id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 96-106));

- "By November 6, 2019, through the joint efforts of Dandekar and Ahmad, Blue Matter had secured the 'team of leaders' Ahmad had proposed in her Five Year Plan – namely, Ahmad herself, Jauregui, and Malhotra." (Id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 107)).

Plaintiffs further contend that,

[i]n April 2019, after providing Dandekar with a copy of her contractual obligations to Precision, Ahmad met with Dandekar and then sent Jauregui and Malhotra an email with the subject "Ashwin follow up" and told them, "I'd like to say that I am interested[.]"

(Pltf. Reply Br. (Dkt. No. 165) at 7 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 43-47))

In arguing that the record does not demonstrate that Blue Matter induced Ahmad to breach her non-solicitation obligations, Defendant contends, inter alia, that "Jauregui and Malhotra were unhappy with their employment with Precision . . . , which was caused by Precision's own poor management" (Def. Opp. (Dkt. No. 150) at 5 (citing Def. R. 51.6 Stmt. (Dkt. No. 156) ¶¶ 198, 210-227; Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 23)); that "Precision effectively pushed Malhotra out on its own, as its executives expressly desired" (id. at 5-6 (citing Def. R. 51.6 Stmt. (Dkt. No. 156) ¶¶ 219-226)); and that the evidence "demonstrates that Ahmad actually urged Malhotra to stay at Precision, as she believed that opportunities would open up for him, though Malhotra ultimately decided to leave on his own because the environment was toxic." (Id. at 6 (citing Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 100) (emphasis in original))

Blue Matter contends that "there is absolutely no evidence that Blue Matter caused Jauregui and Malhotra to resign at all, let alone by inducing Ahmad to breach her non-solicit obligations." (Id. (emphasis in original); see also Def. Sum. J. Br. (Dkt. No. 155) at 9-15 ("there is absolutely no evidence that Blue Matter caused Ahmad, Jauregui, and Malhotra to

allegedly breach their restrictive covenants or to leave Precision")) According to Blue Matter –

because "the evidence shows that the alleged 'breach would have occurred "[absent] any

involvement by"' [Blue Matter] 'or apart from [Blue Matter's] actions'" – Plaintiffs have not

shown "'but-for causation.'" (Def. Opp. (Dkt. No. 150) at 7 (quoting Rich v. Fox News

Network, LLC, 939 F.3d 112, 127 (2d Cir. 2019)) Blue Matter further contends that New York

courts "routinely dismiss[] . . . tortious interference claim[s]" where "a former employee resigns

due to issues with his/her employment, and then the former employer tries to shift the blame onto

the new employer with a tortious interference claim. . . ." (Id. at 7-8 (citing IDG USA, LLC v.

Schupp, 2012 WL 5217223 (W.D.N.Y. Oct. 22, 2012); Metito LTD., v. G.E. Co., 2009 WL

399221 (S.D.N.Y. Feb. 18, 2009); Michele Pommier Models, Inc. v. Men Women N.Y. Model

Management, Inc., 173 F.3d 845 (2d Cir. 1999))

        a.    **Analysis**

      In connection with the intentional procurement element of a tortious interference

with contract claim, "'it is not enough that a defendant engaged in conduct with a third-party that

happened to constitute a breach of the third party's contract with the plaintiff; instead, the

evidence must show that the defendant's objective was to procure such a breach.'" Wellington

Shields & Co. LLC v. Breakwater Inv. Mgmt. LLC, No. 14-CV-7529 (RJS), 2016 WL 5414979,

at *5 (S.D.N.Y. Mar. 18, 2016) (quoting Roche Diagnostics GmbH v. Enzo Biochem, Inc., 992

F. Supp. 2d 213, 221 (S.D.N.Y. 2013)) (emphasis in Wellington Shields). "Put simply, a

defendant must specifically intend to interfere with the relevant contract [to be liable for tortious

interference]." Roche Diagnostics GmbH, 992 F. Supp. 2d at 221.

      As discussed above, Ahmad's Precision offer letter contains the following non-

solicitation provision:

<u>Non-Solicitation of Employees, Customers and Other Business Relations</u>. You agree not to, while employed with [Precision] and for a period of . . . twenty-four (24) months after the date upon which your employment . . . terminates . . . , do any of the following:

> (i)    encourage any . . . employee of the Company . . . to leave his or her employment with the Company . . . or assist any third party . . . to offer, employ, engage, solicit or entice any employee of the Company. . . ;

(Pltf. R. 56.1 Stmt., Ex. 18 (Ahmad Contract) (Dkt. No. 146-18) at 6)

Accordingly, the Court must consider whether the evidence demonstrates that Blue Matter intentionally procured Ahmad's alleged breach of her non-solicitation obligations by causing her to (1) "encourage [Jauregui and Malhotra] to leave [their] employment [at Precision]"; or (2) "assist" Blue Matter in its efforts to "offer, employ, engage, solicit or entice [Jauregui and Malhotra to join Blue Matter]."  And contrary to Blue Matter's arguments (Def. Sum. J. Br. (Dkt. No. 155) at 9-14), the "intentional procurement" element here does not turn on whether Jauregui and Malhotra would have resigned from Precision even absent Ahmad and Blue Matter's alleged actions.  The issue – in that regard – is whether Ahmad would have breached her non-solicitation obligations even absent Blue Matter's actions.  <u>Wolff</u>, 210 F. Supp. 2d at 498.

To demonstrate that Blue Matter procured Ahmad's alleged breach of her non-solicitation obligations, Plaintiff must offer evidence that Blue Matter "commit[ted] an intentional act whose probable and foreseeable outcome" was that Ahmad would breach her non-solicitation obligations by encouraging Jauregui and Malhotra to leave their employment at Precision, or that she would assist Blue Matter in offering, employing, engaging, soliciting or enticing Jauregui and Malhotra to join Blue Matter.  <u>Leventhal v. Franzus Co.</u>, 88 Civ. 3547 (MBM), 1988 WL 132868, at *7 (S.D.N.Y. Dec. 6, 1988); <u>see also</u> <u>Union Cent. Life Ins. Co. v. Berger</u>, No. 10 CIV. 8408 PGG, 2012 WL 4217795, at *14 (S.D.N.Y. Sept. 20, 2012), <u>aff'd</u>, 612

F. App'x 47 (2d Cir. 2015) ("A defendant intentionally procures a breach when he 'knows of a valid . . . contract' and 'commits an intentional act whose probable foreseeable outcome is that one party will breach the contract, causing the other party damage.'") (quoting Leventhal v. Franzus Co., 88 Civ. 3547 (MBM), 1988 WL 132868, at *7 (S.D.N.Y. Dec. 6, 1988)).[12]

The evidence Plaintiffs cite in this regard does not demonstrate that Blue Matter directed or induced Ahmad's actions.  For example, while Ahmad sent an April 2019 email to Jauregui and Malhotra with the subject line "Ashwin follow up," and stated, "I'd like to say that I am interested," there is no evidence that Blue Matter directed or induced Ahmad to transmit this email to Jauregui and Malhotra.  (See Pltf. R. 56.1 Stmt., Ex. 36 (Apr. 29, 2019 Email) (Dkt. No. 146-36) at 2)  Indeed, Ahmad testified that the "purpose of" her email "was to keep them updated on what I was thinking about myself."  (Pltf. R. 56.1 Stmt., Ex. 4 (Ahmad Dep.) (Dkt. No. 146-5) at 223:5 – 223:14) ("Q.  Now, in an earlier e-mail we saw, you had e-mailed Jay [Jauregui] about a conversation with Ashwin [Dandekar] and here you are emailing both Jay and Mridul [Malhotra].  Were you keeping them in the loop at this point because the idea that Ashwin had involved them potentially joining you at Blue Matter?  A.  My purpose of informing them was to keep them updated on what I was thinking about myself.")  There is no contrary evidence.

---

[12]  While other district courts have stated that they are "not persuaded" that the "'probable foreseeable outcome' standard" "is the appropriate standard under New York law," they have concluded in the alternative that "a plaintiff asserting a tortious interference claim must plausibly allege that the defendant knew that the interference would be 'a necessary consequence of his action.'"  Power Up Lending Grp., Ltd. v. Parallax Health Scis., Inc., No. 20-CV-3259 (JMA) (AYS), 2023 WL 3006802, at *6–7 (E.D.N.Y. Apr. 19, 2023) (quoting Restatement (Second) of Torts § 766(j)).  In any event, applying the alternative standard articulated in Power Up Lending Grp, 2023 WL 3006802, would lead to the same result here, and for the same reasons.

Similarly, while the evidence indicates that Dandekar received "'intel'" from Ahmad that "Jauregui and Malhotra might be interested in joining Blue Matter as well" (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 61 (citing Dandekar Dep. (Dkt. No. 146-8) at 198:17-201:13); see also id. ¶ 60 (citing Dandekar email from early July 2019 in which he "advised a staffing recruiter . . . 'not [to] send us any candidates from ISA. . . . We have already identified a number of ISA candidates . . . based on some intel we have and are in the process of reaching out to them. . . .'"); id. ¶ 62 (citing Dandekar testimony that his email to the staffing recruiter referred to Jauregui and Malhotra; "'at that point Naina [Ahmad] had expressed to me that they were interested in joining'")), there is no evidence that Dandekar sought information from Ahmad about Jauregui and Malhotra's interest in joining Blue Matter, as opposed to Ahmad volunteering this information to Dandekar. Indeed, while Ahmad and Dandekar testified at deposition about their efforts to solicit Jauregui and Malhotra, neither testified that Dandekar directed Ahmad to solicit Jauregui and Malhotra, or that he sought Ahmad's assistance in soliciting Jauregui and Malhotra. (See Pltf. R. 56.1 Stmt., Ex. 7 (Dandekar Dep.) (Dkt. No. 146-8) at 189:22-192:15, 201:5-201:13; 203:15-203:25, 204:22-205:3; id., Ex. 4 (Ahmad Dep.) (Dkt. No. 146-5) at 293:24-294:5, 296:14-297:24) Malhotra and Jauregui likewise did not testify that Dandekar was directing – or appeared to be directing – Ahmad's efforts to solicit them to work at Blue Matter, or that Ahmad appeared to be assisting Dandekar in recruiting them. (See Pltf. R. 56.1 Stmt., Ex. 5 (Jauregui Dep.) (Dkt. No. 146-6) at 189:2-189:15, 192:13-192:20, 195:3-195:6; id., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 117:16-118:23, 120:2-120:21, 122:9-123:2, 128:18-129:21, 138:8-138:17, 140:3-143:22)

As to the Five-Year Plan Ahmad provided to Blue Matter, while Dandekar testified that "'[Jauregui] was part of the'" Five Year "'plan that . . . [Ahmad] was proposing to

[him]'" in the summer of 2019 (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 54 (quoting Pltf. R. 56.1

Stmt., Ex. 7 (Dandekar Dep.) (Dkt. No. 146-8) at 188:12-189:21)), and "Malhotra testified that

Ahmad had presented him with the same Five Year Plan that she shared with Dandekar and

advised him that he would be either [the] MD#2 or MD#3 [referenced in the Plan]" (Def. R. 56.1

Resp. (Dkt. No. 151) ¶ 55 (citing Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at

128:18-129:18, 140:13-143:22)), there is no evidence that Dandekar directed or induced Ahmad

to (1) prepare the Five-Year Plan and submit it to him; (2) share the Five-Year Plan with

Malhotra; or (3) propose to Malhotra that he join the envisioned Blue Matter market access team.

As to the fall 2019 coffee shop meeting attended by Dandekar, Ahmad, and

Malhotra, Plaintiffs have proffered no evidence that Dandekar directed or induced Ahmad to (1)

arrange or attend the meeting; or (2) introduce Dandekar to Malhotra.  Dandekar merely testified

that Ahmad "put him in touch" with Malhotra, and that they met in a coffee shop before Blue

Matter made a job offer to Malhotra.  (Pltf. R. 56.1 Stmt., Ex. 7 (Dandekar Dep.) (Dkt. No. 146-

8) at 203:15-205:3) ("Q. . . . This offer letter that I just referenced that's dated October 29, 2019,

this is the earliest communication that we have between you and Mr. Malhotra.  Is it fair to say

that you had prior communications with him before sending the October 29, 2019 offer letter?

A.  I remember meeting him in a coffee shop somewhere once.  It's – it was definitely before the

offer, but I don't know when. . . . Q.  How was it that you first made contact with him?  Did

someone put him in touch with you?  A.  Yeah, Naina [Ahmad] did.")

Nor does Malhotra's testimony about the circumstances leading up to the fall

2019 coffee shop meeting indicate that Dandekar induced any of Ahmad's actions:

Q.  When did you first consider the possibility of leaving Precision to go work at Blue
Matter?

A.  Fall of 2019.

Q. How did you become aware at that point there was now a potential opportunity for you at Blue Matter?

A. Conversation with Naina [Ahmad].

Q. Who initiated that conversation; you or Naina?

A. She did.

. . . .

Q. What did she say to you?

A. I know of this guy named Ashwin. He's running Blue Matter. They have a very strong culture. I'm considering it. Something that you would be interested in. Have a discussion. Very broad.

. . . .

Q. Did you say anything during that discussion?

A. Yeah. I said okay, I would like to hear more, what are we talking about.

Q. And what happened next in the process?

A. The three of us met together, Ashwin, Naina and myself, I don't know, September, maybe October, fall.

Q. Where did you guys meet?

A. Coffee shop in Manhattan.

. . . .

Q. And what did you guys discuss during that meeting?

A. He wanted to know what my path was, what my past was, what motivated me, what excited me, what I wanted to do next, broad brushstrokes.

Q. What did you tell them you wanted to do next?

A. I wanted to build. I was a builder, and I wanted an opportunity where I could build something.

Q. Build what?

A. That was nondescriptive. We actually didn't even talk about what exactly the building was. We assumed it would be some sort of expertise that we had. I had shared with him that I wanted to do something different. He knew I was bored of the last ten years of market access, and I wanted to try something different.

Q. You wanted to build something at Blue Matter that was different than what you had already been doing?

A. No, that's not specifically what I shared with him. He had asked me what it is I wanted and I said I wanted to, A, try something different and B, be in a leadership position to build it out. We didn't specifically say be at Blue Matter. He asked what I wanted. That's what I shared.

(Pltf. R. 56.1 Stmt., Ex. 6 (Malhotra Dep.) (Dkt. No. 146-7) at 117:16-121:18)

Plaintiffs also assert that "[o]n November 6, 2019, just a week after extending an offer to Malhotra, Dandekar met with Ahmad, Jauregai, and Malhotra to discuss '[Blue Matter Market Access] Leadership Compensation'" (Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 107; see also Pltf. Sum. J. Br. (Dkt. No. 144) at 25 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 107)) But again, there is no evidence that Dandekar directed or induced Ahmad to take any action related to this meeting.

As discussed above, in order to prevail on their claim that Blue Matter tortiously interfered with Ahmad's non-solicitation contractual obligation, Plaintiffs must offer evidence that Blue Matter "commit[ted] an intentional act whose probable foreseeable outcome" was that Ahmad would breach her non-solicitation obligations.[13] Because Plaintiffs have not proffered

---

[13] In arguing that Blue Matter intentionally procured Ahmad's breach of her contractual non-solicitation obligation, Plaintiffs rely primarily on Revere Transducers, Inc. v. Deere & Co., 595 N.W.2d 751, 768 (Iowa 1999), which applies Iowa law. (See Pltf. Sum. J. Br. (Dkt. No. 144) at 25) No party here has argued that Iowa law applies. In any event, the facts in Revere are not comparable to the evidence here. In Revere, the basis for plaintiff's tortious inference with contract claim was that defendant "Deere allegedly induced two former Revere employees, Greg Eckart and Francis Delfino, to violate an employment agreement with Revere, start a company, and develop and manufacture a draft sensor device to sell to Deere, which would replace a similar device that Revere was manufacturing and selling to Deere." Revere Transducers, 595

evidence that Blue Matter induced or directed Ahmad to (1) solicit Jauregui or Malhotra to join

Blue Matter, or (2) assist Blue Matter in its solicitation of Jauregui or Malhotra, Blue Matter is

entitled to summary judgment on Plaintiffs' tortious interference with contract claim to the

extent that claim is based on Ahmad's alleged solicitation of Jauregui and Malhotra or alleged

assistance to Blue Matter in its efforts to hire Jauregui and Malhotra.

### 2. Tortious Interference with Contract Based on Ahmad, Jauregui, and Malhotra's Alleged Breach of their Non-Compete Obligations

Plaintiffs and Blue Matter have cross-moved for summary judgment on Plaintiffs'

claim that Blue Matter intentionally procured Ahmad, Jauregui, and Malhotra's alleged breach of

their non-compete obligations in their Precision offer letters and contracts.  (Pltf. Sum. J. Br.

(Dkt. No. 144) at 25-28; Def. Sum. J. Br. (Dkt. No. 155) at 9-17)

---

N.W.2d at 755.  In upholding a jury verdict concluding that Deere had intentionally and
improperly interfered with Revere's agreement with Delfino and Eckart, the Iowa court
explained that

> Revere presented evidence that Kunath of Deere allegedly contacted Eckart concerning a
> proposal for a device to replace [Revere's device], while Deere contends that it was
> Eckart who contacted Kunath.  Regardless of who actually initiated the idea for the
> proposal, Delfino, Eckart and Kunath not only discussed the idea of developing an
> alternative to replace [Revere's device], but took affirmative steps towards development
> and manufacturing such a device.  All of this was done, including Deere's promise that it
> would appropriate the funds for development, while Delfino and Eckart were still
> employed by Revere and when Deere, through its employees, had knowledge or were on
> notice of Delfino and Eckart's agreement with Revere concerning disclosure of
> inventions and/or discoveries and confidential information.

Id. at 768.

In sum, there was evidence in Revere that a Deere employee had taken "affirmative steps" to
induce the third parties – Delfino and Eckart – to violate their employment agreements with
Revere.  By contrast, and as discussed above, Plaintiffs have not proffered evidence that Blue
Matter took affirmative steps to induce Ahmad to violate her non-solicitation obligations.

As discussed above, in order to prevail on a tortious interference with contract claim, a plaintiff must proffer evidence showing "(1) 'the existence of a valid contract between the plaintiff and a third party'; (2) the 'defendant's knowledge of the contract'; (3) the 'defendant's intentional procurement of the third-party's breach of the contract without justification'; (4) 'actual breach of the contract'; and (5) 'damages resulting therefrom.'" Kirch, 449 F.3d at 401-02 (quoting Lama Holding, 88 N.Y.2d at 424).

As to damages, Plaintiffs assert that "Blue Matter's conduct with respect to Ahmad, Jauregui, and Malhotra devastated Precision's [Global Pricing and Market Access] practice and cost the Company millions of dollars in lost cash flow and enterprise value. . . ." (Pltf. Sum. J. Br. (Dkt. No. 144) at 21 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 172)) In arguing that Precision suffered damages as a result of Blue Matter's tortious interference with contract, Plaintiffs further contend that "Blue Matter does not dispute that Precision was damaged when Blue Matter recruited Ahmad, Jauregui, and Malhotra to leave Precision to run Blue Matter's competing market access practice. As Dandekar himself admitted, 'I knew [Precision] would be harmed, but I had no idea how big it would be or that was not my intention.'" (Id. at 28 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 171)) According to Plaintiffs, "as there are no genuine issues of fact with respect to Blue Matter's liability on Precision's tortious interference with contract claim, this Court should grant [Plaintiffs] summary judgment on [their tortious interference with contract claim,] and the precise amount of Precision's damages should be determined at trial." (Id.)

In moving for summary judgment on Plaintiffs' tortious interference with contract claim, however, Blue Matter contends that there is no evidence that Precision suffered damages as a result of Blue Matter's alleged actions inducing Ahmad, Jauregui, and Malhotra to breach

their non-compete obligations. According to Blue Matter, "there is no evidence that Ahmad, Jauregui, and Malhotra solicited market access consulting work from any of Precision's clients – in fact, Precision is wholly unable to establish that it lost any clients or projects to [Ahmad, Jauregui, or Malhotra], much less Blue Matter itself." (Def. Sum. J. Br. (Dkt. No. 155) at 15 (citing Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 234)) Blue Matter further contends that "Precision's inability to demonstrate damages alone precludes its tortious interference [with contract] claim." (Id. (citing Design Partners, Inc. v. Five Star Elec. Corp., 2018 WL 3636700, at *15-16 (E.D.N.Y. Feb. 24, 2018); Banner Indus. of N.E., Inc. v. Wicks, 71 F. Supp. 3d 284, 305 (N.D.N.Y. 2014), aff'd, 631 Fed. Appx. 79 (2d Cir. 2016)); see also Def. Opp. (Dkt. No. 150) at 12 n.2 (citing Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 234; Def. R. 56.1 Resp. (Dkt. No. 151) ¶¶ 171-72)) In their opposition brief (Pltf. Opp. (Dkt. No. 161)), Plaintiffs do not respond in any fashion to this argument.

### a.    Analysis

As discussed above, "'to maintain a claim for tortious interference with contractual relations, a plaintiff must establish damages.'" Maalouf v. Salomon Smith Barney, Inc., No. 02 CIV. 4770 (SAS), 2004 WL 2008848, at *8 (S.D.N.Y. Sept. 8, 2004), aff'd sub nom. Maalouf v. Citigroup Glob. Markets, Inc., 156 F. App'x 367 (2d Cir. 2005) (quoting Net2Globe Int'l, Inc. v. Time Warner Telecom of New York, 273 F. Supp. 2d 436, 463 (S.D.N.Y. 2003)) (granting defendant summary judgment on tortious interference with contract claim because plaintiff "cannot show damages").

"Under New York law, for tortious interference with contract, 'the elements of damages, including consequential damages, [are] those recognized under the more liberal rules applicable to tort actions.'" Rich v. Fox News Network, LLC, 939 F.3d 112, 128 (2d Cir. 2019) (quoting Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 406 N.E.2d 445, 452 n.6 (1980)).

"'One who is liable to another for interference with a contract . . . is liable for damages for (a) the pecuniary loss of the benefits of the contract or the prospective relation; (b) consequential losses for which the interference is a legal cause; and (c) emotional distress or actual harm to reputation, if they are reasonably to be expected to result from the interference.'" Id. (citing Restatement (Second) of Torts § 774A(1) (1979); Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 597 (2d Cir. 1996)).  "Stated differently, a 'plaintiff who establishes a valid tort claim for interference with contract . . . may recover in an appropriate case:  (1) general damages based on the difference between contract price and market value of the thing promised, where the interference prevents the performance of the thing promised; (2) special or consequential damages subject to the rules of proximate cause . . . and subject also to the requirements of the reasonable certainty and avoidable consequences rules; (3) punitive damages where the defendant's conduct and state of mind warrant punishment; and (4) emotional distress damages in a limited class of cases.'" Int'l Mins. & Res, 96 F.3d at 597 (quoting 2 Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution § 6.6(2), at 134 (2d ed. 1973)).

"General damages are 'normally . . . measured by the difference between the contract price and the value of the performance to be received.'  Consequential damages include recovery for lost profits, which must be proven with reasonable certainty." Id. (quoting 2 Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution § 6.6(2), at 134-35 (2d ed. 1973)).  "Thus, 'the damages for a tortious interference claim are linked to the damages for the breach of the underlying contract.'" AP Links, LLC v. Russ, No. 09-CV-5437(JS)(AKT), 2017 WL 3394599, at *8 (E.D.N.Y. Aug. 7, 2017) (quoting Design Partners, Inc. v. Five Star Electric Corp., No. 12-CV-2949, 2017 WL 818364, at *15 n.18 (E.D.N.Y. Mar. 1, 2017)).

In arguing that Plaintiffs have not offered evidence that they suffered damages as a result of Blue Matters's alleged tortious interference with contract, Blue Matter asserts that "Precision is wholly unable to establish that it lost any clients or projects to the three individual defendants, much less Blue Matter itself." (Def. Sum. J. Br. (Dkt. No. 155) at 15) In support of its argument that Plaintiffs have not "demonstrate[d] damages," Blue Matter cites Design Partners, Inc. v. Five Star Elec. Corp., 2018 WL 3636700, at *15-16 (E.D.N.Y. Feb. 24, 2018) and Banner Indus. of N.E., Inc. v. Wicks, 71 F. Supp. 3d 284, 305 (N.D.N.Y. 2014), aff'd, 631 Fed. Appx. 79 (2d Cir. 2016)).

In Design Partners, plaintiff's tortious interference with contract claim was "based on [defendant] Five Star's alleged solicitation and hiring of Stailey and [Wyllie]," two former Design Partners employees who – while at Design Partners – had performed work for Five Star. Plaintiff contended that – after leaving Design Partners – its former employees had taken positions at Five Star, in violation of their non-compete agreements. Id. at *7, *12-16. Five Star moved for summary judgment on Design Partners' tortious interference with contract claim, arguing that Design Partners could not "prove it was damaged as a result of Five Star's solicitation and hiring of Stailey and Wyllie." Design Partners responded that "the measure of [its] damages [would] be the number of years (or part thereof) that [its former] employees have worked at Five Star multiplied by 2000 hours per year, times the hourly rates that Design Partners charged for their services under the contracts to provide [services] to Five Star." Design Partners, Inc. v. Five Star Elec. Corp., No. 12CV2949PKCVMS, 2017 WL 818364, at *14 (E.D.N.Y. Mar. 1, 2017) (internal quotations and citations omitted). While "Design Partners cite[d] no facts or law in support of this measure of damages," the Design Partners court permitted "Design Partners to proceed to trial on general damages" premised on "profits diverted

from Design Partners as a direct result of Stailey's and Wyllie's switch to Five Star. . . ."[14] Id. at *14-15.

After a bench trial, however, the Design Partners court found that plaintiff had "failed to prove by a preponderance of evidence that Five Star committed tortious interference [with contract] with respect to [either Stailey or Wyllie]." Design Partners, 2018 WL 3636700, at *12-16. In so ruling, the court found that plaintiff was "unable to recover lost profit damages" as to its tortious interference with contract claim premised on Five Star's interference with Wyllie's non-compete agreement, because "there is no evidence that Five Star would have hired a consultant from Design Partners to replace Wyllie. First, there is no evidence that Design Partners could have met Five Star's design needs at the time Wyllie was hired by Five Star. Second, there is evidence that Five Star's contracting relationship with Design Partners ended shortly after Wyllie's termination." Id. at *16.

The court further concluded that "Design Partners failed to prove that it suffered any damages resulting from Five Star hiring Stailey," and thus "failed to prove the elements necessary for its claim for intentional interference as to Stailey." Id. at *12, 15.

> In setting forth a framework for calculating damages based on Five Star's hiring of Stailey, the Court's [summary judgment order] presupposed, but did not determine, that if Five Star had not hired Stailey . . . , Five Star would have hired another Design Partners consultant on the same terms as those under which Stailey worked for Design Partners before he resigned. Five Star is correct, however, that the facts presented at trial do not support an application of the damages framework set forth in the [summary judgment order]. Before he was ever solicited by Five Star, Stailey decided to resign from Design Partners because of the amount he was being paid and the location of the work. At the same time, Five Star was actively requesting that Design Partners supply additional

---

[14] While the Design Partners court stated that "[l]ost profits may" constitute either general damages or consequential damages, the court noted that "a party claiming consequential damages must prove the amount of damage with 'reasonable certainty.'" Id. at *15 (quoting Kenford Co. v. Erie Cty., 493 N.E.2d 234, 235 (1986)). Because "Design Partners ha[d] failed to point to any facts supporting a claim for consequential damages," the court did not permit Design Partners to proceed to trial on a theory of consequential damages. Id.

consultants . . . , but Design Partners was unable to meet Five Star's request. Accordingly, the Court finds by a preponderance of evidence that Design Partners did not lose any profits as a result of Five Star's hiring of Stailey after he decided to resign from Design Partners.

Id. at *15 (internal citations omitted).

In Banner Industries, 71 F. Supp. 3d, plaintiff argued that defendant Harrington Industrial Plastics had "tortiously interfered" with a non-compete agreement signed by Wicks, a former employee of Banner Industries, "by hiring Wicks to work for Harrington, a competitor of Banner. . . ." Id. at 305 (internal quotations and citations omitted). In granting defendant Harrington summary judgment, the Banner Industries court noted that

> Banner has not shown that it sustained any damages from Wicks' taking the position at Harrington. The Court has already found no evidence that Banner sustained any harm from any use or disclosure by Wicks of trade secrets, confidential customer lists, or confidential customer information. As for goodwill, it is undisputed that while employed at Banner as its national sales manager, Wicks did not directly make sales but rather provided support to Banner's salespeople.

> Even accepting that, while working as a sales manager at Banner, Wicks "was in a position to affect, and tried to foster, Banner's goodwill" and tried to promote Banner's goodwill when he attended trade shows, there is no evidence that Wicks made use of Banner's goodwill when he worked at Harrington, or that Banner was harmed by any such use.

Id. at 303. Because "no rational factfinder could find . . . that Banner sustained harm resulting from any such breach [of the non-compete agreement] by Wicks, the [c]ourt [found] that Banner cannot make out a claim for tortious interference by Harrington." Id. at 305.

The teaching of Design Partners and Banner Industries is that a plaintiff alleging a tortious interference with contract claim premised on a breach of a third party's non-compete agreement must proffer evidence that it suffered damages as a result of the third party's competitive activities – such as evidence that (1) plaintiff would have been hired by a particular client but for the third party's breach of their non-compete agreement, or (2) that the third party –

at defendant's volition – made use of plaintiff's trade secrets, confidential customer information, or goodwill in their new role with defendant. Here, Plaintiffs have proffered no such evidence. Indeed, in their opposition brief, Plaintiffs do not respond in any fashion to Blue Matter's argument that they have failed to proffer evidence of damages. (See Pltf. Opp. (Dkt. No. 161)) As discussed above, "'[f]ederal courts may deem a claim abandoned when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way.'" Duarte, 265 F. Supp. 3d at 352–53 (quoting Taylor, 269 F.Supp.2d at 75).

In moving for summary judgment, however, Plaintiffs cite to the following evidence as proof of damages: (1) a report prepared by their damages expert, Thomas W. Britven (Pltf. Sum. J. Br. (Dkt. No. 144) at 21 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 172)); and (2) Dandekar's testimony that he "'knew [that Precision] would be harmed. . . .'" (Id. at 28 (quoting Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 171))[15]

Precision's damages expert, Thomas Britven, calculates Precision's damages from Defendant's alleged tortious interference with contract based on a loss of "enterprise value and lost profits." (See Pltf. R. 56.1 Stmt., Ex. 90 (Britven Rpt.) (Dkt. No. 146-72) at 24 (emphasis omitted)) Britven states that "[i]n the two full years prior to their departure to Blue Matter, [Ahmad, Jauregui, and Malhotra] generated an average of $7.3 million dollars in revenue per year thanks, in part, to the numerous trade secrets and confidential information at their disposal. Precision was harmed by the loss of these three employees, who were all bound by post-

---

[15] Although Plaintiffs address damages only in their moving brief – and not in their opposition to Blue Matter's summary judgment motion – this Court will consider whether the evidence Plaintiffs cite in their moving brief creates a material issue of fact as to whether they suffered damages as a result of Defendant's alleged tortious interference with contract.

employment restrictive covenants." (Id.) Britven further states that he "understand[s] that lost enterprise value and lost profit damages can be based on an analysis of the amount of profit [Precision] would have earned but for the alleged wrongful conduct." (Id. at 31 (emphasis in original))

> Britven goes on to report that

> Blackstone purchased approximately 63 percent of Precision as part of the Blackstone Transaction on November 18, 2020. Due diligence associated with the Blackstone Transaction was performed for the trailing twelve-month ("TTM") period ending June 30, 2020, with Precision's Adjusted EBITDA [i.e., earnings before interest, taxes, depreciation, and amortization] calculated at $102.3 million. However, Precision's TTM period ending June 30, 2020 experienced a loss in revenues that it otherwise would have had but for Blue Matter's interference with Precision's employees.

(Id. at 33 (emphasis in original))

> Britven then "quantifie[s] the lost enterprise value and lost profits stemming from Blue Matter's wrongful acts" under two scenarios:

> > Scenario 1: Permanent loss in enterprise value realized for the portion of the business sold in the November 18, 2020 Blackstone Transaction[.]

> > Scenario 2: Precision's lost profits prior to the November 18, 2020 Blackstone Transaction[.]

(Id. at 31)

> Britven "performed the analyses in Scenarios 1 & 2 using the historical revenue generated by Ahmad, Jauregui, and Malhotra, as illustrated below":

### Table 1: Summary of Employee Revenue Production

|  | 2017 | 2018 | Average Production |
|---|---|---|---|
| Naina Ahmad | $ 2,800,000 | $ 3,037,626 | $ 2,918,813 |
| Jay Jauregui | 3,000,000 | 2,416,407 | 2,708,204 |
| Mridul Malhotra | 654,658 | 2,756,000 | 1,705,329 |
| Total | $ 6,454,658 | $ 8,210,033 | $ 7,332,346 |

(Id.)

In Scenario 1, Britven used the revenue data set forth above, data related to Precision's costs and profits, and data from alleged similar companies to "calculate[] Precision's lost enterprise value resulting from Blue Matter's wrongful conduct. . . ." Britven concludes that the "lost enterprise value" is "approximately $29.7 million to approximately $44.1 million." (Id. at 33-39)

In Scenario 2, Britven calculates Precision's "lost profits" attributable to the departure of Ahmad, Jauregui, and Malhotra for the period between July 13, 2019 and November 18, 2020. In this exercise, Britven "us[es] historical revenue and profitability data" he obtained from Precision. "[W]ithout assuming any growth over time," Britven concludes that Precision suffered the following in lost profits:

#### Table 2: Summary of Lost Profits by Employee from July 13, 2019 through November 18, 2020

| Employee | Lost Profits |
|----------|-------------|
| Naina Ahmad | $ 1,953,720 |
| Jay Jauregui | 1,633,304 |
| Mridul Malhotra | 744,837 |
| **Total** | **$4,331,861** |

(Id. at 39-41)

Britven's analysis of "lost enterprise value" and lost profits is premised exclusively on historical data. He does not cite to any actual clients or projects that Precision lost as a result of Ahmad, Jauregui, and Malhotra's alleged competitive activities at Blue Matter. Indeed, Britven does not address in any fashion any competitive damage that Precision suffered as a result of the departure of Ahmad, Jauregui, and Malhotra. His damage analysis is instead

premised on the simple fact that Ahmad, Jauregui, and Malhotra are no longer working for Precision, and thus are no longer generating revenue and profits for Precision.

While damages for tortious interference with contract can include "consequential losses for which the interference is a legal cause," Rich, 939 F.3d at 128, including lost profits, see, e.g., Int'l Mins. & Res., 96 F.3d at 597 (stating in the context of a tortious interference with contract claim that "'[c]onsequential damages include recovery for lost profits, which must be proven with reasonable certainty'") (quoting 2 Dan B. Dobbs, Law of Remedies: Damages-Equity-Restitution § 6.6(2), at 134-35 (2d ed. 1973)), Plaintiffs cite no law for the proposition that they can recover lost profits damages or "loss of enterprise" damages based on the induced departure of a practice group, rather than on the loss of particular clients and matters as a result of the alleged tortious interference with contract.

A plaintiff seeking damages for tortious interference with contract must proffer evidence that the defendant's conduct caused plaintiff to suffer the loss of a particular client, project, or matter, however, which resulted in an ascertainable loss of revenue and the profits associated with such revenue.

As discussed above, "'the damages for a tortious interference claim are linked to the damages for the breach of the underlying contract.'" AP Links, 2017 WL 3394599, at *8 (quoting Design Partners, 2017 WL 818364, at *15 n.18); see also Radar Sports Mgmt., LLC v. Legacy Lacrosse, LI Inc., No. 21-CV-5749 (JMW), 2023 WL 7222736, at *10 (E.D.N.Y. Nov. 2, 2023) (for purposes of a tortious interference with contract claim, "the damages must be 'damages resulting' from the tortious interference with the contract") (quoting Lama Holding, 88 N.Y.2d at 424). Here, the contracts that Blue Matter allegedly interfered with are the non-compete agreements signed by the individual Defendants. But the individual Defendants' non-

compete agreements do not obligate them to remain at Precision and to continue generating revenue for the Company. Accordingly, Precision could have had no reasonable contractual expectation that they would stay at the Company. The individual Defendants were always free to leave Precision, regardless of the effect their departure – whether individually or collectively – would have on Precision's revenue.

Rather than requiring the individual Defendants to continue generating revenue for Precision, the non-compete provisions restrict their ability to perform market access work for a competing entity during either a one or two-year period after their Precision employment ends. (See Pltf. R. 56.1 Stmt., Ex. 18 (Ahmad Contract) (Dkt. No. 146-18) at 4, 7-8; id., Ex. 19 (Jauregui Contract) (Dkt. No. 146-19) at 4, 7-8; id., Ex. 30 (Malhotra Contract) (Dkt. No. 146-30) at 2-3, 8) And in seeking lost profits or "loss of enterprise" damages for the alleged tortious interference that caused the individual Defendants to breach their non-compete obligations, Plaintiffs must offer evidence of revenue and resulting profits that Precision actually lost as a result of Blue Matter's alleged tortious conduct – not evidence of revenue and profits generated by the individual Defendants in the past. See, e.g., Design Partners., 2018 WL 3636700, at *16; Banner Indus., 71 F. Supp. 3d at 303-05. But Plaintiffs have not offered evidence of any revenue or profits, or any specific clients or matters, that Precision lost as a result of Blue Matter's hiring of the individual Defendants. Indeed, Plaintiffs say that their damage claim is not premised on "some specific clients transitioning their business from Precision to Blue Matter." (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 235)

Plaintiffs' second basis for an award of damages – Dandekar's deposition testimony that he "'knew [Precision] would be harmed'" by the departure of the individual Defendants – is speculative and insufficient to create a material issue of fact as to whether

Precision suffered recoverable damages as a result of Blue Matter's alleged tortious interference with the individual Defendants' non-compete agreements.

In sum, Plaintiffs have not met their "obligation to 'come forward with sufficient evidence of damages to defeat the present summary judgment motion.'" BDG Gotham Residential, LLC v. W. Waterproofing Co., Inc., No. 19-CV-6386 (BCM), 2024 WL 4349163, at *15 (S.D.N.Y. Sept. 30, 2024), reconsideration denied, No. 19-CV-6386 (BCM), 2024 WL 5201596 (S.D.N.Y. Dec. 23, 2024), and motion to certify appeal denied, No. 19-CV-6386 (BCM), 2024 WL 5245007 (S.D.N.Y. Dec. 30, 2024) (quoting W.S.A., Inc. v. ACA Corp., No. 94 CIV. 1493 (CSH), 1998 WL 635536, at *6 (S.D.N.Y. Sept. 15, 1998)); see also Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 397-98 (S.D.N.Y. 2023) ("In federal court, 'the absence of evidence at the summary judgment stage redounds to the detriment of the plaintiff, not the defendant.'") (quoting Susana v. NY Waterway, 662 F. Supp. 3d 477, 489 (S.D.N.Y. 2023)). Because Plaintiffs have not proffered evidence of damages resulting from Blue Matter's alleged tortious conduct in inducing Ahmad, Jauregui, and Malhotra to breach their non-compete agreements, Blue Matter is entitled to summary judgment on Plaintiffs' tortious interference with contract claim to the extent that claim is based on the individual Defendants' alleged breach of their non-compete agreements.

*    *    *    *

For the reasons stated above, Plaintiffs' motion for summary judgment on their tortious interference with contract claim (Am. Cmplt. (Dkt. No. 42), Count V) will be denied, and Defendant Blue Matter's cross-motion for summary judgment on this claim will be granted.

C.     **Defend Trade Secret Act, Misappropriation of
       Trade Secret, and Unfair Competition Claims**

Defendant Blue Matter has moved for summary judgment on Plaintiffs' claims for violation of the Defend Trade Secrets Act (Am. Cmplt. (Dkt. No. 42) Count I), misappropriation of trade secrets and confidential information (id., Count VII), and unfair competition (id., Count X).  (See Def. Sum. J. Br. (Dkt. No. 155) at 18-21)

In the Amended Complaint, Plaintiffs contend that Jauregui misappropriated more than 21,000 files containing Plaintiffs' "trade secrets and confidential and proprietary information" by copying this material from his Precision laptop to an external drive, and by sending these materials to his personal email address.  (Am. Cmplt. (Dkt. No. 42) ¶ 121) Plaintiffs further allege that Malhotra saved "large numbers of Precision files containing trade secret and confidential and proprietary information" onto his personal computer.  (Id. ¶¶ 120-122)

According to the Amended Complaint, the trade secret material that Jauregui and Malhotra improperly misappropriated includes

> (i) business plans and models; (ii) client contact information; (iii) marketing strategies and future plans with respect to clients; (iv) client contracts, which set forth the key terms of such relationships; (v) market research data; (vi) proprietary analytics, strategies, and methodologies relating to market access, pricing and contracting, distribution and HUB services, reimbursement, and due diligence; (vii) proprietary data management systems; and (viii) proprietary payer relationship data.  Among Precision's proprietary analytics, strategies, and methodologies, its trade secrets include (i) fair market value methodologies; (ii) predictive model methodologies; (iii) value proposition proposals; (iv) pricing research, methods, and case studies; (v) launch pricing capabilities, and (v) other market access strategies and modeling prepared for specific Precision clients.

(Id. ¶ 111)  The Amended Complaint also cites specific files containing trade secret information that Defendants allegedly misappropriated, including what appear to be presentations ISA prepared for large pharmaceutical companies, such as Takeda, Bristol Myers Squibb, Amgen, and AstraZenaca.  (Id.)

In moving for summary judgment, Blue Matter argues that there "is no evidence that Blue Matter acquired, used, or disclosed any of Precision's alleged trade secrets. Precision's assertion that Jauregui downloaded documents from his computer hard drive when he resigned and provided them to Blue Matter is nothing more than speculation." (Def. Sum. J. Br. (Dkt. No. 155) at 19) Blue Matter also contends that "Precision's routine allowance of thumb drives and other unsecure processes to be used to handle its purported trade secrets" constitutes a "fail[ure] to take reasonable steps to protect the secrecy of the purported trade secret[s]," and as such, "trade secret status is lost." (Id. at 20 n.1)

Plaintiffs respond that they have "identified 28 categories of trade secrets that Jauregui misappropriated just before leaving Precision to join Blue Matter[,]. . . . many of which took several years to develop and were found in Blue Matter's possession. . . ." According to Plaintiffs, these alleged trade secrets "have been critical to Precision's ability to distinguish itself as a leader in market access consulting." (Pltf. Opp. (Dkt. No. 161) at 20) Plaintiffs also contend that they have "taken sufficient steps to protect [their] trade secrets." (Id. at 22) Finally, Plaintiffs assert that Blue Matter "acquired and knowingly used Precision's confidential information and trade secrets to develop Blue Matter's market access capabilities and to solicit market access business for Blue Matter." (Id. at 25)

### 1.    <u>Applicable Law</u>

Under the Defend Trade Secrets Act (the "DTSA"), "a party must show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" <u>Free</u>

Country Ltd v. Drennen, 235 F. Supp. 3d 559, 565 (S.D.N.Y. 2016) (quoting Syntel Sterling Best

Shores Mauritius Ltd. v. Trizetto Grp., Inc., No. 15 Civ. 211 (LGS) (RLE), 2016 WL 5338550,

at *6 (S.D.N.Y. Sept. 23, 2016)). "The DTSA defines trade secrets as any business information

that, '(A) the owner thereof has taken reasonable measures to keep . . . secret; and (B) . . . derives

independent economic value, actual or potential, from not being generally known to, and not

being readily ascertainable through proper means, by another person who can obtain economic

value from the disclosure or use of the information.'" Gen. Sec., Inc. v. Commercial Fire &

Sec., Inc., 17 Civ. 1194 (DRH) (AYS), 2018 WL 3118274, at *4 (E.D.N.Y. June 25, 2018)

(quoting 18 U.S.C. § 1839(3)(A)-(B)). "'Improper means' under the Act includes 'theft, bribery,

misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy,' but

excludes 'reverse engineering, independent derivation, or any other lawful means of

acquisition.'" AUA Private Equity Partners, LLC v. Soto, 17 Civ. 8035 (GHW), 2018 WL

1684339, at *4 (S.D.N.Y. Apr. 5, 2018) (quoting 18 U.S.C. § 1839(6)).

 "The existence, vel non, of a trade secret usually is treated as a question of fact."

Chevron U.S.A., Inc. v. Roxen Serv., Inc., 813 F.2d 26, 29 (2d Cir. 1987).

 Under New York law, "'[a] plaintiff claiming misappropriation of a trade secret

must prove: '(1) it possessed a trade secret, and (2) defendant is using that trade secret in breach

of an agreement, confidence, or duty, or as a result of discovery by improper means.'"

Integrated Cash Mgmt. Servs., Inc. v. Digital Transactions, Inc., 920 F.2d 171, 173 (2d Cir.

1990) (quoting Rapco Foam, Inc. v. Sci. Applications, Inc., 479 F. Supp. 1027, 1029 (S.D.N.Y.

1979)) (citations omitted).

 In determining whether information amounts to a trade secret, New York courts

have applied the Restatement of Torts' definition of a trade secret. See, e.g., L.I. City Ventures

v. Urb. Compass, Inc., No. 18 CIV. 5853 (PGG), 2019 WL 234030, at *9-12 (S.D.N.Y. Jan. 16,

2019) (applying the Restatement of Torts' definition of a trade secret); Stanacard, LLC v.

Rubard, LLC, No. 12 CIV. 5176, 2016 WL 462508, at *18–19 (S.D.N.Y. Feb. 3, 2016) (same).

The Restatement of Torts provides that "'[a] trade secret may consist of any formula, pattern,

device or compilation of information which is used in one's business, and which gives [the

holder] an opportunity to obtain an advantage over those who do not know or use it.'" Integrated

Cash Mgmt. Servs., 920 F.2d at 173 (quoting Restatement of Torts § 757, comment b).

New York courts consider six factors in determining whether information

constitutes a trade secret:

> (1) the extent to which the information is known outside of [the holder's]
> business; (2) the extent to which it is known by employees and others involved in
> [the holder's] business; (3) the extent of measures taken by [the holder] to guard
> the secrecy of the information; (4) the value of the information to [the holder] and
> to [its] competitors; (5) the amount of effort or money expended by [the holder] in
> developing the information; (6) the ease or difficulty with which the information
> could be properly acquired or duplicated by others.

Id. (quotations and citations omitted).

"The essence of a misappropriation unfair competition claim under New York law

'is that the defendant misappropriated the fruit of plaintiff's labors and expenditures by obtaining

access to plaintiff's business idea either through fraud or deception, or an abuse of a fiduciary or

confidential relationship.'" Small Bus. Bodyguard Inc. v. House of Moxie, Inc., 230 F. Supp. 3d

290, 307 (S.D.N.Y. 2017) (quoting Katz Dochrermann & Epstein, Inc. v. Home Box Office, No.

97 Civ. 7763, 1999 WL 179603, at *4 (S.D.N.Y. Mar. 31, 1999)); see also PLC Trenching Co.,

LLC v. Newton, 11 Civ. 515, 2011 WL 13135653, at *10 (N.D.N.Y. Dec. 12, 2011) ("To state

an unfair-competition claim on a theory of misappropriation under New York common law, a

plaintiff must allege that the defendant (1) misappropriated and used, (2) the plaintiff's property

[or commercial advantage], (3) to compete against the plaintiff's own use of the same property [or commercial advantage].").

### 2.   **Analysis**

As an initial matter, it is undisputed that – as Jauregui was leaving Precision – he copied Precision materials onto a thumb drive. At deposition, Jauregui testified that – as his employment at Precision was ending – he copied "[a] number of work-in-progress files," such as "PowerPoint[s], Excels mostly, PDFs" onto a thumb drive. (Pltf. R. 56.1 Stmt., Ex. 5 (Jauregui Dep.) (Dkt. No. 146-6) at 233-37; Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 113) And when Jauregui arrived at Blue Matter, he "opened up Precision documents from th[e] thumb drive onto the Blue Matter laptop" and "saved those materials onto the [Blue Matter] desktop of that laptop. . . ." (Pltf. R. 56.1 Stmt., Ex. 5 (Jauregui Dep.) (Dkt. No. 146-6) at 246; Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 113) Accordingly, it is undisputed that Jauregui took Precision documents with him when he left the company, and that he copied these documents onto his Blue Matter laptop after arriving at Blue Matter.[16]

In opposing Blue Matter's motion for summary judgment on Plaintiffs' DTSA, misappropriation, and unfair competition claims (see Pltf. Opp. (Dkt. No. 161) at 20-21 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 242)), Plaintiffs contend that discovery has revealed "that Blue Matter has taken [documents that contain] Precision's trade secrets and confidential information and used them to further develop its own market access business and to compete with Precision" (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 242), including the following:

---

[16] While the Amended Complaint alleges that Malhotra transmitted "large numbers of Precision files containing trade secret and confidential and proprietary information" onto his personal computer (Am. Cmplt. (Dkt. No. 42) ¶ 122), Plaintiffs do not contend in their summary judgment briefing (see Pltf. Opp. (Dkt. No. 161)) that Malhotra engaged in such conduct. Accordingly, any such claim has been abandoned.

- "a 128-slide PowerPoint titled 'Blue Matter PowerPoint Slide Master,' which includes numerous Precision trade secrets and other confidential information concerning, for example, its primary research and proprietary framework for analyzing payer treatment of neurocognitive assessments and distribution networks for certain drugs. Indeed, many of the slides in this PowerPoint explicitly state that they were developed by ISA, leaving no doubt as to the source of the information." (Id. (citing Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶¶ 22-23; id., Ex. M (Payer Treatment Slide) (Dkt. No. 160-12); id., Ex. N (Distribution Slide) (Dkt. No. 160-13)) (internal citations omitted))

- "a PowerPoint titled 'BMS [Bristol Meyers Squibb] Future of Oncology Final Work Session Draft,' which also contained numerous slides explicitly identifying ISA as the source of the information. This PowerPoint, which was developed by ISA, details the future market access issues ISA anticipated in the area of oncology – one of its areas of special expertise – based on years of experience and hundreds of projects completed." (Pltf. R. 56.1 Resp. (Dkt. No. 160) ¶ 242 (citing Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶ 24; id., Ex. P (BMS Presentation) (Dkt. No. 160-14)) (internal citations omitted))

- "[a] PowerPoint Ahmad and Jauregui drafted for Blue Matter's proposal to Spero in January 2020[,] [which] contained multiple slides taken directly from earlier Precision and ISA presentations and rebranded as Blue Matter's own insights, such as Precision/ISA's market access project approach, payer-pricing market access framework, and methodology for leveraging primary research findings." (Id. (citing Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶¶ 14-16; id., Ex. D (Roadmap Slide) (Dkt. No. 160-3); id., Ex. E (Preliminary Market Access Slide) (Dkt. No. 160-4); id., Ex. F (Payer Pricing Market Access Slide) (Dkt. No. 160-5); id., Ex. G (Payer Pricing Market Access Advisory Services Slide) (Dkt. No. 160-6); id., Ex. H (Project Approach Slide) (Dkt. No. 160-7); id., Ex. I (Primary Research Findings Slide) (Dkt. No. 160-8)) (internal citations omitted))

- "[A] Samumed proposal Scull sent Blue Matter Partner George Schmidt on April 6, 2020, [which] included market access concepts and frameworks that were developed by and unique to ISA/Precision, including their Level of Access and Quality of Access Methodologies, Price Access Continuum Methodology, and Detailed Access Launch Roadmap." (Id. (citing Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶¶ 17-21; id., Ex. J (Market Access Framework Slide) (Dkt. No. 160-9); id., Ex. K (Access Goals Slide) (Dkt. No. 160-10); id., Ex. L (Detailed Access Launch Roadmap Slide) (Dkt. No. 160-11)) (internal citations omitted))

As to the "extent the information is known outside of [Precision's] business," "the value of the information to [Precision] and to [its] competitors," "the amount of effort or money

expended by [Precision] in developing [its] information," and "the ease or difficulty with which

[Precision's] information could be properly acquired or duplicated by others," Integrated Cash

Mgmt. Servs., 920 F.2d at 173 (internal quotations and citations omitted), Plaintiffs proffer

evidence that the documents cited above contain

- "ISA's entire methodology for helping a client bring its drug to market including which steps to take in the process and when," which "ISA developed and refined . . . over many years and by working on hundreds of market access projects," and which "provided ISA and subsequently Precision with a competitive advantage over their competitors who lacked our experience and knowhow" (Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶ 14);

- "a proprietary ISA framework [for helping its clients maximize their products' value] that it developed over many years and by working on hundreds of market access projects," which "would be extremely valuable for any company seeking to pitch clients on its market access services, as it demonstrates a deep and unique understanding of how to analyze payer-pricing issues" (id. ¶ 15);

- "ISA's proprietary methodology for leveraging our primary research findings to help our clients better target top tier US payer accounts," which is based on "research ISA and Precision gathered by speaking directly with payers (i.e., medical insurance carriers)," who "do not speak with just anyone. Rather, they are very selective and only speak with entities like ISA and Precision that have been in the market access consulting business for many years" and provide "information that . . . is not publicly available," which can be used to "help[] . . . clients understand what top tier insurance companies consider when deciding whether to cover a particular drug and to help . . . clients best position [their] drug for coverage" (id. ¶ 16);

- Precision's "Level of Access and Quality of Access Methodologies, which [ISA and Precision] developed over many years. . . . us[ing] proprietary mathematical formulas that [ISA] began to develop in 2006," and which "were developed based upon [ISA and Precision's] primary and secondary research and [ISA and Precision's] experience working on hundreds of market access projects," and which are "crucial to developing a market access plan that maximizes the drug's coverage with respect to both patient population and with respect to payers" (id. ¶ 18);

- Precision's "Price Access Continuum Methodology," which was "developed . . . over many years" and is "use[d] . . . to help . . . clients pinpoint the ideal price to maximize the level and quality of their drugs' market access" (id. ¶ 19);

- Precision's "Detailed Access Launch Roadmap," which was "developed . . . over many years and from working on hundreds of market access projects," and which "is used to show . . . clients [Precision's] step-by-step method for launching a product into the market and when [Precision] need[s] to take each step in order to make the product launch as successful as possible" (id. ¶ 20);

- Precision's "confidential and proprietary information regarding the distribution network for certain drugs," which is based on "knowledge and information regarding which distributors . . . prefer to work with which pharmaceutical manufacturers" – information that was obtained by ISA and Precision "[o]ver the course of many years," and which "can give . . . clients a tremendous advantage with respect to pricing flexibility, which in turn can increase the drug's market access and coverage" (id. ¶ 22);

- Precision's "primary research and proprietary framework for analyzing payer treatment of neurocognitive assessments," which "was developed by talking to many of the leading national and regional payers, who will typically only communicate with a small number of leading market access consulting firms, including ISA/Precision," and which "would be extremely valuable to Blue Matter because [it] would allow Blue Matter to demonstrate to prospective clients that Blue Matter has access to and can conduct research with the leading national and regional payers, which is a critical competitive advantage in securing market access engagements" (id. ¶ 23); and

- a "PowerPoint, which ISA developed" that "details the future market access issues [Precision] anticipate[s] in the area of oncology – one of [Precision's] areas of special expertise – based on years of experience and hundreds of projects . . . completed," and which "would be extremely valuable to Blue Matter, allowing Blue Matter to obtain the numerous insights into oncology market access issues ISA spent considerable time, money, and effort developing." (Id. ¶ 24)

As to "the extent of measures taken by [Precision] to guard the secrecy of [its] information," Integrated Cash Mgmt. Servs., 920 F.2d at 173 (internal quotations and citations omitted), Plaintiffs proffer evidence that "Precision . . . maintain[s] a dedicated information technology ('IT') security staff who are primarily responsible for developing and ensuring compliance with documented security policies that are focused on protecting data from being accessed by unauthorized users, both inside and outside Precision." (Pltf. R. 56.1 Resp., Ex. B (Morgan Decl.) (Dkt. No. 163-3) ¶ 6)  Those policies include:

(i) utilizing unique user IDs and strong passwords; (ii) employing the principle of "least privilege" which limits access rights for users to the bare minimum permissions they need to perform their work; (iii) requiring all Precision employees to sign confidentiality agreements acknowledging that all confidential and proprietary information concerning Precision's processes, systems, methods, formulas, and research activities (among various other topics) is the exclusive property of Precision (whether or not created by the employee) and shall not be divulged outside the Company without permission; and (iv) requiring clients and other third parties to sign nondisclosure agreements before accessing any Precision trade secrets or other confidential or proprietary information.

Pursuant to Precision's established security procedures and protocols, any disclosures of Precision confidential and proprietary business information to Precision clients have always been typically made with appropriate confidentiality protections in place. Precision's security framework includes protection at the perimeter, network, endpoint, application and data levels. Industry best practices and leading industry tools are used in all areas of the framework. Regarding data privacy and protection, Precision has implemented an established set of standard operating data protection and privacy procedures and controls that are overseen by [its] Privacy and Corporate Compliance Department to make sure that Precision's data has the highest level of protections. In addition, Precision's employee handbook contains employee guidelines for protecting company data assets.

(Id. ¶¶ 7-8)

In moving for summary judgment on Plaintiffs' DTSA, misappropriation of trade secret, and unfair competition claims, Blue Matter argues that the "materials that did end up on Blue Matter hardware . . . did not constitute formulas, patterns, compilations, programs, devices, methods, techniques, processes, or other information that derived independent economic value from not being generally known and readily ascertainable, or that were subject to efforts to maintain secrecy," and instead "principally consisted of PowerPoint presentations and other materials shared with third parties external to Precision, such as marketing materials, or otherwise not comprising confidential or sensitive data, such as generic templates or language recycled throughout the industry." (Def. Sum. J. Br. (Dkt. No. 155) at 20)

Plaintiffs respond that the evidence described above – all of which was "found on Blue Matter's systems" – "reflect[s] Precision's unique approach to market access consulting,

and not mere 'generic templates.'" (Pltf. Opp. (Dkt. No. 161) at 20 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 242))  According to Plaintiffs, "[i]t is well established that these types of information constitute trade secrets under the DTSA and New York law." (Id. at 21)

The Court concludes that the Precision documents that Blue Matter obtained contain proprietary methodologies and frameworks that ISA and Precision developed after spending many years working on hundreds of market access projects and cultivating relationships with valuable sources of information, including medical insurance carriers and drug distributors.  Plaintiffs have also proffered evidence that Precision's methodologies and frameworks regarding, inter alia, market launch, pricing, and insurance coverage strategies, provide value in terms of pitching potential market access clients and performing market access work.  (See Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶¶ 14-24)  Plaintiffs have also proffered evidence that Precision expended effort in protecting these methodologies and frameworks, including by requiring that employees use user IDs and passwords to access the information, limiting access to employees who "had a need to know," requiring employees to sign confidentiality agreements acknowledging that such methodologies and frameworks are the exclusive property of and shall not be divulged outside of Precision without permission,[17] and

---

[17]  Blue Matter argues that Precision did not "take reasonable steps to protect the secrecy of [its] purported trade secret[s]," and that "Precision's routine allowance of thumb drives and other unsecure processes to be used to handle its purported trade secrets – the same mechanism used by Jauregui (without Blue Matter's knowledge or consent) that forms the basis of Precision's claims – alone defeats Precision's misappropriation claims." (Def. Sum. J. Br. (Dkt. No. 155) at 20 n.1 (citing, inter alia, Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 238))

The DTSA requires owners of trade secrets to "take[] reasonable measures to keep such information secret," 18 U.S.C. § 1839(3)(A), and "[l]ike the DTSA, New York law requires that 'the possessor of a trade secret take reasonable measures to protect its secrecy.'" Mason v. AmTrust Fin. Servs., Inc., No. 19CV8364 (DLC), 2020 WL 1330688, at *3 (S.D.N.Y. Mar. 23, 2020), aff'd, 848 F. App'x 447 (2d Cir. 2021) (quoting Defiance Button Mach. Co. v. C&C Metal

requiring clients and third parties to sign non-disclosure agreements before accessing the

information.[18]  (See Pltf. R. 56.1 Resp., Ex. B (Morgan Decl.) (Dkt. No. 163-3) ¶¶ 7-8)

_____

Products Corp., 759 F.2d 1053, 1063 (2d Cir. 1985)).  "Generally speaking, such measures can include 'the use of confidentiality agreements, password-protection, sharing information with employees only on a need-to-know basis, emphasizing the need to keep the information confidential in an employee handbook, and frequently reminding employees of the need to maintain confidentiality.'"  Catalyst Advisors, L.P. v. Catalyst Advisors Invs. Glob. Inc., 602 F. Supp. 3d 663, 675 (S.D.N.Y. 2022) (quoting Inv. Sci., LLC v. Oath Holdings Inc., 20 Civ. 8159 (GBD), 2021 WL 3541152, at *3 (S.D.N.Y. Aug. 11, 2021)).  As discussed above, Plaintiffs have proffered evidence that they adopted most if not all of these measures.  Given this evidence, the Court cannot rule as a matter of law that Precision did not take reasonable steps to protect its alleged trade secrets.  See Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 385-87 (S.D.N.Y. 2023) (finding "a factual dispute as to whether [plaintiff's] protective measures were reasonable," because, inter alia, "the record contains evidence of both generally applicable protective measures and protective measures specifically pertaining" to the alleged trade secrets, including a requirement that "all [of plaintiff's] employees" sign an agreement affirming that they will not disclose plaintiff's "confidential or proprietary information or trade secrets"; plaintiff's maintenance of a "a 100+-page Information Security Management Program, which contains the company's policies regarding confidential information, including how such information is protected and how access to such information is regulated within the company"; limitations on access to the alleged trade secrets "to only those employees who are actively working" on related projects; and "two-factor authentication" protection for certain alleged trade secrets (internal quotations and citations omitted)); see also Medidata Sol., Inc. v. Veeva Sys., Inc., No. 17 CIV. 589 (LGS), 2021 WL 467110, at *11 (S.D.N.Y. Feb. 9, 2021) (denying defendant's motion for "summary judgment on the question of trade secret protection" because plaintiff "cites evidence that it implements procedural, technical and physical measures to safeguard each Trade Secret"); cf. Ad Lightning Inc. v. Clean.io, Inc., 19 Civ. 7367 (JPO), 2020 WL 4570047, at *3 (S.D.N.Y. Aug. 7, 2020) (plaintiff's allegations "that its proprietary information was accessible only to parties with permission to view such information, and only after they have agreed to contracts that include strict confidentiality provisions that require them not to use or disclose this information" were sufficient to allege trade secret under the DTSA (internal quotations and citations omitted)).

[18]  Blue Matter argues that the Precision documents cited by Plaintiffs "principally consisted of PowerPoint presentations and other materials shared with third parties external to Precision, such as marketing materials, or otherwise not comprising confidential or sensitive data, such as generic templates or language recycled throughout the industry," and [t]he public nature of a purported trade secret – even if at one time it was not public – defeats trade secret protection." (Def. Sum. J. Br. (Dkt. No. 155) at 20-21 (citing Sorias v. Nat'l Cellular USA, Inc., 124 F. Supp. 3d 244, 259 (E.D.N.Y. 2015); Alcon Vision, LLC v. Lens.com, 2020 WL 3791865, at *7 (E.D.N.Y. July 7, 2020)) While it is correct that, "[u]nder New York law, information disclosed to third parties in the absence of a nondisclosure agreement is not confidential," Matec SLR v.

Given the evidence proffered by Plaintiffs, and the fact that "[t]he existence, <u>vel non</u>, of a trade secret usually is treated as a question of fact," <u>Chevron U.S.A., Inc.</u>, 813 F.2d at 29, the Court concludes that there are material issues of fact as to whether the Precision materials obtained by Blue Matter constitute trade secrets. <u>Better Holdco</u>, 666 F. Supp. 3d at 388-89 (issue of material fact as to whether plaintiff's operating model constituted a trade secret, as plaintiff proffered evidence that (1) it "invested significant time and means in compiling [its] Operating Model," "a massive Excel workbook comprised of dozens of worksheets which details [plaintiff's] unique and proprietary approaches and methods for organizing, staffing (including proprietary compensation information and other information about [plaintiff's] operations), and financing its business, as well as marketing and executing its business, and therefore constitutes a roadmap of [plaintiff's] [business] strategies"; and (2) that its operating model "cannot be replicated by a competitor using proper means because it is compiled on an ongoing basis and organically from [plaintiff's] own confidential and proprietary data to which competitors do not have lawful access" (internal quotations and citations omitted)); <u>Cicel (Beijing) Sci. & Tech. Co. v. Misonix, Inc.</u>, 581 F. Supp. 3d 454, 459-460, 459 n.9 (E.D.N.Y. 2022), <u>aff'd</u>, No. 22-1834-CV, 2024 WL 959619 (2d Cir. Mar. 6, 2024) (denying defendant's motion for summary judgment on misappropriation of trade secrets claim after noting that defendant's "argument that [plaintiff's] business data at issue" – "including customer lists, margins and pricing data" – "do not constitute trade secrets strains credulity," "[g]iven that a former . . . employee [of plaintiff]

---

<u>Gramercy Holdings I, LLC</u>, No. 20-CV-4136 (AJN), 2021 WL 1226956, at *4 (S.D.N.Y. Mar. 31, 2021) (citing <u>Hyperlync Techs., Inc. v. Verizon Sourcing LLC</u>, 125 N.Y.S.3d 96, 97 (1st Dep't 2020)), Plaintiffs have proffered evidence that third parties who were given access to Precision's alleged trade secrets – including potential and active clients – were required to sign non-disclosure agreements. (<u>See</u> Pltf. R. 56.1 Resp., Ex. B (Morgan Decl.) (Dkt. No. 163-3) ¶ 7) Accordingly, Blue Matter is not entitled to summary judgment on the grounds that Plaintiffs publicly shared their alleged trade secrets.

asked [defendant] to not share a 2014 'business plan' and that the [representative of defendant] promised he would 'protect the info'" (internal citations omitted)); TBA Glob., LLC v. Proscenium Events, LLC, 114 A.D.3d 571, 573 (1st Dep't 2014) (ruling that "the motion court incorrectly found that there is no evidence that defendants misappropriated or used plaintiff's customer lists or trade secrets," because "[t]he record contains evidence that [defendant] regularly forwarded to his personal email account [plaintiff's] confidential and proprietary . . . pricing and customer information, including [plaintiff's] internal . . . reports detailing comprehensive information about [plaintiff's] customers such as revenue figures, project pricing and the status of projects, and also took proprietary documents pertaining to [plaintiff's] work [related to a particular client], including proposal and pitch materials")

Under the DTSA, the owner of a trade secret must also "show 'an unconsented disclosure or use of a trade secret by one who (i) used improper means to acquire the secret, or, (ii) at the time of disclosure, knew or had reason to know that the trade secret was acquired through improper means, under circumstances giving rise to a duty to maintain the secrecy of the trade secret, or derived from or through a person who owed such a duty.'" Free Country, 235 F. Supp. 3d at 565 (quoting Syntel Sterling Best Shores Mauritius, 2016 WL 5338550, at *6). Similarly, under New York law "'[a] plaintiff claiming misappropriation of a trade secret must prove" not only that "'(1) it possessed a trade secret,'" but "'(2) [that] defendant is using that trade secret in breach of an agreement, confidence, or duty, or as a result of discovery by improper means.'" Integrated Cash Mgmt. Servs., 920 F.2d at 173 (quoting Rapco Foam, 479 F. Supp. at 1029) (citations omitted).

In arguing that Blue Matter improperly obtained and used Precision's trade secrets, Plaintiffs cite the following evidence:

- "on August 13, 2021, Jauregui copied roughly 6,800 files containing Precision's trade secrets and other confidential information onto a thumb drive" (Pltf. Opp. (Dkt. No. 161) at 24 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 238));

- "on September 11, 2019, Jauregui started at Blue Matter. As Jauregui admitted at his deposition, upon joining Blue Matter, he brought with him the thumb drive containing the Precision files he had copied and saved some number of them onto his Blue Matter laptop" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 112-13));

- "[w]ithin days of arriving at Blue Matter, Jauregui built a 315-slide PowerPoint of market access concepts using Precision's trade secrets and, by October 1st, he was holding 'BM-MA Brainstorming Sessions' with Putcha and Scull, where they would discuss Blue Matter's market access capabilities and where Jauregui would teach Putcha and Scull about market access concepts with which they were unfamiliar, like segmentation and distribution" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 115-23; Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 185));

- "[b]y fall 2019, Blue Matter – which purported to have virtually no U.S. market access experience as late as the summer of 2019 – had secured a $219,000 purchase order for 'Market Access Projects' from Purdue [Pharma]" (Pltf. Opp. (Dkt. No. 159) at 25 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 132-33; Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 185));

- "[w]ithin months, Blue Matter would go on to solicit or perform market access work for numerous other pharmaceutical companies, including Agios Pharmaceuticals ('Agios'), AstraZeneca, Bristol Myers Squibb, Roche Group, Samumed, and Spero [Therapeutics]" (id. (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 186));

- "[t]hroughout the course of his employment with Blue Matter, Jauregui (and Ahmad) continued to use Precision's trade secrets on Blue Matter's behalf, including by incorporating Precision slides directly into Blue Matter's January 2020 proposal to Spero [Therapeutics]" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 115-19, 146; Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 242));

- "[t]o date, no one at Blue Matter has made any effort to remove Precision's confidential information and trade secrets from Blue Matter's systems, notwithstanding the fact that this action was filed nearly a year and a half ago" (Pltf. Opp. (Dkt. No. 161) at 25 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 242));

- "Blue Matter produced in discovery a PowerPoint titled 'Blue Matter PowerPoint Slide Master,' which includes numerous Precision trade secrets and confidential information concerning, for example, its primary research and proprietary framework for analyzing payer treatment of neurocognitive assessments and distribution networks for certain drugs. Indeed, many of the slides in this

PowerPoint explicitly state that they were developed by ISA. . . . [and] the PowerPoint's metadata reveals that Scull was the last person to work on it, on October 4, 2019 – after Jauregui had arrived at Blue Matter with thousands of Precision's confidential files on his thumb drive" (id. at 25-26 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶¶ 240-242) (internal citations omitted));

- "Blue Matter produced a PowerPoint titled 'BMS [Bristol Myers Squibb] Future of Oncology Final Work Session Draft,' which also contains numerous slides listing ISA as the source of the information. For example, [this] PowerPoint contains information concerning payment methodologies, market access implications, primary research, and research recommendations developed by ISA. Again, the metadata shows that Scull was the last person to work on the PowerPoint, on October 25, 2019" (Pltf. Opp. (Dkt. No. 159) at 26 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶¶ 240-242) (internal citations omitted));

- "[t]he PowerPoint Ahmad and Jauregui drafted for Blue Matter's January 2020 proposal to Spero [Therapeutics] contained multiple slides taken directly from earlier Precision ISA presentations, such as Precision/ISA's market access project approach, payer-pricing market access framework, and methodology for leveraging primary research. Scull, who was leading Blue Matter's proposal to Spero [Therapeutics] and had worked at ISA and Precision for roughly two years, was . . . aware of Ahmad and Jauregui's incorporation of Precision's proprietary frameworks and methodologies into the proposal." (Id. (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶¶ 240-242) (internal citations omitted))

- "[t]he Samumed proposal Scull sent Blue Matter Partner George Schmidt on April 6, 2020, included market access concepts and frameworks that were developed by and unique to Precision/ISA, including their Level of Access and Quality of Access Methodologies, Price Access Continuum Methodology, and Detailed Access Launch Roadmap. Again, Scull would have . . . recognized these as Precision/ISA's proprietary frameworks and methodologies for analyzing market access issues." (Id. (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶¶ 186, 242) (internal citations omitted))

In moving for summary judgment on Plaintiffs' trade secret, misappropriation, and unfair competition claims, Blue Matter contends that it "had absolutely no role in Jauregui's receipt of Precision files," and that "nobody at Blue Matter knew anything about Mr. Jauregui's handling of any Precision files, including that he had copied certain files to his thumb drive." (Def. Sum. J. Br. (Dkt. No. 155) at 19-20 (citing Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 239))  But this is nonsense. Jauregui was not in "receipt" of Precision files. It is undisputed that he copied

Precision files onto a thumb drive before leaving his job at Precision to join Blue Matter. And once Jauregui became a Blue Matter employee on September 11, 2019 (see Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 94), he remained aware that he had brought Precision materials with him to Blue Matter, and Blue Matter became responsible for his conduct. Moreover – as discussed above – there is evidence that Jauregui and Ahmad used Precision slides – allegedly containing Precision trade secret material – in pitching potential pharma clients, including Spero Therapeutics. (See Pltf. R. 56.1 Stmt. (Dkt. No. 149) ¶ 146 (citing Pltf. R. 56.1 Stmt., Ex. 78 (Spero Therapeutics Presentation) (Dkt. No. 149-32); Pltf. R. 56.1 Stmt., Ex. 7 (Dandekar Dep.) (Dkt. No. 146-8) at 309:5-320:4))[19] Finally, there is evidence that many of the Precision slides used at Blue Matter contained references to ISA. Accordingly, any Blue Matter employee who saw these slides would have become aware that Blue Matter was using slides that had been obtained from ISA.[20]

---

[19] Blue Matter complains that "Precision cites to no evidence in the record to establish that the information contained in the [Spero Therapeutics] slide deck . . . constitutes confidential information or was 'taken directly from earlier Precision and ISA presentations.'" (Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 146) As discussed above, however, Plaintiffs have proffered evidence that the January 2020 Spero Therapeutics presentation contains Precision trade secrets, including "Precision/ISA's market access project approach, payer-pricing market access framework, and methodology for leveraging primary research findings." (Pltf. R. 56.1 Resp. (Dkt. No. 160) ¶ 242 (citing Pltf. R. 56.1 Resp., Ex. A (Schiavi Decl.) (Dkt. No. 163-2) ¶¶ 14-16; id., Ex. D (Roadmap Slide) (Dkt. No. 160-3); id., Ex. E (Preliminary Market Access Slide) (Dkt. No. 160-4); id., Ex. F (Payer Pricing Market Access Slide) (Dkt. No. 160-5); id., Ex. G (Payer Pricing Market Access Advisory Services Slide) (Dkt. No. 160-6); id., Ex. H (Project Approach Slide) (Dkt. No. 160-7); id., Ex. I (Primary Research Findings Slide) (Dkt. No. 160-8)) (internal citations omitted)) And Blue Matter does not dispute that Jauregui and Ahmad "reviewed" the Spero Therapeutics presentation that contained Precision's alleged trade secrets. (See Def. R. 56.1 Resp. (Dkt. No. 151) ¶ 144)

[20] Blue Matter does not contend that any of the Precision materials in its possession came from a source other than Jauregui's thumb drive. Indeed, Blue Matter refers to Precision's alleged trade secrets as "materials that . . . end[ed] up on Blue Matter hardware as a result of Jauregui's subsequent utilization of his thumb drive. . . ." (Def. Sum. J. Br. (Dkt. No. 155) at 20)

"Use of a trade secret is defined as 'any exploitation of the trade secret that is likely to result in injury to the trade secret owner or enrichment to the defendant,' including '. . . soliciting customers through the use of information that is a trade secret.'" Saniteq, LLC v. GE Infrastructure Sensing, Inc., No. CV17771SJFARL, 2018 WL 4522107, at *8 (E.D.N.Y. July 12, 2018), report and recommendation adopted, No. 17-CV-771 (SJF)(ARL), 2018 WL 4357475 (E.D.N.Y. Sept. 13, 2018) (quoting Next Commc'ns, Inc. v. Viber Media, Inc., No. 14-CV-8190 (RJS), 2016 WL 1275659, at *4 (S.D.N.Y. Mar. 30, 2016)). As discussed above, Plaintiffs have proffered evidence that Blue Matter used Precision's alleged trade secrets, including in creating a presentation to solicit Spero Therapeutics, a potential market access customer. Accordingly, there are material issues of fact as to whether Blue Matter used Precision's trade secrets.

There is also evidence that Jauregui "'used improper means to acquire [Precision's trade secret information]. . . .'" Free Country Ltd, 235 F. Supp. 3d at 565 (quoting Syntel Sterling Best Shores Mauritius, 2016 WL 5338550, at *6). For purposes of the DTSA, "'[i]mproper means'" "includes 'theft, bribery, misrepresentation, [and] breach or inducement of a breach of a duty to maintain secrecy'. . . ." AUA Private Equity Partners, 2018 WL 1684339, at *4 (quoting 18 U.S.C. § 1839(6)). Under New York law, "'improper means'" includes "'us[e] [of a] trade secret in breach of an agreement, confidence, or duty. . . .'" Integrated Cash Mgmt. Servs., 920 F.2d at 173 (quoting Rapco Foam, 479 F. Supp. at 1029) (citations omitted).

Here, there is evidence that at the time Jauregui left Precision he downloaded Precision's alleged trade secret material onto a thumb drive, which he took with him to his new position at Blue Matter. Once at Blue Matter, he downloaded Precision's alleged trade secret material onto a Blue Matter computer. There is also evidence that Jauregui used Precision's alleged trade secret material in the course of his duties at Blue Matter. Finally, there is evidence

that in committing these acts Jauregui violated a confidentiality agreement that he signed when he joined Precision, in which he "acknowledge[d] that all confidential and proprietary information concerning Precision's processes, systems, methods, formulas, and research activities . . . is the exclusive property of Precision (whether or not created by the employee) and shall not be divulged outside [Precision] without permission. . . ." (Pltf. R. 56.1 Resp., Ex. B (Morgan Decl.) (Dkt. No. 163-3) ¶ 7)

For all these reasons, Blue Matter's motion for summary judgment on Plaintiffs' DTSA, misappropriation of trade secrets, and unfair competition claims will be denied.[21]

**D.    Tortious Interference with Prospective Economic Advantage**

Defendant Blue Matter has moved for summary judgment on Plaintiffs' tortious interference with prospective economic advantage claim. (Am. Cmplt. (Dkt. No. 42) (Count VI) ¶¶ 176-184)

In the Amended Complaint, Plaintiffs contend that Blue Matter "intentionally and unjustifiably interfered with Precision's business relationships with its customers by soliciting them to terminate their relationships with Precision and move their business to Blue Matter. . . . using dishonest, unfair, and improper means, including by using the trade secrets and other confidential and proprietary information [Ahmad, Jauregui, and Malhotra] misappropriated from Precision to solicit Precision's customers to do business with Blue Matter." (Id. ¶¶ 179-80) According to the Amended Complaint, "[a]s a result of [Blue Matter's] intentional tortious acts,

---

[21]  Precision's unfair competition claim is premised on misappropriation of trade secrets and – in seeking summary judgment on this claim – Blue Matter relies on the same arguments it made regarding Plaintiffs' DTSA and misappropriation of trade secrets claims. (See Def. Sum. J. Br. (Dkt. No. 155) at 18-21)

Precision's customer relationships and business expectancies, including with AstraZeneca, Pfizer, and other customers, have been damaged." (Id. ¶ 183)

To state a claim for tortious interference with prospective economic advantage under New York law, "four conditions must be met:  (1) the plaintiff had business relations with a third party; (2) the defendant interfered with those business relations; (3) the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means; and (4) the defendant's acts injured the relationship."  Catskill Dev., L.L.C. v. Park Place Entm't Corp., 547 F.3d 115, 132 (2d Cir. 2008) (citations omitted).[22]

A plaintiff cannot prevail on such a claim "unless [it] 'demonstrate[s] both wrongful means and that the wrongful acts were the proximate cause of the rejection of the plaintiff's proposed contractual relations.'"  State St. Bank & Tr. Co. v. Inversiones Errazuriz Limitada, 374 F.3d 158, 171-72 (2d Cir. 2004) (quoting Pacheco v. United Medical Assoc., P.C., 305 A.D.2d 711, 712 (3d Dep't 2003) (emphasis omitted)).  Stated another way, "'[a] plaintiff must . . . establish causation by demonstrating "that [it] would have entered into an economic relationship but for the defendant's wrongful conduct."'"  Plaintiff Funding Holding, LLC v. Blue Ocean Partners LLC, No. 22 CIV. 4094 (KPF), 2024 WL 3524497, at *7 (S.D.N.Y. July 24, 2024) (quoting Nat'l Air Cargo Grp., Inc. v. Maersk Line Ltd., No. 17 Civ. 8659 (KPF), 2019 WL 4735426, at *9 (S.D.N.Y. Sept. 27, 2019)); see also G.K.A. Beverage Corp. v. Honickman, 55 F.3d 762, 768 (2d Cir. 1995) ("It is axiomatic that, in order to prevail on [a claim of tortious interference with prospective business relations], [plaintiffs] would have to show that

---

[22] "Tortious interference with prospective economic advantage" is also known as "tortious interference with business relations."  See id.; Lombard v. Booz-Allen & Hamilton, Inc., 280 F.3d 209, 214 (2d Cir. 2002).

[defendants] intentionally caused the retailers not to enter into a contractual relation with them."); Knocking Inc. v. Carter, No. 24-CV-09020 (VEC), 2025 WL 2257434, at *9 (S.D.N.Y. Aug. 7, 2025) ("Plaintiff must also allege facts that tend to show it 'would have entered into an economic relationship but for the defendant's wrongful conduct.'") (quoting Zikakis v. Staubach Retail Servs., Inc., No. 04 Civ. 9609, 2005 WL 2347852, at *4 (S.D.N.Y. Sep. 26, 2005)).  In this regard, a plaintiff must allege conduct directed at its customers or those with whom it seeks a business relationship.  See Plasticware, LLC v. Flint Hills Res., LP, 852 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (citing Carvel Corp. v. Noonan, 3 N.Y.3d 182, 192 (2004) ("[C]onduct constituting tortious interference with business relations is, by definition, conduct directed not at the plaintiff itself, but at the party with which the plaintiff has or seeks to have a relationship.")).

        The Second Circuit has noted that

> [t]he wrongful means requirement makes alleging and proving a tortious interference claim with business relations "more demanding" than proving a tortious interference with contract claim.  Guard-Life Corp. v. S. Parker Hardware Mfg. Corp., 50 N.Y.2d 183, 191 (1980) (describing the interference with business relations tort by an alternative name, "interference with prospective contractual relations" and describing element three as "wrongful means").  The standard is more demanding because a plaintiff's mere interest or expectation in establishing a contractual relationship must be balanced against the "competing interest of the interferer," id., 428 N.Y.S.2d at 632, as well as the broader policy of fostering healthy competition, NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc., 87 N.Y.2d 614, 623 (1996).

Catskill Dev., 547 F.3d at 132.

        "While a defendant's commission of a 'crime or an independent tort' clearly constitutes wrongful means, such acts are not essential to find wrongful means."  Id. (citing Carvel Corp.  v. Noonan, 3 N.Y.3d 182, 189 (2004); Hannex Corp. v. GMI, Inc., 140 F.3d 194, 206 (2d Cir. 1998) (holding that participating in a knowing breach of fiduciary duty can constitute wrongful means)).  Where no crime or independent tort is alleged, a defendant may nevertheless be held liable if he engages in conduct "'for the sole purpose of inflicting

73

intentional harm on plaintiff[],'" or has employed "'wrongful means,'" such as "'physical violence, fraud or misrepresentation, civil suits and criminal prosecutions,'" and "extreme and unfair 'economic pressure. . . .'" Carvel Corp., 3 N.Y.3d at 190-92 (citations omitted); see also Sidney Frank Importing Co. v. Beam Inc., 998 F. Supp. 2d 193, 212 (S.D.N.Y. 2014) ("In Carvel Corp., the New York Court of Appeals recognized one exception to the general rule 'where a defendant engages in conduct "for the sole purpose of inflicting intentional harm on plaintiffs."' . . . . The court then identified other 'more culpable' conduct discussed in earlier cases, explaining that an interferer would not be held liable 'so long as "the means employed are not wrongful."'" (citations omitted)).  "[P]ersuasion alone although it is knowingly directed at interference with the contract[]" does not constitute wrongful means.  Carvel Corp., 3 N.Y.3d at 191 (internal quotation marks and citations omitted).  Moreover, the "wrongful means" exception is narrow, and does not apply where a defendant's "motive in interfering with [plaintiff's] relationships with their customers was normal economic self-interest. . . ." Id. at 190; 16 Casa Duse, LLC v. Merkin, 791 F.3d 247, 262 (2d Cir. 2015) ("[T]his exception is narrow:  When a defendant has acted with a permissible purpose, such as 'normal economic self-interest,' wrongful means have not been shown, even if the defendant was 'indifferent to the [plaintiff's] fate.'" (citations omitted)).

Here, Defendant Blue Matter contends that it is entitled to summary judgment on Plaintiffs' tortious interference with prospective economic advantage claim, because Plaintiffs have not offered evidence that creates a material issue of fact as to the third element – that "the defendant acted for a wrongful purpose or used dishonest, unfair, or improper means." According to Blue Matter, "the third element sets a high bar," and "there is no evidence that Blue Matter engaged in any tortious, much less criminal, behavior in an attempt to obtain any of its

clients."  (Def. Sum. J. Br. (Dkt. No. 155) at 17-18)  Blue Matter further argues that a necessary

component of a tortious interference with prospective economic advantage claim is that the

"defendant . . . target[ted] its activities . . . [at a] third party and convince[d] the third party not to

enter into a business relationship with the plaintiff" (id. at 17 (citing Fonar Corp. v. Magnetic

Resonance Plus, Inc., 957 F.Supp. 477, 482 (S.D.N.Y. 1997)), and that here Plaintiffs have not

offered evidence that creates a material issue of fact as to whether Blue Matter convinced any

third party not to enter into business relationships with Precision.  In this regard, Blue Matter

points out that "Precision is unaware of any clients or projects that Precision lost to . . . Blue

Matter at any time."  (Id. at 18 (citing Def. R. 56.1 Stmt. (Dkt. No. 156) ¶ 235))

In arguing that "Blue Matter's conduct . . . easily meets [the] standard" for the

third element of a "tortious interference with prospective economic advantage" claim (Pltf. Opp.

(Dkt. No. 161) at 28), Plaintiffs argue the following:

- "[u]pon hatching its scheme to build [Blue Matter Market Access], Blue Matter deliberately sought to cripple Precision's ability to compete in the market access space, systematically raiding the [Global Pricing and Market Access] practice for its key employees, including Ahmad, Jauregui, Malhotra, and Scull.  Indeed, Dandekar's June 10, 2019 email to the staffing recruiter Paul Leonard makes clear that he was deliberately targeting Precision" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶ 60));

- "[t]hroughout Ahmad, Jauregui, and Malhotra's tenure with Blue Matter, Blue Matter deceitfully sought to keep their market access work hidden from Precision. As detailed in Precision's Motion, Blue Matter employees used personal email accounts to communicate with Ahmad and Jauregui about Blue Matter market access work, disclosed that Ahmad, Jauregui, and Malhotra were part of Blue Matter's 'market access team' only when they believed it would be 'safe' to do so, and attempted to keep Ahmad, Jauregui, and Malhotra 'incognito' because they were in violation of their Non-Compete Obligations" (id. (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 161-65));

- "[e]ven after Precision put Blue Matter on notice of Ahmad, Jauregui, and Malhotra's breach of their Non-Compete Obligations, Blue Matter ignored Precision's directive to cease and desist tortiously interfering with their contracts with the Company.  Indeed, in brazen disregard of Precision's rights, after

receiving Precision's cease and desist letter, Blue Matter's co-founder and Managing Partner, Emily Hua, deliberately sought to staff Malhotra on a 'HUGE project' to 'develop a US market access strategy' for Roche Group." (Pltf. Opp. (Dkt. No. 159) at 28-29 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 166-70));

- "Blue Matter has unlawfully and surreptitiously sought to use the client relationships Ahmad and Jauregui developed at Precision/ISA, including with Will Zellweger (who worked at AstraZeneca) and Terese Hoekstra (who worked at Flexion Therapeutics and then Spero), to secure market access business from Precision clients" (id. at 29 (citing Pltf. R. 56.1 Stmt. (Dkt. No. 146) ¶¶ 142-43, 149-52; Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 187)); and

- "[w]hile Blue Matter purports to have been unaware that Jauregui brought Precision's trade secrets with him to Blue Matter, it seemingly has no intention to get rid of them. As Dandekar admitted, no one at Blue Matter has taken any steps to search for and remove those trade secrets from Blue Matter's systems notwithstanding the fact that this action was filed nearly a year and a half ago." (Pltf. Opp. (Dkt. No. 161) at 29 (citing Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 242))

According to Plaintiffs, "given the egregious and aggravated nature of Blue Matter's misconduct, summary judgment should be denied on Precision's tortious interference with economic advantage claim." (Id. (citing G-I Holdings, Inc. v. Baron & Budd, 179 F. Supp. 2d 233, 254 (S.D.N.Y. 2001))

Plaintiffs do not, however, address Blue Matter's argument that a party alleging tortious interference with prospective economic advantage must offer evidence that defendant "target[ted] its activities . . . toward [a] third party and convince[d] the third party not to enter into a business relationship with the plaintiff." (Def. Sum. J. Br. (Dkt. No. 155) at 17) And while Plaintiffs contend that the evidence shows that Blue Matter (1) sought to use client relationships that Ahmad and Jauregui had developed at Precision/ISA to secure market access business from Precision clients; and (2) assigned Malhotra to work on a market access strategy project for a potential client – Roche Group, Plaintiffs do not proffer evidence that either the former Precision clients or Roche Group would have hired Precision to perform market access work but for Blue Matter's actions. Indeed, Plaintiffs state that "Precision's damages resulted

not from some specific clients transitioning their business from Precision to Blue Matter, but from Blue Matter unlawfully recruiting Ahmad, J[au]regui, and Malhotra – the [Global Pricing and Market Access] practice's senior leaders and revenue generators – to leave Precision and build a competing market access practice at Blue Matter, which resulted in a precipitous decline in the [Global Pricing and Market Access] practice's revenue, cash flow, and enterprise value." (Pltf. R. 56.1 Resp. (Dkt. No. 163) ¶ 235)

In order to proceed with their tortious interference with prospective economic advantage claim, however, Plaintiffs must proffer evidence that Precision "'would have entered into an economic relationship [with some entity] but for [Blue Matter's] wrongful conduct.'" Plaintiff Funding Holding, 2024 WL 3524497, at *7 (quoting Nat'l Air Cargo Grp, 2019 WL 4735426, at *9). Because Plaintiffs have not proffered any such evidence, Blue Matter's motion for summary judgment on Plaintiffs' tortious interference with prospective economic advantage claim will be granted.

## CONCLUSION

For the reasons stated above, Plaintiffs' motion for summary judgment (Dkt. No. 143) is denied. Defendant Blue Matter's motion for summary judgment (Dkt. No. 154) is granted as to Plaintiffs' (1) aiding and abetting breach of fiduciary duty claim (Count IV); (2) tortious interference with contract claim (Count V); and (3) tortious interference with prospective economic advantage claim (Count VI). Defendant's motion is otherwise denied. Plaintiffs' claims under the Pennsylvania Uniform Trade Secrets Act (Count VIII) and the New Jersey Uniform Trade Secrets Act (Count IX) are dismissed on consent. (See Pltf. Opp. (Dkt. No. 161) at 7 n.1) Plaintiffs' motion for a status conference regarding their motion for summary judgment (Dkt. No. 201) is denied as moot. The Clerk of Court is directed to terminate the motions (Dkt. Nos. 143, 154, 201).

This case will proceed to trial at 9:30 a.m. on **November 10, 2025**, in Courtroom 705 of the United States Courthouse, 40 Foley Square, New York, New York.  The joint pretrial order, motions in limine, requested voir dire, and requests to charge are due on **October 17, 2025**.  Responsive papers are due on **October 24, 2025**.  The parties are directed to consult this Court's Individual Rules as to the contents of their pretrial filings.

Dated:  New York, New York
       September 22, 2025

                                      SO ORDERED.

                                        Paul G. Gardephe
                                        United States District Judge