UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PRECISION MEDICINE GROUP, LLC, PRECISIONADVISORS GROUP, INC., and PRECISION MEDICINE GROUP HOLDINGS, INC.,<br><br>      Plaintiffs,<br><br>  - against -<br><br>BLUE MATTER, LLC,<br><br>      Defendant. | **MEMORANDUM**<br>**OPINION & ORDER**<br><br>20 Civ. 2974 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

    The Court is currently on trial in this misappropriation of trade secrets and unfair competition case. This opinion addresses an issue that has arisen during trial – in connection with both the jury instructions and Defendant Blue Matter's motion for judgment as a matter of law – concerning the scope of materials that Plaintiffs may contend before the jury contain (1) trade secrets – for purposes of Plaintiffs' misappropriation of trade secrets claims under the Defend Trade Secrets Act and New York law; and (2) confidential and proprietary information that confers a commercial advantage, for purposes of Plaintiffs' unfair competition claim.[1]

---

[1] On March 17, 2026, Defendant Blue Matter moved for judgment as a matter of law at the close of Plaintiffs' case. (See Def. JMOL (Dkt. No. 327); see also Def. JMOL Br. (Dkt. No. 328)) In its motion, Blue Matter argues that "Plaintiffs' claims [for misappropriation of trade secrets] fail because [Plaintiffs] never identified the alleged trade secrets with reasonable particularity, a foundational requirement without which no reasonable jury can render a verdict." (Def. JMOL Br. (Dkt. No. 328) at 6)

Defendant further contends that Plaintiffs' Defend Trade Secrets Act claim fails because Plaintiffs have not offered evidence sufficient to demonstrate that their alleged trade secrets have "independent economic value," as required under the Act. (See Def. JMOL Br. (Dkt. No. 328) at 4 (quoting Gen Sec., Inc. v. Comm. Fire & Sec., Inc., 17 Civ. 1192 (DRH)(AYS), 2018 WL 3118274, at *4 (E.D.N.Y. June 25, 2018)) ("'The DTSA defines trade secrets as any business

The background for the claims currently on trial is as follows:

Plaintiffs – Precision Medicine Group, LLC, PrecisionAdvisors Group, Inc., and Precision Medicine Group Holdings, Inc. (collectively, "Precision") – and Defendant Blue Matter, LLC, are consulting firms that provide specialized services to pharmaceutical companies seeking to introduce new prescription drugs to the marketplace. (Sum. J. Op. (Dkt. No. 204) at 2-3, 12; see also Mar. 9, 2026 Trial Tr. 47-48, 97; PX 104) The parties refer to these specialized services – which involve advice concerning positioning a new drug in the marketplace, obtaining government or insurance carrier coverage for the new drug, pricing determinations, and related matters – as "market access" consulting. Precision and Blue Matter are direct competitors in this space. (Sum. J. Op. (Dkt. No. 204) at 2-3; see also Mar. 9, 2026 Trial Tr. 47 (Schiavi defining "market access" consulting); Mar. 10, 2026 Trial Tr. 321 (Jones discussing "market access" work))

In December 2017, Precision acquired the market access consulting firm Insight Strategy Advisors ("ISA") to obtain ISA's "personnel," "proprietary methodologies," and "IP," and bolster its market access practice. (Mar. 9, 2026 Trial Tr. 45) After the acquisition, ISA employees Naina Ahmad and Jose "Jay" Jauregui joined Precision as "key employees" in the post-merger market access practice. (Sum. J. Op. (Dkt. No. 204) at 3-4)

Between July 2019 and January 2020, Ahmad, Jauregui, and Mridul Malhotra – the former head of Precision's market access group – left Precision and joined Blue Matter. (Id.)

---

information that, '(A) the owner thereof has taken reasonable measures to keep . . . secret; and (B) . . . derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means, by another person who can obtain economic value from the disclosure or use of the information.'"); see also id. at 15-16 ("On this record, no reasonable jury could find that the information Plaintiffs claim as trade secrets derived independent economic value from being kept secret. Thus, this factor independently defeats trade secret protection as a matter of law."))

Precision alleges that Jauregui stole trade secrets and other confidential and proprietary information from Precision and used this material at Blue Matter, in violation of confidentiality agreements they had entered with Precision.  (Mar. 9, 2026 Trial Tr. 20 (asserting that Jauregui "secretly copied more than 6,000 files from Precision's systems")).

As a result of summary judgment motion practice (see Sum. J. Op. (Dkt. No. 204)), three claims in the Amended Complaint (Dkt. No. 42) remained for trial:  (1) violation of the Federal Defend Trade Secrets Act, 18 U.S.C. § 1836; (2) misappropriation of trade secrets under New York law; and (3) unfair competition under New York law.  (Mar. 9, 2026 Trial Tr. 24)

Precision's misappropriation of trade secret and unfair competition claims are premised on evidence that Jauregui – before he left Precision – downloaded onto a thumb drive 6,874 Precision documents.[2]  (See, e.g., Mar. 9, 2026 Trial Tr. 114-16, 127, 136; Mar. 10, 2026 Trial Tr. 148-49)  Precision contends that all of these 6,874 documents contain Precision trade secrets and confidential information. (Mar. 9, 2026 Trial Tr. 26-27 (asserting that Jauregui "secretly copied more than 6,800 files from Precision's systems," and that "each one of these documents represents years of work, research, client engagements, methodologies that were refined over time");  Pltf. Trial Br. (Dkt. No. 252) at 19 ("Jauregui copied roughly 6,800 files containing Precision's alleged trade secrets and other confidential information onto a thumb

---

[2]  At trial, Jauregui testified that he had sought assistance from Precision's IT department to remove personal material – such as photos of his children – from his Precision laptop.  The IT department employee told Jauregui to download the material he wanted onto a thumb drive.  Jauregui then downloaded approximately 20,000 files onto a thumb drive, including 6,874 Precision documents.  (Mar. 10, 2026 Trial Tr. 148-49)  When Jauregui arrived at Blue Matter, he uploaded the Precision files he had taken onto his Blue Matter desktop.  (Id.; Mar. 11, 2026 Trial Tr. 514-17)  Precision contends that Blue Matter used the Precision documents that Jauregui had taken to compete against Precision for market access work.  (March 9, 2026 Trial Tr. 24-25)

drive"); Third Amended Joint Pretrial Order (Dkt. No. 311-1) at 9 (stating that Jauregui "copied approximately 6,800 Precision documents" and that "[t]he documents that Jauregui misappropriated were replete with Precision's trade secrets and confidential and proprietary information."); Mar. 9, 2026 Trial Tr. 127 (Precision witness Harry Schiavi testifying that "virtually all" of the 6,800 files contain Precision's confidential business information))

Precision further contends that when Jauregui began work at Blue Matter, he uploaded all of these documents to his Blue Matter computer, and that he used certain of these documents during his seven-month tenure at Blue Matter, prior to being placed on "garden leave." (Mar. 11, 2026 Trial Tr. 406, 573 (Jauregui testifying that he joined Blue Matter in September 2019 and "went on garden leave" in April 2020); see also Third Amended Joint Pretrial Order (Dkt. No. 311-1) at 10 ("During the . . . months" after Jauregui joined Blue Matter, "Blue Matter went on to solicit or perform market access work for several other pharmaceutical companies" using materials that "contain Precision trade secrets and confidential information.")).

Although Precision has access to all 6,874 documents Jauregui downloaded onto a thumb drive (see PX 1), it has introduced only thirteen of these documents at trial. Rather than introduce documents that allegedly contain trade secret and/or confidential and proprietary information, Precision has elicited testimony in which witnesses – who have not reviewed the 6,874 documents – make generalized statements about the nature and content of these documents. This approach presents the issue of whether the jury – which has seen only a handful of the 6,874 documents that Precision contends contain trade secrets and/or confidential and proprietary information – could rationally conclude that all of these 6,874 documents – each of which is apparently unique – actually contain trade secrets and/or confidential and proprietary information.

4

## I.    THE EVIDENCE AT TRIAL

Harry Schiavi was Precision's primary witness at trial concerning the nature of the 6,874 Precision documents that Jauregui took from Precision.  Schiavi and Steve Reid – co-founders of ISA – sold their company to Precision for an upfront payment of $24 million, with a potential earnout of another $26 million.  (Mar. 9, 2026 Trial Tr. 91; Mar. 12, 2026 Trial Tr. 810; Mar. 16, 2026 939; Sum. J. Op. (Dkt. No. 204) at 4)

Schiavi testified that he prepared PX 1 – a 553-page spreadsheet listing the file name and the "full path" (the folder where the file was saved on Precision's servers) of each of the 6,874 documents that Precision contends contain its trade secrets and confidential and proprietary information.  (Mar. 9, 2026 Trial Tr. 118)  Schiavi "t[ook] out all of the personal material" from "the 20,000 initial files" that Jauregui copied from his Precision laptop onto his thumb drive.  (Id. at 127)  When asked how he "identif[ied] the files that are listed on Plaintiffs' Exhibit 1," Schiavi testified, "So there is a series of keywords that we will use in a keyword search that will look at the title of the document.  And if it occurred in the title of that document, then we included that because it had information in it according to the category."  (Id. at 118; see also id. at 119 ("Basically we created categories of the types of documents that was likely in the 6,500 using keyword searches.  And then we were able to populate that and determine how many of those documents included those keywords – I'm sorry, how many of the titles of those documents include those keywords."))  Schiavi created PX 1 within a "couple of months" of November 2020 – more than five years before trial.  (Id. at 119)  Schiavi further testified that he was "familiar" with the 6,874 files listed in PX 1 because at some point during the seventeen years he was employed at ISA he had "worked on or approved every one of those files."  (Id. at 119, 44 (testifying that he founded ISA in 2002))

In preparing his list of the 6,874 documents, and in later categorizing these documents as containing particular types of trade secrets (see PX 2), Schiavi employed keyword searches. The keyword searches were of the file titles of the documents, and not of the text of the documents.[3] Schiavi reviewed only "50, 60, [or a] 100" of the 6,874 documents to confirm what information they actually contained:

> Q. Mr. Schiavi, I want to make sure I heard you. Did you say you personally reviewed every single file on this list?
> A. I reviewed the title of every single file.
> Q. Did you review each actual document?
> A. No. (Mar. 9, 2026 Trial Tr. 121)
> . . . .
> THE COURT: So how many of the documents did you actually look at, physically?
>
> THE WITNESS: I would say upwards towards 50, 60, 100. I don't remember exactly the number of it, but it was a lot. (Mar. 10, 2026 Trial Tr. 154)

Although he had not reviewed most of the 6,874 documents, Schiavi testified that "virtually all of them" contained "Precision's confidential business information."[4] (March 9, 2026 Trial Tr. 127)

---

[3] A table in PX 2 lists the thirty-seven keywords used by Schiavi: "Distribution," "Fair market value," "FMV," "SOP," "Trade," "Retail," "Specialty Pharmacy," "Value Prop," "Value Proposition," "Value Driver," "Pricing," "Willingness to pay," "List Price," "WAC Price," "Price Access," "Access," "Contracting," "Net Price," "Continuum," "Access Mountain," "Access Objective," "Recruiting," "On Boarding," "training," "new hire," "Fit It Grit," "Pricing Model," "Staffing," "Staffing Model," "GCA," "Office Meeting," "Word of the Year," "Storm," "Transform," "Elevate," "Disrupt," and "Convergence." (PX 2 at 414)

[4] When questioned about the handful of Precision documents that were introduced into evidence, Schiavi showed a lack of familiarity with basic facts concerning the documents, such as the drug that was the subject of the study, and the condition that the drug was designed to treat. (See, e.g., Mar. 10, 2026 Trial Tr. 154-56) And many of the slides that Schiavi discussed touted ISA's unique resources – such as the company's primary research and proprietary databases. (See id. at 161-65; see also id. at 169 (discussing the "price access continuum" slide in PX 212), 187 (discussing the payer "value proposition" slides in PX 211), 190 (discussing ISA's global payer market access capabilities, as represented in a slide found in PX 181), 195-96 (discussing ISA's orphan analogue database, referenced in PX 11)) When asked how slides discussing "ISA's capabilities and resources" would be useful to a competitor that lacked ISA's primary research and proprietary databases, Schiavi responded as follows: "Let's put it this way,

Schiavi later prepared "a summary" of PX 1 – another spreadsheet that was introduced as PX 2. (March 10, 2026 Trial Tr. 148-49) PX 2 lists in rows the names of the 6,874 files Schiavi determined contained Precision's trade secrets and/or confidential business information. (Id. at 149) According to Schiavi, these files include "PowerPoints, Word documents, Excel spreadsheets, databases, et cetera." (Id. at 151) PX 2 contains columns of eight "categories of the types of trade secrets and confidential information that [ISA and Precision] created." (Id. at 151) The eight categories are:

(1) "Distribution Methodologies, SOPs, FMV & Case Study Databases, Proposals";

(2) "Value Propositon [sic] Frameworks, Methodologies, and Proposals";

(3) "Pricing Research Methodologies, Case Studies, Proposals";

(4) "Access Projections, Analogs, Contracting Strategies, Case Studies, Proprietary Terms/Concepts";

(5) "Recruiting, Interviewing, Hiring, On Boarding, Training Internal Methods/Processes";

(6) "Project Scoping & Pricing Models";

(7) "Staffing Model, Assumptions, Formulas, and [R]eporting" ; and

(8) "Company [C]ulture Building Methodologies." (PX 2)

In connection with the 6,874 documents, Schiavi used a computer program to tabulate the number of files with at least one of his keywords in the file title. The program placed the number "1" in the columns corresponding to the trade secrets contained in that file. (Id. at 152) Schiavi testified that "[e]ach one of these [eight] categories have a series of keywords that I came up with that represent that if those keywords were in the title of that

_____

it would be even more egregious if they didn't have the databases and they put this slide in a business development deck because they would be saying, we could do that," which would be a lie. (Id. at 165)

7

document, then that document would be a representation of that particular trade secret. And so I used those keywords to identify the documents." (Id. at 149-50)  Schiavi further explained that these eight categories were derived from the "original 28 [categories] that [he] had come up [with] . . . [Schiaivi sought] to simplify the 28 because it was a bit much." (Id. at 151-52)

As to the specific keywords he used in his searches, Schiavi testified as follows:

> THE WITNESS.  [T]here would be things like distribution, value proposition, pricing, case studies, analogues, access projections, contracting, training, onboarding, recruiting.  These are all the types of words that each category would have a series of words in it.  And it wasn't like I created 100 words.  We didn't have much time to put this together.  I just created the words that I knew would more than likely get a ping.
>
> THE COURT.  So your study, your work on this, assumed that if one or more of these words was used in a document, that was something that you were going to regard as a trade secret?
>
> THE WITNESS.  It would mean because I understand the methodologies and capabilities and frameworks that were in those documents at all times, if it had that ping in it, it would at least have that.  It may have more information in there.

(Id. at 153-54)[5]

The keywords chosen by Schiavi – and the corresponding categories of trade secret and/or confidential information each keyword purportedly identified – are reproduced in Plaintiffs' Exhibit 2 as follows:

| Distribution Methodologies, SOPs, FMV & Case Study Databases, Proposals | Value Propositon Frameworks, Methodologies, and Proposals | Pricing Research Methodologies, Case Studies, Proposals | Access Projections, Analogs, Contracting Strategies, Case Studies, Proprietary Terms/Concepts | Recruiting, Interviewing, Hiring, On Boarding, Training Internal Methods/Processes, | Project Scoping & Pricing Models | Staffing Model, Assumptions, Formulas, and reporting | Company culture Building Methodologies |
|---|---|---|---|---|---|---|---|
| KW Group 1 | KW Group 2 | KW Group 3 | KW Group 4 | KW Group 5 | KW Group 6 | KW Group 7 | KW Group 8 |
| Distribution | Value Prop | Pricing | Price Access | Recruiting | Pricing Model | Staffing | GCA |
| Fair Market Value | Value Proposition | Willingness to pay | Access | On Boarding | | Staffing Model | Office Meeting |
| FMV | Value Driver | List Price | Contracting | training | | | Word of the Year |
| SOP | | WAC Price | Net Price | new hire | | | Storm |
| Trade | | | Continuum | Fit It Grit | | | Transform |
| Retail | | | Access Mountain | | | | Elevate |
| Specialty Pharmacy | | | Access Objective | | | | Disrupt |
| | | | | | | | Convergeance |

---

[5] Although the Court's question referred to whether "one or more of these words was used in a document," Schavi's keyword search was directed only at the file title of the documents. (See Mar. 10, 2026 Trial Tr. 153)

(PX 2 at 414)

Accordingly, if keywords such as "trade," "retail," "recruiting," "on boarding," "training," "new hire," "office meeting," "storm," "elevate," "transform," and "disrupt" appeared in the file title of one of the 6,874 documents Jauregui had taken, Schiavi classified that document as a document that contained Precision trade secrets and confidential and proprietary information.  (Id.)  In selecting these keywords, Schiavi chose words that he knew would more than likely be in the titles of the Precision documents that Jauregui had taken; he selected "words that [he] knew would more than likely get a ping."  (Mar. 10, 2026 Trial Tr. 153-54)

## DISCUSSION

### I.    LEGAL STANDARD

"After the presentation of evidence, but before the case is submitted to the jury, Rule 50(a) authorizes either party to move for judgment as a matter of law."  Dupree v. Younger, 598 U.S. 729, 731 (2023).  Rule 50(a) authorizes the court "to resolve [an] issue against [a] party" so long as "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue."  Fed. R. Civ. P. 50(a)(1); see also LinkCo, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 493 (S.D.N.Y. 2002) (quoting Fed. R. Civ. P. 50(a)(1)) ("After a party presents its case, judgment as a matter of law is appropriate when 'there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue.'").  The Rule 50(a)(1) standard "largely 'mirrors' the summary-judgment standard, the difference being that district courts evaluate Rule 50(a) motions in light of the trial record rather than the discovery record.'"  Dupree, 598 U.S. at 731-732.

### II.    ANALYSIS

#### A.    Misappropriation of Trade Secrets Claims

9

"Under both the DTSA and New York law, a claimant bears the burden of identifying a purported trade secret with sufficient specificity." Syntel Sterling Best Shores Mauritius Ltd. v. The TriZetto Grp., Inc. ("Syntel Sterling"), 68 F.4th 792, 800 (2d Cir. 2023); see also Next Commc'ns, Inc. v. Viber Media, Inc., 758 F. App'x 46, 48 (2d Cir. 2018) (quoting Engleman v. David McKay Co., 73 A.D.2d 511, 511 (1st Dep't 1979)) ("To show that such a process, design, or operation constitutes a trade secret [under New York law], a party must describe the trade secret with 'specific and concrete information.'"). "The specificity requirement 'place[s] a defendant on notice of the bases for the claim being made against it,' . . . and allows a factfinder to determine whether certain information is, in fact, a trade secret." Id. at 801 (quoting Oakwood Laby's LLC v. Thanoo, 999 F.3d 892, 906 (3d Cir. 2021)) (internal citation omitted). "The existence of a trade secret, including whether it was adequately identified, is 'a fact-specific question to be decided on a case-by-case basis.'" Id. (quoting Oakwood Laby's, 999 F.3d at 906) As a fact question, it generally must be resolved by a jury. Id.

Syntel Sterling illustrates the type of evidence that a plaintiff must introduce in order to prevail on a trade secret claim. In that case, the Second Circuit considered a sufficiency challenge to a jury verdict in favor of plaintiff in a trade secret case. Id. at 800. The court concluded that there was sufficient evidence to support the jury's verdict that the 104 items identified by plaintiff were, in fact, trade secrets, for three reasons. First, "[f]or each trade secret, [fact witness] Noonan explained (1) what the secret was, (2) how the secret was developed, (3) the value of the secret to TriZetto, and (4) that the secret was maintained as confidential." Id. Second, plaintiffs' expert witness "presented several demonstratives linking the title of each individual trade secret to specific exhibits." Id. at 801; see id. (noting that "[t]hese

demonstratives listed the name, exhibit numbers, and general category for each asserted trade secret"). "Finally, the jury received the documents or source code tied to the asserted trade secrets." Id.

Here, however, only thirteen of the 6,874 "documents . . . tied to the asserted trade secrets" were offered into evidence.[6] Id. As a result, the jury will have no opportunity to review any of the remaining underlying documents and determine whether they do in fact contain trade secrets. Precision instead asks the Court to permit the jury to rely on Schiavi's analysis, which involved only a search of the file name, very little review of the underlying documents, and the use of common and innocuous terms in keyword searches, including words such as "trade," "retail," "recruiting," "on boarding," "training," "new hire," "office meeting," "storm," "elevate," "transform," and "disrupt." No rational jury could determine – based on the presence of words such as these in the file name – that these documents invariably contained Precision's trade secrets.

Moreover, no reasonable jury could conclude – based on Schiavi's testimony – that a particular document found in Schiavi's list of 6,874 documents contains a trade secret where that document was not introduced into evidence and Schiavi had not reviewed that document.

Schiavi's testimony that "virtually all" of the 6,874 Precision documents taken by Jauregui and listed in PX 1 contain "Precision's confidential business information" (March 9,

---

[6] The demonstratives used in Syntel Sterling – which "listed the name, exhibit numbers, and general category for each asserted trade secret" have no analogue in this case. Syntel Sterling, 68 F.4th at 801. At trial, Plaintiffs' counsel did not use a demonstrative that connected the files listed in PX 1 and PX 2 to the exhibits that were offered into evidence. Accordingly, the Court calculated the total number of trial exhibits that were both received in evidence and listed on PX 1 and 2 by cross-referencing the exhibits with (1) the files listed in PX 1 and 2 and (2) witness testimony connecting specific exhibits to these lists.

11

2026 Trial Tr. 127) is also completely inconsistent with PX 2 – also prepared by Schiavi – which asserts that 2,144 of the 6,874 Precision documents taken by Jauregui contain Precision's trade secrets and confidential information.  (See PX 2 at 415)

Two other witnesses offered testimony that involved identifying specific Precision documents that contain trade secrets.  Jake Graetz – Precision's Chief Business Officer – testified about PX 220, an ISA financial forecast dated February 2, 2018.  (Mar. 16, 2026 Trial Tr. 950)  This document – which was introduced into evidence – contains extremely detailed historical and projected financial performance data – including profit and loss data by month – as well as detailed compensation information for all ISA employees, including base salary and bonus.  (Id.)  The Court concludes that Graetz's testimony is sufficient to permit Precision to argue to the jury that PX 220 – which was admitted into evidence – contains trade secret and confidential and proprietary information.

Precision employee Lance Grady offered testimony as to the specific contents of certain misappropriated Precision files containing trade secret and proprietary information, including research databases and Excel files such as the Orphan Analog Database and the Decision Analytics Group formulary database, and the value these databases provided Precision.  (Mar. 17, 2026 Trial Tr. 1163-67)  Grady's testimony also addressed – with specificity – certain proprietary models developed by Precision, including Precision's "Relative Revenue Relative Demand" and "Deal View" models.  (Id. at 1182, 1195)  Given Grady's detailed testimony concerning these databases and proprietary models, Precision will be permitted to argue to the jury that these databases and proprietary models contain trade secret and confidential and proprietary information, even though the actual databases and models were not entered into evidence.

"'The existence, vel non, of a trade secret usually is treated as a question of fact,' and properly the province of the jury." Better Holdco, Inc. v. Beeline Loans, Inc., 666 F. Supp. 3d 328, 384 (S.D.N.Y. 2023) (quoting Chevron U.S.A., Inc. v. Tocen Serv., Inc., 813 F.2d 26, 29 (2d Cir. 1987)). Here, however, Precision elected to introduce almost none of the very documents that it claims contain trade secrets, thereby depriving the jury of the opportunity to make a reasoned, factual determination as to what the allegedly misappropriated documents contain, and whether their contents qualify as trade secrets. Given these circumstances, no reasonable jury could find that the documents not received in evidence actually contain Precision trade secrets. Accordingly – except for the databases, Excel files, and proprietary models that were the subject of specific testimony – Precision will be precluded from arguing to the jury that documents it chose not to introduce contain trade secrets.

## B.     Unfair Competition

"'The essence of an unfair competition claim under New York law is that the defendant has misappropriated the labors and expenditures of another' with 'some element of bad faith.'" Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32, 50-51 (2d Cir. 2019) (quoting Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037, 1044 (2d Cir. 1980)); see also Macy's Inc. v. Martha Stewart Living Omnimedia, Inc., 127 A.D.3d 48, 56 (1st Dept. 2015) ("It is well settled that the primary concern in unfair competition is the protection of a business from another's misappropriation of the business's organization [or its] expenditure of labor, skill, and money.") (internal quotations omitted). "Under New York law, a defendant engages in unfair competition if the defendant misappropriated and used the plaintiff's property or commercial advantage to compete against the plaintiff." Mercer Health & Benefits LLC v. DiGregorio, 307 F. Supp. 3d 326, 353-54 (S.D.N.Y. 2018) (citing ITC Ltd. v. Punchgini, Inc., 9 N.Y.3d 467, 477-478 (N.Y. 2007)).

13

New York "'recognize[s] two theories of common-law unfair competition: palming [or passing] off and misappropriation.'" CDC Newburgh Inc. v. STM Bags, LLC, 692 F. Supp. 3d 205, 225 (S.D.N.Y. 2023) (quoting Carson Optical Inc. v. eBay Inc., 202 F. Supp. 3d 247, 267 (E.D.N.Y. 2016) (quoting Punchgini, 9 N.Y. at 477)). Precision's unfair competition claim is premised on a misappropriation theory (see, e.g., Amended Complaint (Dkt. No. 42) ¶¶ 229-230) and offers "two possible predicates" for this claim: misappropriation of trade secrets and misappropriation of confidential information. See LinkCo, 230 F. Supp. 2d at 501. Having concluded that a reasonable jury could not find – except as to certain databases, Excel spreadsheets, and proprietary models that were the subject of specific testimony – that documents not offered into evidence contain trade secrets, the Court considers whether documents not offered into evidence can be used to support an unfair competition claim premised on confidential and proprietary information. See Id.

In every case this Court has identified where a New York unfair competition claim – premised on a misappropriation theory – has gone to trial, either the alleged misappropriated material was introduced at trial, or specific details concerning the misappropriated material were introduced. (See e.g., Paz Sys., Inc. v. Dakota Grp. Corp., 514 F. Supp. 2d 402, 409 (E.D.N.Y. 2007) (finding defendant liable at bench trial involving unfair competition claim predicated on the misappropriation of "disks [that] contained a copy of Paz's DBA database, including a purchase and sales order accounting program containing several years of sales, client, inventory and purchasing data"; noting that "[t]his DBA database represented Paz's entire financial business, including accounts receivable, general customer information, customer lists including inactive/active status, sales orders, inventory items, invoices, bid histories, vendor lists and quotation histories."); McKinnon Doxsee Agency, Inc. v.

14

Gallina, 187 A.D.3d 733, 738 (2nd Dept. 2020) ("Here, the record reveals that while employed by McKinnon Doxsee, the defendants electronically copied information from the subject books of business, including customer contact information and information regarding the customers' insurance policies.  The record, including the copies of the change of broker letters, also contains evidence from which it may be inferred that the defendants solicited some of those customers prior to their resignation from McKinnon Doxsee.  Under these circumstances, the record demonstrates that the defendants engaged in unfair competition."); Advanced Magnification Instruments of Oneonta, N.Y., Ltd. v. Minuteman Optical Corp., 135 A.D.2d 889, 890 (3rd Dept. 1987) (the evidence established that the following items were misappropriated:  "master list, which embraced the entire United States, recited the extent of each customer's sales activity; the accounts receivable list furnished current information on the customer's credit rating; and, significantly, the customer cards indicated those customers susceptible to telemarketing (then a new marketing technique in the optical supplies field) and other information, some of it personal, relating to the customer and the operation of the customer's office, gathered by sales personnel in the course of developing and servicing the customers by telephone."); Rosenberg, Minc & Armstrong v. Mallilo & Grossman, 798 N.Y.S.2d 322, 327 (N.Y. Sup. Ct. 2005) (concluding that "the names of the potential clients who called Rosenberg are sufficiently analogous to confidential information so as to support the misappropriation charge");  Corp. Interiors, Inc. v. Pappas, 784 N.Y.S.2d 919, 2004 WL 750507, at *3 (N.Y. Sup. Ct. Apr. 7, 2004) ("Thousands of documents had been exchanged and on the first day of testimony, fifty one (51) were admitted into evidence" in bench trial of unfair competition claim predicated on misappropriation of trade secrets and proprietary and confidential client information).

Here, however, the jury knows nothing about the contents of nearly all the thousands of documents that Precision alleges have been misappropriated. And because Precision did not offer these documents, the jury has no opportunity to review them and make a rational determination as to whether they contain information that conferred a commercial advantage on Precision.

In connection with its unfair competition claim, Precision argues that Jauregui misappropriated 6,874 Precision documents, that he shared these documents with colleagues at Blue Matter, and that Blue Matter used these Precision documents to compete against Precision in the market access space. (See, e.g., Mar. 9, 2026 Trial Tr. 26-27 ("Blue Matter used Precision's confidential business information as a ready-made foundation for its own business.")) In connection with Precision's unfair competition claim, the jury will be tasked with determining whether Blue Matter (1) misappropriated Precision's confidential and proprietary information for its own commercial advantage; and (2) did so in bad faith. Reed Constr. Data Inc. v. McGraw-Hill Cos., Inc., 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010) ("To state a claim for misappropriation of confidential information, a plaintiff must allege that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage."); Eagle Comtronics, Inc. v. Pico Prods., Inc., 256 A.D.2d 1202, 1203 (4th Dept. 1998) ("[T]he gravamen of a claim of unfair competition is the bad faith misappropriation of a commercial advantage belonging to another by infringement or dilution of a trademark or trade name or by exploitation of proprietary information or trade secrets.").

Because of Precision's failure to introduce the documents that it claims constituted its "commercial advantage" – a commercial advantage that was allegedly "unfairly neutralized" by Blue Matter's conduct, E.J. Brooks Co. v. Cambridge Sec. Seals, 31 N.Y.3d 441,

16

449 (N.Y. 2018) – the jury cannot evaluate whether the documents listed in PX1 and PX 2 did in fact provide Precision with a "commercial advantage." For all the reasons discussed above in connection with Precision's trade secret claims, there is no reliable evidence as to the nature of nearly all the documents that Jauregui took from Precision.

No reasonable jury could conclude from a list of file names and file paths, and from Schiavi's generalized testimony about the information one might expect to find in a file with a file name that contained one or more of his keywords – that the 6,874 files taken by Jauregui contain confidential and proprietary information that conferred a commercial advantage on Precision that was "neutralized" by Blue Matter's misappropriation. Id. Although Schiavi offered generalized testimony as to the utility of the 6,874 files misappropriated by Jauregui – as to documents not introduced – Precision has offered no specific evidence as to how these documents conferred a commercial advantage on Precision or assisted Blue Matter in competing in the market access space. As to documents that were not introduced, and about which there was no specific testimony, the jury thus lacks any basis to make a reasonable determination as to whether the documents listed in PX 1 and PX 2 files conferred a commercial advantage upon either Precision or Blue Matter. Accordingly, Precision will not be permitted to argue – in connection with its unfair competition claim – that the jury can rely on documents that were not received in evidence, except as to the research databases, Excel spreadsheets, and proprietary models about which Lance Grady testified.

### CONCLUSION

As set forth above, Precision will not be permitted to argue to the jury – as to its trade secret and unfair competition claims – that any document not received in evidence contains

17

trade secret and/or confidential and proprietary information, except as to research databases,

Excel files, and proprietary models that were the subject of specific testimony.

Dated:  New York, New York
        March 19, 2026

                                    SO ORDERED.

                                    _____
                                    Paul G. Gardephe
                                    United States District Judge